## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| COACH USA, INC., *et al.*,[1] | Case No. 24-11258 (_____) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING (A) PAYMENT OF PREPETITION OBLIGATIONS INCURRED IN THE ORDINARY COURSE OF BUSINESS IN CONNECTION WITH INSURANCE AND SURETY PROGRAMS, INCLUDING PAYMENT OF POLICY PREMIUMS, BROKER FEES, AND CLAIMS ADMINISTRATOR FEES, AND (B) CONTINUATION OF INSURANCE PREMIUM FINANCING PROGRAM; (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF

Coach USA, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby move the Court (this "Motion"), pursuant to sections 105(a), 363(b), and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of an interim order (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "Proposed Orders"), substantially in the form annexed hereto as Exhibit D and Exhibit E, respectively: (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, renew liability, property, and other

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/CoachUSA. The Debtors' mailing address is 160 S Route 17 North, Paramus, NJ 07652.

insurance and surety programs and pay policy premiums,[2] broker fees, and claims administrator fees arising thereunder or in connection therewith, including prepetition obligations arising in the ordinary course of business, and (b) continue, renew, or replace the Debtors' insurance premium financing agreement, including entering new premium financing agreements, as necessary and under substantially similar terms, in the ordinary course of business or in the Debtors' business judgment; (ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing; (iii) scheduling a final hearing with respect to the foregoing; and (iv) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Spencer Ware in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which was filed concurrently herewith.[3]  In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b), and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith

---

[2]      Certain policy premiums include additional expenses for Surcharges, Fees, Surplus Lines Taxes, and/or Fire Marshall Tax Taxes.

[3]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), and 364 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(m).

## BACKGROUND

3.     On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

4.     Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

5.     Information regarding the Debtors' history, business operations, capital structure, and secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the First Day Declaration.

## INSURANCE AND SURETY PROGRAMS

6.     In connection with the operation of their business, the Debtors maintain, (i) among others, insurance programs for directors and officers, employment practices and fiduciary liability, general liability, property, business automobile and garage, cyber, crime and terrorism, storage tank, environmental, and umbrella and excess liability, as described below

31729336.1

(collectively, the "Insurance Programs"),[4] through several different insurance carriers (each,

an "Insurance Carrier," and collectively, the "Insurance Carriers") including under the insurance

contracts listed on Exhibit A attached hereto,[5] and (ii) thirty (30) surety bonds (collectively,

the "Surety Bonds," and together, the "Surety Program") issued by Nationwide Mutual Insurance

Company, Travelers Casualty and Surety Company of America, Capitol Indemnity Corporation,

Old Republic Surety Company, and Atlantic Specialty Insurance Company (each, a "Surety

Carrier," and collectively, the "Surety Carriers"), as listed on Exhibit B attached hereto.

**A.        Management Liability Insurance Program**

7.        As is common with businesses of this kind, the Debtors maintain primary and

excess insurance coverage for all of their directors and officers that covers, among other things,

defense costs, settlements, and court awards from claims brought by third parties alleging that an

insured is liable for an error, misstatement, misleading statement, improper act, omission,

neglect, or breach of duty (collectively, the "Management Liability Insurance Program").

8.        Prior to the Petition Date, the policies underlying the Management Liability

Insurance Program were renewed until April 16, 2025 or August 1, 2024, as applicable. The

premiums for the Management Liability Insurance Program are approximately $1,855,330 in the

---

[4]        The descriptions of the Insurance Programs and the related PFA (as defined below) provided herein are intended only as a summary, and the actual terms of the foregoing shall govern in the event of any inconsistency with the descriptions set forth herein.

[5]        In addition to the Insurance Programs discussed herein, the Debtors maintain insurance policies with respect to the Debtors' workers' compensation program (the "Workers' Compensation Program"), which are listed on Exhibit A attached hereto.  The Workers' Compensation Program is described in further detail in the *Debtors' Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Wages, Salaries, and Other Compensation, (II) Authorizing Certain Employee Benefits and Other Associated Obligations, and (III) Granting Related Relief* (the "Employee Wage Motion") filed contemporaneously herewith.  Any relief requested with respect to the Workers' Compensation Program is requested in the Employee Wage Motion.

aggregate.[6]  The Debtors believe that there are no outstanding amounts under any of the policies comprising the Management Liability Insurance Program as of the Petition Date.

**B.      General Liability, Property, Automobile and Garage, Cyber, Crime and Terrorism, Storage Tank, Environmental, and Umbrella Insurance Programs**

9.      The Debtors maintain a general commercial liability insurance policy, which insures the Debtors for, among other things, products, accident, premises, and personal injury liability (the "General Liability Insurance Program").  Prior to the Petition Date, the policies underlying the General Liability Insurance Program were renewed until August 1, 2024 or August 15, 2024, as applicable.  The annual premiums for the General Liability Insurance Program are approximately $79,613 in the aggregate.[7]  The Debtors believe that there are no outstanding amounts under any of the policies comprising the General Liability Insurance Program as of the Petition Date.

10.      The Debtors also maintain a property insurance policy that insures the Debtors for, among other things, certain losses related to damages to the Debtors' personal and real property (the "Property Insurance Program").  Prior to the Petition Date, the policies underlying the Property Insurance Program were renewed until August 1, 2024 or August 15, 2024, as applicable.  The annual premiums for the Property Insurance Program are approximately $1,015,015 in the aggregate.  The Debtors believe that there are no outstanding amounts under any of the policies comprising the Property Insurance Program as of the Petition Date.

11.      The Debtors also maintain automobile and garage insurance policies (the "Automobile Insurance Program").  Prior to the Petition Date, the policies underlying the

---

[6]      The Debtors' most recent renewal of certain policies underlying the Management Liability Insurance Program includes a six (6)-year tail policy, which is included in the premium aggregate amount listed here.

[7]      The premiums associated with the Debtors' Canadian and U.S. insurance policies are paid in local currency.  However, all amounts listed in this Motion are reflected in USD, and any Canadian amounts have been converted to USD with a conversion rate of 0.75.

Automobile Insurance Program were renewed until August 1, 2024, August 15, 2024, or March 1, 2025, as applicable.  The annual premiums for the Automobile Insurance Program are approximately $1,159,927 in the aggregate.  The Debtors believe that there are no outstanding amounts under any of the policies comprising the Automobile Insurance Program as of the Petition Date.

12.     The Debtors also maintain a cyber liability insurance policy that insures the Debtors for, among other things, certain losses related to damages caused by information technology system failures or breaches and other security or privacy violations (the "Cyber Insurance Program").  Prior to the Petition Date, the Cyber Insurance Program was renewed until August 1, 2024.  The annual premium for the Cyber Insurance Program is approximately $120,244.  The Debtors believe that there are no outstanding amounts under the Cyber Insurance Program as of the Petition Date.

13.     The Debtors also maintain crime and terrorism insurance policies that insure the Debtors for, among other things, damages resulting from crimes or terrorist acts against the Debtors' property (the "Crime Insurance Program").  Prior to the Petition Date, the Crime Insurance Program was renewed until August 1, 2024.  The annual premiums for the Crime Insurance Program are approximately $44,332 in the aggregate.  The Debtors believe that there are no outstanding amounts under the Crime Insurance Program as of the Petition Date.

14.     The Debtors also maintain a storage tank insurance policy that insures the Debtors for, among other things, certain losses related to damage to the Debtors' storage equipment or related property (the "Storage Tank Insurance Program").  Prior to the Petition Date, the Storage Tank Insurance Program was renewed until August 1, 2024.  The annual premium for the

Storage Tank Insurance Program is approximately $75,450.  The Debtors believe that there are no outstanding amounts under the Storage Tank Insurance Program as of the Petition Date.

15.     The Debtors also maintain an environmental insurance policy that insures the Debtors for, among other things, damages resulting from certain environmental risks (the "Environmental Insurance Program").  Prior to the Petition Date, the policies underlying the Environmental Insurance Program were renewed until August 1, 2024 or August 15, 2024, as applicable.  The annual premiums for the Environmental Insurance Program are approximately $61,673 in the aggregate.  The Debtors believe that there are no outstanding amounts under any of the policies comprising the Environmental Insurance Program as of the Petition Date.

16.     The Debtors also maintain an umbrella insurance policy that insures the Debtors for certain losses in excess of the coverage provided by the Debtors' primary insurance policies (the "Umbrella Insurance Program").  Prior to the Petition Date, the policies underlying the Umbrella Insurance Program were renewed until August 15, 2024 or May 1, 2025, as applicable. The annual premiums for the Umbrella Insurance Program are approximately $4,746,714 in the aggregate.  The Debtors believe that there are no outstanding amounts under any of the policies comprising the Umbrella Insurance Program as of the Petition Date.

17.     Similarly, the Debtors also maintain multiple excess liability insurance policies that insure the Debtors for certain losses in excess of the coverage provided by the Debtors' primary insurance policies (the "Excess Liability Insurance Program").  Prior to the Petition Date, the policies underlying the Excess Liability Insurance Program was renewed until August 1, 2024, August 15, 2024, or May 1, 2025, as applicable.  The annual premiums for the Excess Liability Insurance Program are approximately $1,402,514 in the aggregate.  The Debtors

believe there are outstanding amounts owed under the Excess Liability Insurance Program in the approximate amount of $716,667 as of the Petition Date.

**C.      High Deductible Policy**

18.      Debtor Coach USA Administration, Inc. is a named insured for a commercial automotive policy provided by Momentum Risk Retention Group, Inc. ("Momentum"). Momentum is a captive insurance company as defined in Section 38-90-10 of the Code of Laws of South Carolina 1976, as amended from time to time.  While Momentum is not a debtor in these proceedings, its common stock is wholly owned by certain of the Debtors.  The policy with Momentum provides for a liability deductible of $4,950,000, and responds to claims filed in certain states in which the Debtors operate and which are not otherwise covered by that certain Automobile Insurance Program with Greenwich Insurance Company.

**D.      Financed Insurance Program**

19.      It is not economically advantageous for the Debtors to pay the premiums on all of the Insurance Programs on an annualized basis.  Accordingly, from time to time, in the ordinary course of business, the Debtors finance the premiums on certain of the Insurance Programs. Prior to the Petition Date, the Debtors were financing the premiums under certain of the Canadian policies (collectively, the "Financed Insurance Program")[8] in their General Liability Insurance Program, Property Insurance Program, Automobile Insurance Program, Environmental Insurance Program, Umbrella Insurance Program, and Excess Liability Insurance Program, pursuant to a premium finance agreement (the "PFA"), with First Insurance Funding Corporation of Canada (the "Premium Financing Company"), a copy of which is attached hereto as Exhibit C.  As of the Petition Date, the Debtors have paid the PFA in full.

---

[8]      Exhibit A attached hereto identifies which of the insurance policies are included in the Financed Insurance Program.

31729336.1

20.    The Debtors seek authority to make additional payments under the Financed

Insurance Program, if necessary, and renew the PFA and/or enter into new premium financing

programs, as necessary, under substantially similar terms, in the ordinary course of business and

in their business judgment.

**E.    Surety Program**

21.    The Surety Bonds are issued in favor of various federal, state, and industry

regulatory agencies to guarantee certain obligations related to various state licenses and permits.

The Debtors are required to maintain the Surety Bonds under certain state law in order to

lawfully conduct their business and operations in the applicable jurisdiction.[9]  This, in turn,

requires the Debtors to:  (a) satisfy premiums and related obligations as and when due,

(b) maintain and/or provide sureties with collateral as necessary, (c) renew or potentially acquire

additional bonding capacity as needed in the ordinary course of their businesses and in their

business judgment, (d) request releases from terminated or obsolete bonding obligations,

(e) cancel, revise, and/or supplement the Surety Bonds, and (f) execute other agreements in the

ordinary course of business, as needed, in connection with the Surety Bonds.  Failing to provide,

maintain, or timely replace the Surety Bonds may prevent the Debtors from lawfully continuing

to conduct their business in the applicable state.

22.    The purpose of a surety bond is to shift the risk of the Debtors' nonperformance

or nonpayment from the Debtors to a surety.  Unlike an insurance policy, if a surety carrier

incurs a loss on a surety bond, it is entitled to recover the full amount of that loss from the

principal.  To that end, the Debtors are party to, or may become party to, certain indemnity

---

[9]    The Debtors also maintain certain other bonds in connection with obligations to their employees or initial bids for government contract (collectively, the "Zero-Premium Bonds").  As of the Petition Date, the Debtors are not required to pay a premium or provide cash collateral for the Zero-Premium Bonds, and do not owe any amounts under the Zero-Premium Bonds.

31729336.1

agreements that set forth the Surety Carriers' rights to recover from the Debtors (the "Surety Indemnity Agreements").[10]  Pursuant to the Surety Indemnity Agreements, the Debtors agree to indemnify the Surety Carriers from any loss, cost, or expense which the surety may incur on account of the issuance of any bonds on behalf of the Debtors.  The Surety Indemnity Agreements also allow the Surety Carriers to request collateral security from the Debtors from time to time.  Additionally, if any Surety Carrier chooses not to renew a Surety Bond it issued pursuant to the Surety Indemnity Agreements, the Surety Bond will stay in effect until the end of its term.  The Debtors seek authority to continue performing under and, as applicable, enter into the Surety Indemnity Agreements in the ordinary course of business.

23.    The annual premiums for the Surety Program are approximately $285,542 in the aggregate.[11]  The Debtors believe that there are no outstanding amounts under the Surety Program as of the Petition Date.

**F.    Broker Fees**

24.    In connection with the Insurance Programs and the Surety Program, the Debtors obtain brokerage and risk management services from Lockton Companies, BFL CANADA Risk and Insurance Services, Inc., and Aon Insurance Managers (USA) Inc. (together, the "Brokers").  The Brokers assist the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the design and development of the Insurance Programs and Surety Program, and the procurement and negotiation of the Insurance Programs, the PFA, and Surety Program, and enabling the Debtors to obtain those policies and the PFA on

---

[10]    Currently, the Debtors are parties to Surety Indemnity Agreements with:  Nationwide Mutual Insurance Company, dated as of April 12, 2021; Travelers Casualty and Surety Company of America, dated as of March 14, 2019; and Atlantic Specialty Insurance Company, dated April 19, 2024.

[11]    The Atlantic Specialty Insurance Company bond (Ending in 3128) required cash collateral of $114,000.  It also has a premium amount of $1,995, which is included in the aggregate amount.

advantageous terms at competitive rates.  As of the Petition Date, the Debtors believe that there are no outstanding amounts on account of fees to the Brokers for their services ("Broker Fees"). To the extent that the Debtors incur Broker Fees on account of postpetition services provided by the Brokers, the Debtors seek authority to pay such Broker Fees in the ordinary course of business.

**G.    Claims Administrator Fees**

25.    Sedgwick Claims Management Services, Inc. and Insurance Services Office (Verisk) (together, the "Claims Administrators") process claims under, among others, the Workers' Compensation Program, the General Liability Insurance Program, and the Automobile Insurance Program.  The Debtors pay the Claims Administrators certain fees for their services on a monthly and quarterly basis, respectively, in advance.  The Debtors believe that approximately $260,000 is due as of the Petition Date or will become due within twenty-one (21) days of the Petition Date on account of fees owed to the Claims Administrators for their services ("Claims Administrator Fees").

## RELIEF REQUESTED

26.    By this Motion, the Debtors seek entry of the Proposed Orders (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, renew or modify the Insurance Programs and Surety Program and pay policy premiums, Broker Fees, and Claims Administrator Fees arising thereunder or in connection therewith, including such prepetition obligations arising in the ordinary course of business, and (b) continue making payments under the Financed Insurance Program, if necessary, and enter into new premium financing programs, as necessary, under substantially similar terms, in the ordinary course of business and in their business judgment, (ii) authorizing the Banks to honor and process check and electronic transfer

31729336.1

requests related thereto, (iii) scheduling a final hearing with respect to the foregoing, and

(iv) granting related relief.

## BASIS FOR RELIEF

**A.     The Court Should Authorize, but Not Direct, the Debtors, in Their Discretion, to Make Necessary Payments Related to the Insurance Programs and the Surety Program and to Maintain, Renew, or Replace Existing Insurance Policies and the Surety Bonds**

27.     Maintaining the Debtors' insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transaction.  Authority to pay any prepetition amounts that may be due and owing related to the Insurance Programs—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits, or proceeds provided under the Insurance Programs—is necessary, as the insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtors' assets and, in most cases, such coverage is required by the various contracts and state and federal laws that govern the Debtors.  *See, e.g.*, 28 U.S.C. § 959(b) (chapter 11 debtor obligated under federal law to operate chapter 11 business according to the laws of the states where business and properties are located).  Further, under the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain during the Chapter 11 Cases certain types of insurance coverage, which coverage is provided by certain of the policies included in the Insurance Programs.

28.     The same goes for the Surety Program.  Maintaining the Debtors' operating licenses and permits under the Surety Program is crucial for the Debtors' ability to operate in the ordinary course.  As explained above, the Debtors are required to maintain the Surety Bonds under certain state laws in order to lawfully conduct their business and operations in the

31729336.1

applicable jurisdiction.  *See* 28 U.S.C. § 959(b) (chapter 11 debtor obligated under federal law to operate chapter 11 business according to the laws of the states where business and properties are located).  The Surety Bonds are issued in favor of certain state governments and agencies to guarantee the Debtors' obligations pursuant to the Debtors' permits with those governments and agencies.  The Surety Program is essential to the ability of the Debtors to operate in the states where the Debtors hold such permits and, therefore, to the value of the Debtors' assets during these Chapter 11 Cases.

29.     In addition, the Debtors may need to renew or replace certain of their Insurance Programs or certain Surety Bonds during the pendency of these Chapter 11 Cases.  The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in one or more of the Insurance Carriers increasing future insurance premiums, declining to renew the insurance policies or refusing to enter into new insurance agreements with the Debtors.  Similarly, the nonpayment of premiums under the Surety Program could result in the Debtors' loss of key permits and licenses for their operations.  If either the Insurance Programs or the Surety Program lapses without renewal, the Debtors may be exposed to substantial liability for first party property claims and third-party liability claims, to the detriment of all parties in interest.

30.     Similarly, the services provided by the Brokers are critical to ensuring that the Debtors obtain the necessary insurance coverage and operating permits on advantageous terms at competitive rates, and the Brokers have a significant amount of institutional knowledge regarding the Debtors' insurance and surety needs.  If the Debtors were forced to replace the Brokers, the Debtors would necessarily be required to spend time, energy, and resources getting a new broker up to speed on the Debtors' insurance and surety needs.

31729336.1

31.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  A bankruptcy court may use its equitable powers under section 105 of the Bankruptcy Code to permit a debtor in possession to pay prepetition claims when payment is necessary to effectuate a debtor's bankruptcy goals and essential to the continued operation of the business.  *See Miltenberger v. Logansport. C. & S.W.R. Co.*, 106 U.S. 286 (1882); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (under necessity of payment doctrine prepetition claims may be paid if essential to the continued operation of the business during reorganization); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (recognizing that necessity of payment doctrine authorizes payment of prepetition claims when "such payment is essential to the continued operation of the business").

32.     In addition, the Court may authorize the Debtors to pay prepetition premiums to maintain the Insurance Program and the Surety Program under section 363(b) of the Bankruptcy Code.  In particular, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Thus, under this section, a court may authorize a debtor to pay certain prepetition claims.  *See Ionosphere Clubs*, 98 B.R. 174, 175-77 (S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code); *In re UAL Corp.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction); *In re Jillian's Entm't Holdings, Inc.*, Case No. 04-33192 (DTS) (Bankr. W.D. Ky. June 22, 2004).

33.     Furthermore, reflecting the recognition that payment of prepetition claims associated with a debtor's insurance program or maintenance of necessary operating permits is critical to a debtor's chapter 11 efforts, courts in this District have routinely granted the relief requested herein in other chapter 11 cases.

**B.     The Court Should Authorize, but Not Direct, the Debtors, in Their Discretion, to Make Necessary Payments Under the Financed Insurance Program, If Necessary, and Renew the Financed Insurance Agreement and/or Enter Into New Premium Financing Agreements in the Ordinary Course of Business**

34.     If the Debtors are unable to make payments under the PFA, if necessary, the Premium Financing Company may be permitted to terminate the PFA.  The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost.  If the Debtors are required to obtain replacement insurance and to pay a lump sum premium for such insurance in advance, this payment may be the same or greater than what the Debtors are required to pay under the PFA.  Even if the Premium Financing Company is not permitted to terminate the PFA, any interruption of payments would severely and adversely affect the Debtors' ability to finance premiums for future policies.  Thus, in view of the importance of maintaining the related insurance coverage and preserving their cash flow by financing the insurance premiums, the Debtors believe that it is in the best interest of their estates and creditors for the Court to authorize the Debtors to honor the obligations under the PFA.  Any other alternative would likely require considerable cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.

35.     Generally, the PFA grants the Premium Financing Company a security interest in the Financed Insurance Program, including all unearned premium, return premium, dividend, and loss payments thereof.  Security interests created by premium finance arrangements generally are recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums

financed pursuant to such agreements.  *See TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.)*, 67 B.R. 990, 994-95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp. (In re Auto-Train Corp.)*, 9 B.R. 159, 164-66 (Bankr. D.D.C. 1981).  Therefore, if the Debtors fail to make required payments under the PFA, the Premium Financing Company could seek relief from the automatic stay, either to cancel the Financed Insurance Program in accordance with the terms of the PFA or to seek adequate protection of its investment.  *See Universal Motor Express*, 72 B.R. 208, 211 (Bankr. W.D.N.C. 1987) (recognizing that a default under the financing arrangement and the resulting decline in value of the unearned premiums justified relief from the automatic stay).  Accordingly, and since the PFA has been paid in full, the Debtors' request the authority to continue making the premium financing payments required under the PFA, if necessary.

36.     In addition, the Court should also authorize the Debtors to renew the PFA and/or enter into new premium financing programs postpetition in the ordinary course of business.

37.     Section 363(c)(1) of the Bankruptcy Code provides that "the trustee [or a debtor in possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1). Section 363(b)(1) of the Bankruptcy Code provides that, "[t]he trustee [or debtor in possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

38.     The Debtors submit that the renewal of the PFA and/or the execution of new premium finance agreements constitute transactions in the ordinary course of business, within

the meaning of section 363(c)(1) of the Bankruptcy Code, that do not require prior bankruptcy court approval.

39.      Neither the Bankruptcy Code nor its legislative history provide a framework for analyzing whether a transaction is in the ordinary course of business.  The Third Circuit, however, has developed a two-part inquiry, including a "horizontal dimension" test and a "vertical dimension" test, for determining whether a transaction is in the ordinary course of business under section 363(c)(1).  *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see, e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 791 (Bankr. D. Del. May 24, 2007); *Braunstein v. McCabe*, 571 F. 3d 108, 124-25 (1st Cir. 2009).  The horizontal dimension test focuses on whether, from an industry wide perspective, the transaction is "of the sort commonly undertaken by companies in that industry."  *In re Roth Am., Inc.*, 975 F.2d 202 at 953.  The vertical dimension test (or creditor's expectation test) focuses on the vantage point of a hypothetical creditor and inquires whether the transaction subjects the creditor to economic risk of a nature different from those the creditor accepted when it decided to extend credit to the debtor.  *Id.*

40.      The Debtors believe that the renewal of the PFA and/or the execution of new premium finance agreements satisfies the "horizontal dimension" test because maintaining insurance coverage and entering into related premium financing agreements is a common industry practice.  *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1154 (Fed. Cir. 1986) (Such a premium financing agreement is a "common commercial arrangement.").  The "vertical dimension" test is also satisfied because the maintenance of insurance under premium finance agreements does not subject estate creditors to any economic risk, but rather, serves to protect them from economic risk.  Accordingly, the renewal of the PFA and/or the execution of new

premium finance agreements constitute "ordinary course" uses of estate property under
section 363(c)(1) of the Bankruptcy Code. *See In re Roth Am.*, 975 F.2d at 952 n.4 (citing *U.S.
v. Estate of Deutscher*, 115 B.R. 592, 598-99 (M.D. Tenn. 1990), for the proposition that
"trustee's use of fund to . . . reinstate insurance was in ordinary course of business").

41.     Indeed, the Debtors submit that it may be outside the ordinary course of business
for them to fail to renew the PFA or enter into new premium finance agreements to obtain
insurance coverage. *See In re Lavigne*, 114 F.3d 379, 383-84 (2d Cir. 1994) (cancellation of
insurance policy was not in the ordinary course of business). Nevertheless, out of an abundance
of caution, the Debtors have filed this Motion seeking entry of the Proposed Orders, to the extent
necessary, approving, under section 363 of the Bankruptcy Code, the Debtors' postpetition
renewal of the PFA and/or the execution of new premium finance agreements.

42.     The Court may also authorize the Debtors to enter into new premium finance
agreements pursuant to section 364(c)(2) of the Bankruptcy Code. Section 364(c)(2) of the
Bankruptcy Code authorizes, after notice and a hearing, a debtor in possession to obtain debt
secured by a lien on property of the estate. *See* 11 U.S.C. § 364(c)(2). Under any new premium
finance agreement, the counterparty would likely require that the Debtors grant a security interest
in the unearned premiums under the financed policies. *See generally In re Schwinn Bicycle Co.*,
200 B.R. 980, 982 (Bankr. N.D. Ill. 1996) (describing insurance premium financing agreements).

43.     Section 364(c) authorizes a debtor, in the exercise of its business judgment, to
incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is
in the best interests of the estates. *See, e.g.*, *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125-
26 (Bankr. S.D.N.Y. May 14, 2009) (granting motion for postpetition financing upon finding that
(a) "no comparable credit [was] available on more favorable terms"; (b) that the debtors needed

postpetition financing to "to preserve [their] assets and continue their operations; and (c) that the terms and conditions of the DIP Documents had been negotiated in good faith); *In re Budget Group, Inc.*, Case No. 02-12152, 2002 Bankr. LEXIS 1050 (Bankr. D. Del. Aug, 1, 2002) (authorizing funding of acquisition of property on a secured basis where acquired property was necessary to maintain operations and debtor could not obtain such funding on an unsecured basis); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Because a borrowing to maintain essential insurance coverage is in the best interests of the Debtors' estates, the Court should authorize the Debtors to renew the PFA and/or execute new premium finance agreements postpetition.

**C.    The Court Should Authorize the Banks to Honor and Process the Debtors' Payments Related to the Insurance Programs, the Surety Program, the PFA, the Broker Fees, and the Claims Administrator Fees**

44.    The Debtors also request the Court to authorize the Banks, when requested by the Debtors, in their discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors further request that all of the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

## SATISFACTION OF BANKRUPTCY RULE 6003

45.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief within twenty-one (21) days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm. Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where

the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

46.     Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein to avoid harm to the Debtors' customers and other third parties.  Unlike Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone.  Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally.  *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the estate").  Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary junctions.  *See 9* Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 4001.07[b][3] (16th ed. 2018) (discussing source of "irreparable harm" standard under Rule 4001(c)(2)).  Courts will routinely consider third-party interests when granting such relief.  *See, e.g.*, *Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

47.     As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without Court authorization for the relief requested herein. Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

## <u>REQUEST FOR WAIVER OF STAY</u>

48.     The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until

31729336.1

the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## **DEBTORS' RESERVATION OF RIGHTS**

49.     Nothing contained herein is intended or should be construed as:  an admission of the validity of, or a promise to pay with respect to, any claim against the Debtors; a waiver of the Debtors' rights to dispute any claim; or an approval, assumption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

## **NOTICE**

50.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the 30 largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to Wells Fargo Bank, National Association, (i) Goldberg Kohn, 55 E. Monroe St., Chicago, Illinois 60603 (Attn: William A. Starshak (William.Starshak@goldbergkohn.com), Dimitri G. Karcazes (Dimitri.Karcazes@goldbergkohn.com), Prisca M. Kim (prisca.kim@goldbergkohn.com), and Nicole P. Bruno (Nicole.Bruno@goldbergkohn.com)) and (ii) Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware (Attn: John H. Knight (knight@rlf.com) and Paul N. Heath (heath@rlf.com)); (d) the Banks; (e) the Insurance Carriers; (f) the Surety Carriers; (g) the Premium Financing Company; and (h) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of

31729336.1

the nature of the relief requested herein, the Debtors submit that no other or further notice is

necessary.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested

herein and such other and further relief as the Court may deem just and proper.

Dated:    June 11, 2024
         Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Joseph M. Mulvihill*
Sean M. Beach (No. 4070)
Joseph M. Mulvihill (No. 6061)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email:    sbeach@ycst.com
         jmulvihill@ycst.com
         tpowell@ycst.com
         rlamb@ycst.com

*- and -*

Alston & Bird LLP
J. Eric Wise (*pro hac vice* admission pending)
Matthew K. Kelsey (*pro hac vice* admission pending)
William Hao (*pro hac vice* admission pending)
90 Park Avenue
New York, New York 10016
Tel:     (212) 210-9400
Fax:     (212) 210-9444
Email:    eric.wise@alston.com
         matthew.kelsey@alston.com
         william.hao@alston.com

*Proposed Counsel to the Debtors and Debtors in Possession*

31729336.1

# EXHIBIT A

**List of Insurance Contracts**

| INSURANCE CARRIER | INSURANCE PROGRAM | POLICY NUMBER | EFFECTIVE DATE; MONTHS COVERED | FINANCED PROGRAM (YES/NO) | APPROXIMATE ANNUAL PREMIUM |
|---|---|---|---|---|---|
| XL Insurance America, Inc. | Workers' Compensation Program | RWD943541211 | 08/01/2023; 12 | No | $1,130,754 |
| XL Insurance America, Inc. | Workers' Compensation Program | RWR943541311 | 08/01/2023; 12 | No | $473,578 |
| XL Specialty insurance Company | Workers' Compensation Program (Excess Policy) | RWE943541511 | 08/01/2023; 12 | No | $24,423 |
| Momentum Risk Retention Group, Inc. | Automobile Insurance Program | RRG26224872-23 | 08/01/2023; 12 | No | $111,500 |
| Greenwich Insurance Co. | Automobile Insurance Program | RAD943765210 | 08/01/2023; 12 | No | $81,885 |
| Greenwich Insurance Co. | Automobile Insurance Program | RAD943800404 | 03/01/2024; 12 | No | $1,730 |
| Greenwich Insurance Co. | General Liability Program | RGD943765110 | 08/01/2023; 12 | No | $25,127 |
| Greenwich Insurance Co. | General Liability Program | RGD300112507 | 08/01/2023; 12 | No | $14,782 |
| Aegis Casualty Consortium 4890 | Excess Liability Insurance Program | NAMCA2201348 | 05/01/2022; 36 | No | $645,000 |
| Magna Carta Insurance Ltd. | Excess Liability Insurance Program | NAMCA2201361 | 05/01/2022; 36 | No | $71,667 |
| Lexington Insurance Company | Umbrella Insurance Program | 066320729 | 05/01/2024; 12 | No | $954,450 |

31729336.1

| INSURANCE CARRIER | INSURANCE PROGRAM | POLICY NUMBER | EFFECTIVE DATE; MONTHS COVERED | FINANCED PROGRAM (YES/NO) | APPROXIMATE ANNUAL PREMIUM |
|---|---|---|---|---|---|
| Scottsdale Insurance Company | Umbrella Insurance Program | XLS2004217 | 05/01/2024; 12 | No | $1,060,500 |
| AXIS Insurance Company | Umbrella Insurance Program | P-001-003705397-01 | 05/01/2024; 12 | No | $689,325 |
| Endurance American Specialty | Umbrella Insurance Program | EXT30059337400 | 05/01/2024; 12 | No | $689,325 |
| Columbia Casualty Company | Umbrella Insurance Program | 7092061495 | 05/01/2024; 12 | No | $530,250 |
| Lexington Insurance Company | Umbrella Insurance Program | 066320730 | 05/01/2024; 12 | No | $530,250 |
| Great American Insurance Co. | Crime Insurance Program | SAA-461-74-50-10-00 | 08/01/2023; 12 | No | $29,632 |
| Crum & Forster Specialty Insurance Company | Cyber Insurance Program | CYB-106260 | 08/01/2023; 12 | No | $120,244 |
| Ascot Specialty Insurance Company | Excess Liability Insurance Program | EOXS2210001511-02 | 08/01/2023; 12 | No | $102,500 |
| Federal Insurance Company (Chubb) | Management Liability Insurance Program | 8258-2115 | 04/16/2023; 24 | No | $198,417 |
| Berkshire Hathaway Specialty Insurance Co. | Management Liability Insurance Program (Excess Policy) | 47-EMC-307549-05 | 04/16/2023; 24 | No | $122,352 |

31729336.1

| INSURANCE CARRIER | INSURANCE PROGRAM | POLICY NUMBER | EFFECTIVE DATE; MONTHS COVERED | FINANCED PROGRAM (YES/NO) | APPROXIMATE ANNUAL PREMIUM |
|---|---|---|---|---|---|
| Old Republic Insurance Company | Management Liability Insurance Program (Excess Policy) | ORPRO13101491 | 04/16/2023; 24 | No | $100,461 |
| Endurance American Insurance Company (Sompo) | Management Liability Insurance Program (Excess Policy) | MPX30001040304 | 04/16/2023; 24 | No | $99,466 |
| Freedom Specialty Insurance (Nationwide) | Management Liability Insurance Program (Excess Policy) | XMF2209010 | 04/16/2023; 24 | No | $99,026 |
| North River Insurance Company (C&F) | Management Liability Insurance Program (Excess Policy) | 575-103019-5 | 04/16/2023; 24 | No | $99,026 |
| Liberty Insurance Underwriters, Inc. | Management Liability Insurance Program (Excess Policy) | DOLAABZSOT004 | 04/16/2023; 24 | No | $103,443 |
| Old Republic Insurance Company | Management Liability Insurance Program (Excess Policy) | ORPRO15100337 | 04/16/2023; 16 | No | $72,743 |
| Old Republic Insurance Company | Management Liability Insurance Program (Excess Policy) | ORPRO14100579 | 04/16/2023; 16 | No | $4,986 |
| National Union Fire Insurance Company of Pittsburgh, PA | Management Liability Insurance Program (Excess Policy) | 04-693-36-38 | 4/25/2024; 12 | No | $60,300 |
| Berkley Insurance Company | Management Liability Insurance Program (Excess Policy) | BPRO8108201 | 04/25/2024,12 | No | $50,250 |
| Lexington Insurance Company (AIG) | Property Insurance Program | 51567027 | 08/01/2023; 12 | No | $997,695 |

3

| INSURANCE CARRIER | INSURANCE PROGRAM | POLICY NUMBER | EFFECTIVE DATE; MONTHS COVERED | FINANCED PROGRAM (YES/NO) | APPROXIMATE ANNUAL PREMIUM |
|---|---|---|---|---|---|
| Harleysville Insurance Company | Excess Liability Insurance Program | CRA0000039 | 08/01/2023; 12 | No | $180,000 |
| Landmark American Insurance Co. (RSUI) | Excess Liability Insurance Program | LHD935690 | 08/01/2023; 12 | No | $178,020 |
| Starr Surplus Lines Insurance Co. | Excess Liability Insurance Program | ITC11901723 | 08/01/2023; 12 | No | $72,188 |
| Indian Harbor Insurance Company | Crime Insurance Program | US00120709SP23A | 08/01/2023; 12 | No | $14,700 |
| Ironshore Specialty Insurance Company | Storage Tank Insurance Program | ISPILLSCB4G-0003 | 08/01/2023; 12 | No | $75,450 |
| Ironshore Specialty Insurance Company | Environmental Insurance Program | ISPILLSB6W3S-001 | 02/05/2024; 6 | No | $23,079 |
| Travelers Insurance Company of Canada | Automobile Insurance Program | 277JG5590 | 08/15/2023; 12 | Yes | $911,180 |
| Travelers Insurance Company of Canada | Automobile Insurance Program | 277JB7315 | 08/15/2023; 12 | Yes | $17,601 |
| Travelers Insurance Company of Canada | Automobile Insurance Program | 277JB7316 | 08/15/2023; 12 | Yes | Part of Premium for policy 277JB7315 |
| Travelers Insurance Company of Canada | General Liability Insurance Program | TRV0047727 | 08/15/2023; 12 | Yes | $38,222 |

4

| INSURANCE CARRIER | INSURANCE PROGRAM | POLICY NUMBER | EFFECTIVE DATE; MONTHS COVERED | FINANCED PROGRAM (YES/NO) | APPROXIMATE ANNUAL PREMIUM |
|---|---|---|---|---|---|
| Northbridge General Insurance Corporation | Umbrella Insurance Program | P04121054 | 08/15/2023; 12 | Yes | $281,687 |
| Aviva Insurance Company of Canada | Excess Liability Insurance Program | 81817845 | 08/15/2023; 12 | Yes | $147,420 |
| Travelers Insurance Company of Canada | Property Insurance Program | TRV0048025 | 08/15/2023; 12 | Yes | $16,050 |
| Royal & Sun Alliance Insurance Company of Canada | Property Insurance Program | REB746056 | 08/15/2023; 12 | Yes | $623 |
| Zurich Insurance Company Ltd. | Environmental Insurance Program | 8614625 | 08/15/2023; 12 | Yes | $37,153 |

5

## <u>EXHIBIT B</u>

**List of Surety Bonds**

| SURETY CARRIER | PRINCIPAL | BOND NUMBER | OBLIGEE | NATURE OF BOND | EXPIRATION DATE | BOND PREMIUM |
|---|---|---|---|---|---|---|
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901064247 | Baltimore County, Maryland | Miscellaneous Transportation Services | 08/06/2024 | $21,823 |
| Nationwide Mutual Insurance Company | Suburban Trails, Inc. | 7901023836 | Board of Education of the Township of East Brunswick | Miscellaneous Transportation Services | 06/30/2024 | $1,179 |
| Nationwide Mutual Insurance Company | Butler Motor Transit, Inc. | 7901064252 | Commonwealth of Pennsylvania, Department of Transportation | Miscellaneous Transportation Services | 08/31/2024 | $2,500 |
| Nationwide Mutual Insurance Company | Hudson Transit Lines, Inc. | 7901064244 | New Jersey Turnpike Authority | Turnpike, Bridge or Toll | 09/26/2024 | $375 |
| Nationwide Mutual Insurance Company | Rockland Coaches, Inc. | 7901064243 | New Jersey Turnpike Authority | Turnpike, Bridge or Toll | 09/26/2024 | $1,500 |
| Nationwide Mutual Insurance Company | Suburban Transit Corp. | 7901064242 | New Jersey Turnpike Authority | Turnpike, Bride or Toll | 09/16/2024 | $3,375 |
| Nationwide Mutual Insurance Company | Independent Bus Company, Inc. | 7901064248 | New Jersey Turnpike Authority | Turnpike, Bride or Toll | 08/16/2024 | $1,500 |
| Nationwide Mutual Insurance Company | Olympia Trails Bus Company, Inc. | 7901064239 | New Jersey Turnpike Authority | Turnpike, Bride or Toll | 08/21/2024 | $4,500 |
| Atlantic Specialty Insurance Company | Hudson Transit Lines, Inc. | 800153128 | New York State Thruway Authority | Turnpike, Bride or Toll | 04/24/2025 | $1,995 |
| Travelers Casualty and Surety Company of America | Chenango Valley Bus Lines, Inc. | 107980476 | New York State Thruway Authority | Turnpike, Bridge or Toll | 01/24/2025 | $100 |
| Old Republic Surety Company | Butler Motor Transit, Inc. | B150039099 | Pennsylvania Turnpike Commission | Motor Vehicle or Truck | 01/24/2025 | $250 |

| SURETY CARRIER | PRINCIPAL | BOND NUMBER | OBLIGEE | NATURE OF BOND | EXPIRATION DATE | BOND PREMIUM |
|---|---|---|---|---|---|---|
| Travelers Casualty and Surety Company of America | Transportation Management Services, Inc. | 107982900 | Pennsylvania Turnpike Commission | Turnpike, Bridge or Toll | 01/24/2025 | $400 |
| Nationwide Mutual Insurance Company | Pacific Coast Sightseeing Tours & Charters, Inc. | 7901064233 | People of the State of California | Motor Vehicle or Truck | 06/30/2024 | $2,500 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901064240 | State of Maryland, Department of Transportation | Miscellaneous Transportation Services | 03/30/2025 | $10,734 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901064224 | State of Maryland, Department of Transportation | Moving and Hauling Contracts | 09/01/2024 | $58,123 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901064223 | State of Maryland, Department of Transportation | Moving and Hauling Contracts | 09/01/2024 | $12,409 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901064222 | State of Maryland, Department of Transportation | Moving and Hauling Contracts | 09/01/2024 | $13,899 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901064221 | State of Maryland, Department of Transportation | Moving and Hauling Contracts | 09/01/2024 | $14,059 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901064220 | State of Maryland, Department of Transportation | Moving and Hauling Contracts | 09/01/2024 | $32,184 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901064219 | State of Maryland, Department of Transportation | Moving and Hauling Contracts | 09/01/2024 | $48,667 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901023832 | State of Maryland, Department of Transportation | Class A Contract | 09/01/2024 | $24,684 |
| Nationwide Mutual Insurance Company | Dillion's Bus Service, Inc. | 7901023894 | State of Maryland, Department of Transportation | Moving and Hauling Contracts | 9/30/2024 | $26,033 |

2

31729336.1

| SURETY CARRIER | PRINCIPAL | BOND NUMBER | OBLIGEE | NATURE OF BOND | EXPIRATION DATE | BOND PREMIUM |
|---|---|---|---|---|---|---|
| Atlantic Specialty Insurance Company | Elko, Inc. | 810016733 | State of Nevada | Motor Vehicle | 01/24/2025 | $1,050 |
| Nationwide Mutual Insurance Company | Powder River Transportation Services, Inc. | 7901064254 | State of Wyoming, Department of Workforce Services | Self-Insurer, Guarantee Premium Assessment | 08/31/2024 | $250 |
| Nationwide Mutual Insurance Company | All West Coachlines, Inc. | 7901064251 | United States of America, Department of Defense, Surface Deployment and Distribution Command | Turnpike, Bridge or Toll | 08/31/2024 | $625 |
| Travelers Casualty and Surety Company of America | Megabus Northeast, LLC | 107980301 | Virginia Department of Motor Vehicles | Miscellaneous Transportation Services | 01/24/2025 | $250 |
| Nationwide Mutual Insurance Company | Community Coach, Inc. | 7901077933 | Wayne County Board of Education | Miscellaneous Transportation Services | 01/03/2025 | $128 |
| Nationwide Mutual Insurance Company | Sam Van Galder, Inc. | 7901064263 | Wisconsin Department of Transportation | Motor Vehicle | 12/31/2024 | $100 |
| Nationwide Mutual Insurance Company | Power River Transportation Services, Inc. | 7901064238 | Wyoming Department of Transportation | Miscellaneous Transportation Services | 08/08/2024 | $250 |
| Capitol Indemnity Corporation | Wisconsin Coach Lines, Inc. | A190079667 | Wisconsin Department of Transportation | Motor Vehicle | 09/01/2024 | $100 |

3

**<u>EXHIBIT C</u>**

**PFA**



Refer to this agreement number
in all correspondence

901-5200555

## Account Opening Statement

| Agent or Broker submitting Agreement (Name and Address) | Insured (Name and Address) |
|---|---|
| BFL CANADA RISK & INS SERVICES INC - TOR<br>181 UNIVERSITY AVE.<br>SUITE 1700<br>TORONTO, ON M5H 3M7 | TRENTWAY-WAGAR INC.<br>TRENTWAY-WAGAR (PROPERTIES) INC.<br>2015 FISHER DRIVE, UNIT 101<br>PO BOX 4017<br>PETERBOROUGH, ON K9J 7B1 |

### Withdrawal details as of 08-Sep-2023

Date account will be debited
The amount of $407,249.23 will be debited on 10-Sep-2023.

| Down Payment Amount | + | Application Fee | + | Past due installments | - | Credit(s) applied | - | Amount retained by broker | = | Total amount to be withdrawn |
|---|---|---|---|---|---|---|---|---|---|---|
| $407,249.23 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $407,249.23 |

NOTE: All funds are in Canadian Dollars (CAD).
Any negative balance will be applied toward future installments.

### Installment Schedule

| Date | Amount | Payment Type |
|---|---|---|
| 10-Sep-2023 | $407,249.23 | Down Payment |
| 15-Sep-2023 | $186,472.96 | Installment |
| 15-Oct-2023 | $186,472.96 | Installment |
| 15-Nov-2023 | $186,472.96 | Installment |
| 15-Dec-2023 | $186,472.96 | Installment |
| 15-Jan-2024 | $186,472.96 | Installment |
| 15-Feb-2024 | $186,472.96 | Installment |
| 15-Mar-2024 | $186,472.96 | Installment |
| 15-Apr-2024 | $186,472.96 | Installment |
| 15-May-2024 | $186,472.96 | Installment |

If you have any questions, please contact your insurance broker or contact FIRST Insurance Funding of Canada at (888) 232-2238.



<table>
<tr><td>Refer to this agreement number<br>in all correspondence<br>901-5200555</td></tr>
</table>

## Notice of assignment and acceptance (Insured)

| Agent or Broker submitting Agreement (Name and Address) | Insured (Name and Address) |
|---|---|
| BFL CANADA RISK & INS SERVICES INC - TOR<br>181 UNIVERSITY AVE.<br>SUITE 1700<br>TORONTO, ON M5H 3M7 | TRENTWAY-WAGAR INC.<br>TRENTWAY-WAGAR (PROPERTIES) INC.<br>2015 FISHER DRIVE, UNIT 101<br>PO BOX 4017<br>PETERBOROUGH, ON K9J 7B1 |

## Payment schedule

| Date of notice and acceptance | First payment due | Day of month payments are due | Number and frequency of installments |
|---|---|---|---|
| 08-Sep-2023 | 15-Sep-2023 | 15th | 9 Monthly |

| Total Premiums | - | Down Payment | = | Principal balance | + | Finance Charge | = | Balance Due | Amount of Installment | Application Fee | Flat rate* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $2,036,246.15 | | $407,249.23 | | $1,628,996.92 | | $49,259.72 | | $1,678,256.64 | $186,472.96 | $0.00 | 2.42% |

*The flat rate represents an annual percentage rate of [7.20%]. This amount is based on a declining balance and accrues interest from the effective date of the policy. Interest under this Agreement is stated at an annual rate, calculated monthly.

## Description of Policy(ies)

| Policy prefix and number | Inception date | Name of each insurance company<br>Name of each general agent or policy issuing agent (if applicable) | Type of coverage | Policy term in months | Premium |
|---|---|---|---|---|---|
| | | See the attached Schedule of Policies | | | |

| Subtotal | $1,933,246.00 + Taxes | $26,865.88 + Broker fees | $76,134.27 + Other Policy Fees | $0.00 = Cash price | $2,036,246.15 |
|---|---|---|---|---|---|

(total premiums including taxes)

### To the Buyer (Insured)

We are pleased to notify you of the acceptance of the Premium Finance Agreement (Agreement), which you recently executed in connection with the purchase of your insurance. The Agreement has been assigned to (or entered into directly with us, accepted by) FIRST Insurance Funding of Canada. (FIRST)

If you have selected pre-authorized payments for your Agreement, please be advised that any down payment, application fee or installments that are past due will be withdrawn within the next 48 hours.

Under the terms of the Agreement you have appointed FIRST Insurance Funding of Canada as your Attorney-in-Fact or Mandatory to cancel the policies in certain circumstances, including in the event you fail to pay the installments as agreed in the prescribed dates as follows:

### Installment Schedule

| Date | Amount | Payment Type |
|---|---|---|
| 10-Sep-2023 | $407,249.23 | Down Payment |
| 15-Sep-2023 | $186,472.96 | Installment |
| 15-Oct-2023 | $186,472.96 | Installment |
| 15-Nov-2023 | $186,472.96 | Installment |
| 15-Dec-2023 | $186,472.96 | Installment |
| 15-Jan-2024 | $186,472.96 | Installment |
| 15-Feb-2024 | $186,472.96 | Installment |
| 15-Mar-2024 | $186,472.96 | Installment |
| 15-Apr-2024 | $186,472.96 | Installment |
| 15-May-2024 | $186,472.96 | Installment |



Refer to this agreement number
in all correspondence
901-5200555

## Notice of assignment and acceptance (Insured)
### Description of policy(ies)

| Policy prefix and number | Inception date | Name of each insurance company Name of each general agent or policy issuing agent (if applicable) | Type of coverage | Policy term in months | Premium |
|---|---|---|---|---|---|
| 277JG5590 | 15-Aug-2023 | C00035-Travelers Insurance - Toronto | AUTO | 12 | $1,224,746. |
| 277JB7315 | 15-Aug-2023 | C00035-Travelers Insurance - Toronto | GARA | 12 | $11,202.00 |
| 277JB7316 | 15-Aug-2023 | C00035-Travelers Insurance - Toronto | GARA | 12 | $13,369.94 |
| TRV0047727 | 15-Aug-2023 | C00035-Travelers Insurance - Toronto | GL | 12 | $54,962.51 |
| CBC 0124715 | 15-Aug-2023 | C00084-Northbridge General - Toronto | UMB | 12 | $379,675.47 |
| 81817845 | 15-Aug-2023 | C00015-Aviva Canada - Toronto (King St) | XSGLPL | 12 | $198,702.31 |
| TRV0048025 | 15-Aug-2023 | C00035-Travelers Insurance - Toronto | PROP | 12 | $23,129.12 |
| REB746056 | 15-Aug-2023 | C00048-Intact Insurance - Toronto | EQUI | 12 | $898.14 |
| 8614625 | 15-Aug-2023 | C00123-Zurich Canada - Toronto | POLL | 12 | $53,425.65 |

Subtotal __$1,933,246.00__ + Taxes __$26,865.88__ + Broker fees __$76,134.27__ + Other Policy Fees __$0.00__ = Cash price __$2,036,246.15__

(total premiums including taxes)

Please note that credit card payments are subject to a 2.97% System Access Fee. Changes to your amount owing will result in changes to the System Access Fee.
If you have any questions please contact your insurance broker or contact FIRST Insurance Funding of Canada at 1 888 232 2238.
LATE PAYMENTS JEOPARDIZE YOUR INSURANCE PROTECTION. KEEP YOUR INSURANCE IN FORCE BY ENSURING THAT YOUR PAYMENTS CLEAR YOUR BANK ACCOUNT ON PRESENTATION.



## Commercial Premium Finance Agreement

| Quote number: | All figures expressed are in: |
|---|---|
| 8171712 | CAD |

| Name and address of Insured (exactly as shown on policies) ("Insured") | Name and address of Insured's broker ("Broker") |
|---|---|
| Trentway-Wagar Inc.<br>Trentway-Wagar (Properties) Inc.<br>2015 Fisher Drive, Unit 101<br>PO Box 4017<br>Peterborough, ON K9J 7B1 | BFL CANADA Risk & Ins Services Inc - Tor<br>181 University Ave.<br>Suite 1700<br>Toronto, ON M5H 3M7<br>Phone: (800) 668-5901 |

### Payment schedule

| Down payment percentage | Number of payments | Day of month payments are due | First payment due date |
|---|---|---|---|
| 20.00% | 9 / Monthly | 15 | 15-Sep-2023 |

Subsequent payments are due on the same day of each succeeding period.

| Total premiums | - | Total down payment | = | Amount financed | + | Finance charge | = | Total of payments and amount of the charge | Amount of each payment | Application Fee | Flat rate* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $2,036,246.15 | | $407,249.23 | | $1,628,996.92 | | $49,259.72 | | $1,678,256.64 | $186,472.96 | $0.00 | 2.42% |

*The flat rate represents an annual percentage of 7.20% and is calculated by dividing the finance charge by the sum of the total premium plus the application fee. This amount is booked on a declining balance and accrues interest from policy effective dates. Interest under this Agreement is stated at an annual rate, calculated monthly.

### Schedule of policies covered by this Agreement ("Schedule")

Together with any policies subsequently purchased in addition to, in substitution for, or in replacement or extension, thereof, regardless of whether they are of the same type, for the same policy term, with the same or different Insured(s) or for different premium amounts (collectively, the "Policies").

| Broker code | Policy number | Full name of insurance company of branch reporting office and full name of general agent | Type of Insurance | Minimum earned % | Term in months | Policy effective date | Policy Premium |
|---|---|---|---|---|---|---|---|
| | 277JG5590 | C00035-Travelers Insurance - Toronto | AUTO | 0.00% | 12 | 15-Aug-2023 | $1,214,906.00 |
| | 277JB7315 | C00035-Travelers Insurance - Toronto | GARA | 0.00% | 12 | 15-Aug-2023 | $11,202.00 |
| | 277JB7316 | C00035-Travelers Insurance - Toronto | GARA | 0.00% | 12 | 15-Aug-2023 | $12,266.00 |

### Broker's representations and warranties

In connection with the Policies, the Broker also represents and warrants that: 1) the Insured received a copy of this Agreement and authorized the transaction; 2) if the Broker has agreed to collect the cash down payment, and/or any instalments due from the Insured, Broker has collected such payment; 3) the listed Policies are in full force and effect, and the information contained in the Schedule is correct; 4) the Broker is the authorized policy issuing broker of the insurers or the Broker placing the coverage directly with the insurer on all Policies except as indicated in the Schedule; 5) no direct company bill, audit, or reporting form policies, or policies subject to retrospective rating or to minimum earned premium, are included, except as indicated in the Schedule or specifically disclosed to FIRST Insurance Funding of Canada (FIRST), and the deposit of provisional premiums is not less than anticipated premiums to be earned for the full Policies' term; 6) the Policies can be cancelled by the Insured or FIRST (or its successors or assignees) with proper notice, and the unearned premiums will be computed by standard short rate or pro-rata tables; 7) to the best of Broker's knowledge, there are no bankruptcy, receivership or other insolvency proceedings affecting the Insured or Broker; 8) Broker shall hold FIRST harmless from, and be liable to FIRST for, any costs, damages or other expenses (including attorney's fees) incurred by FIRST or its assignee as a result of or in connection with violation of these representations and warranties, Broker breach of the Agreement, or from errors, omissions, and inaccuracies of Broker in preparing this Agreement; 9) Broker recognizes the Insured's assignment of the unearned premium to FIRST; 10) to hold in trust for FIRST any payments made or credited to the Insured through or to the undersigned, directly or indirectly, actually or constructively, by the insurers or FIRST and pay the monies and any unearned commission to FIRST promptly upon demand to satisfy the indebtedness of Insured without any deduction of amounts owed by Insured to Broker; 11) to the best of Broker's knowledge, the Policies do not require advance notice of cancellation to any party (other than notice required to be given by FIRST), are not for a term of less than one year or subject to any other liens, and have not been paid for other than as described herein; 12) Broker will promptly remit all funds received from FIRST and the Insured for the Policies due to the insurers issuing such Policies; and 13) Broker is not an agent of FIRST and is not authorized to bind FIRST and has not made any representation to the contrary.

By _____ Date _____
          (Signature of Broker)         (Name and Title)

*For Reference Purpose Only*

### Acceptance by Insured

The Insured has received a copy of the Agreement and read it in its entirety. Upon execution of this Agreement, Insured(s), jointly and severally if more than one, acknowledges and agrees to all terms and provisions herein. If the Insured is not an individual, the undersigned is authorized to sign this Agreement on behalf of all named insureds. The Insured is not required to enter into this financing arrangement as a condition for obtaining insurance.

By _____ Date _____
          (Signature of Insured)         (Name and Title)

*For Reference Purpose Only*



## Commercial Premium Finance Agreement

Schedule of policies covered by this Agreement ("Schedule")

Together with any policies subsequently purchased in addition to, in substitution for, or in replacement or extension, thereof, regardless of whether they are of the same type, for the same policy term, with the same or different Insured(s) or for different premium amounts (collectively, the "Policies").

| Broker code | Policy number | Full name of insurance company of branch reporting office and full name of general agent | Type of Insurance | Minimum earned % | Term in months | Policy effective date | Policy Premium |
|---|---|---|---|---|---|---|---|
| | TRV0047727 | C00035-Travelers Insurance - Toronto | GL | 0.00% | 12 | 15-Aug-2023 | $50,962.00 |
| | CBC 0124715 21 | C00084-Northbridge General - Toronto | UMB | 0.00% | 12 | 15-Aug-2023 | $375,582.00 |
| | 81817845 | C00015-Aviva Canada - Toronto (King St) | XSGLPL | 25.00% | 12 | 15-Aug-2023 | $196,560.00 |
| | TRV0048025 | C00035-Travelers Insurance - Toronto | PROP | 0.00% | 12 | 15-Aug-2023 | $21,400.00 |
| | REB746056 | C00048-Intact Insurance - Toronto | EQUI | 0.00% | 12 | 15-Aug-2023 | $831.00 |
| | 8614625 | C00123-Zurich Canada - Toronto | POLL | 0.00% | 12 | 15-Aug-2023 | $49,537.00 |

Subtotal  $1,933,246.00 + Taxes  $26,865.88 + Broker fees  $76,134.27 + Other Policy Fees  $0.00 = Cash price  $2,036,246.15

(total premiums including taxes)

Terms and conditions

1.  AGREEMENT TO PAYMENT. In consideration of the payment by FIRST of the Amount Financed and subject to the terms and conditions set out in this Agreement, the Insured agrees to pay FIRST the Total of Payments in accordance with the terms of this Agreement. The Insured shall have the option of utilizing any FIRST accepted digital payment methods to credit FIRST. If so notified by the Insured or Broker, FIRST is authorized to debit the Insured's account transacting as FIRST INSURANCE with all amounts specified in debit slips or other media that, in either case, purport to represent monthly payments due under the terms of this Agreement. This authorization shall extend to include any revised payment amounts which may become due from revisions to this Agreement, rejected payments, or other amounts due to FIRST. This authorization may be revoked on thirty days prior written notice by the Insured to FIRST. To obtain more information on your right to cancel/recourse, you may contact your financial institution or visit www.payments.ca.

2.  WARRANTY OF ACCURACY. Insured warrant that all Policies are in full force and effect and that is has not and will not assign any specific interest in the unearned premiums for the policies. FIRST is authorized by Insured to insert the names of insurers, policy numbers and first instalment due date in this Agreement if omitted or if any financed policy has not been issued at the time of signing. Insured represents that none of the Policies are for personal, household or family purposes, including without limitation for the business of farming in the Provinces of Alberta or Prince Edward Island or for the business of fishing in Prince Edward Island. Insured further warrants that no insolvency proceedings is instituted by or against Insured, it has paid in full to Broker or FIRST the down payment and any past due instalments, and FIRST need not notify or obtain consent from another party to effect cancellation of the Policies.

3.  ACCEPTANCE. This Agreement will not become effective until accepted in writing by FIRST, and upon acceptance, is a valid and enforceable contract. FIRST reserves the right to charge the Insured $0.00 as a fee for the establishment of this loan facility.

4.  SECURITY INTEREST. The Insured assigns and grants to FIRST a security interest in the Policies, including all gross unearned premiums plus applicable taxes that may accrue by reason of the cancellation or termination of the Policies under the terms thereof for any reason whatsoever, dividend payments or other income arising under the Policies, and loss payments which reduce unearned premium, subject to any mortgagee or loss payee interest. If any premiums related to any financed policy could be fully earned in the event of loss, FIRST shall be named a loss-payee with respect to the policy.

5.  POWER OF ATTORNEY. The Insured hereby irrevocably appoints FIRST (and any of FIRST's employees or agents) as attorney-in-fact and agent with full power of substitution and full authority, to, (i) cancel the Policies in accordance with the provisions herein, (ii) receive all sums assigned to FIRST, and (iii) execute and deliver on behalf of the Insured all documents, forms and notices relating to the Policies in furtherance of this Agreement. The Insured agrees that this right to cancel will terminate only after all of Insured's indebtedness under this Agreement is paid in full. This appointment is by onerous title and is coupled with an interest, and the Insured hereby represents and warrants that it has the authority to appoint FIRST as such attorney-in-fact and agent on behalf of each of the Insured's affiliates.

6.  PREPAYMENT. The Insured may prepay its loan in full at any time and receive a refund of the unearned finance charge as calculated by the Rule of 78s. If there is an outstanding credit balance owing to the Insured of $10.00 or less, FIRST shall not be required to refund it.

7.  LATE & RETURNED PAYMENTS. The Insured agrees upon default in payment of any instalment to pay a delinquency charge of 5% of the delinquent payment amount. Missed payments jeopardize insurance coverage; Insured shall ensure payments are honoured on the due date to keep insurance in force. Insured agrees that, in the event any of its payment is returned to FIRST or is otherwise not honoured, then Insured shall pay FIRST a returned payment charge not to exceed $50.00 per occurrence or otherwise as stated in writing during any subsequent renewal term.

8.  ASSIGNMENT. All rights given to FIRST shall benefit its successors and assignees, and FIRST may transfer its rights under this Agreement without Insured's consent. Insured shall not assign this Agreement or Policies without FIRST's written consent, except for adding mortgagees or loss payees.

9.  DEFAULT/CANCELLATION. Insured is in default under this Agreement if a) a payment is not received by FIRST when due, b) a proceeding in bankruptcy, receivership, insolvency or other proceeding is instituted by or against Insured, c) any representation or warranty of Insured or Broker contained herein is not true and accurate or misleading in any respect, or d) Insured fails to comply with any of the terms of this or any other Agreement with FIRST. At the time of default, all amounts due under this Agreement become immediately due and payable and the Insured is liable for all amounts described herein, and interest shall accrue thereon at the interest rate of 18.00% per annum, calculated monthly, on the unpaid balance as of the scheduled due date of the first delinquent payment leading to termination of the Policies until the date of payment in full of such outstanding balance. Upon default, FIRST has no further obligation under this Agreement or by applicable law. If a default by the Insured results in cancellation of any of the Policies, the Insured agrees to pay to FIRST a Cancellation Charge in each case not to exceed $100.00. If cancellation occurs, the Insured agrees to pay FIRST interest on the balance due at the contract rate, or at the maximum lawful rate, until the balance is paid in full.

10. RIGHTS AFTER POLICIES CANCELLED. After any of the Policies are cancelled, whether by FIRST, Insured, or the insurance companies listed in the Schedule, FIRST has the right to receive all unearned premiums and other funds assigned to FIRST as security herein and to apply them to Insured's unpaid balance under this Agreement or any other agreement between the Insured and FIRST. Receipt of unearned premiums does not constitute payment of instalments to FIRST, in full or in part. If the amount received is more than the amount owed by Insured, any excess amount will be refunded to Insured; the minimum refund is $10.00. If the amount received is less than the amount owed by Insured, Insured shall be responsible for the discrepancy. Insured agrees that the insurance companies may rely exclusively on FIRST's representations regarding the Policies.

11. REINSTATEMENT. Insured agrees that any payments made and accepted after a Notice of Cancellation has been sent to insurers shall not constitute reinstatement or obligate FIRST to request reinstatement of such Policies, and Insured acknowledges that FIRST has no authority to reinstate coverage, and such payments may be applied to Insured's indebtedness hereunder. FIRST may request insurers to reinstate the Policies if all outstanding payments are brought up to date.

12. COLLECTION COSTS. FIRST may take all necessary actions to enforce payment of any deficiency and debt generally of Insured. Receipt and acceptance by FIRST of any refund of unearned premium or any other amount shall be without prejudice to the right of FIRST to proceed with legal action against Insured to recover payment of any amount not satisfied. Insured agrees to pay attorney fees, court costs and other collection costs to FIRST if a balance is referred to an attorney or collection agent who is not a salaried employee of FIRST to collect money Insured owes.

13. AUTHORITY. Broker is not an agent of FIRST and Broker cannot bind FIRST. FIRST is not an agent of any insurer and is not liable for any acts or omissions of any insurer. Insured acknowledges that: a) it has chosen to do business with Broker and the insurers, and that the insolvency, fraud, defalcation or other action or failure by any of them shall not relieve or diminish Insured's obligations to FIRST; b) FIRST is not the assignee of the obligations of the insurers, and FIRST has no liability whatsoever in respect of the Policies; and c) Broker has the authority to bind Insured in the event of changes or amendments to this Agreement, including the addition of additional premiums and renewals, and FIRST is under no obligation to obtain the signature of Insured.

14. ADDITIONAL PREMIUMS. The funds paid by FIRST shall be applied only for the premiums due at the time the Policies are issued. Insured shall pay to the insurer(s) any additional premiums or any other sums that become due. Insured or Broker may request that FIRST finance additional policies and/or additional premium during the term of this Agreement, and if FIRST agrees and issues a revised Notice of Acceptance, this Agreement shall be deemed amended accordingly. Should FIRST assign the same account number to any further extensions of credit, then a) this Agreement and other loan documents identified by the account number shall be deemed to comprise a single and indivisible loan transaction, b) any default under any component of the transaction shall constitute a default under the entire transaction, and c) any unearned premium relating to any component of the transaction may be collected and applied by FIRST to the entire loan transaction balance. FIRST may charge $35 for each endorsement or other change request resulting in the terms of this Agreement being modified.

15. CONTINUOUS PAY. Where Insured chooses the Continuous Premium Finance option, the following provisions shall apply: a) this Agreement shall provide continuous financing for insurance premiums and is an ongoing contract which may be, at FIRST's option, renewed or extended at the request of Insured or Broker; b) this Agreement may be renewed annually for the policy terms and premium amounts identified in a Renewal Notice executed by Insured and/or Broker and received by FIRST; c) each term and condition of this Agreement shall remain in full force and effect during any renewal term notwithstanding any change of insurer, coverage, premium or payment schedule; d) a down payment as stated herein shall be paid to FIRST by Insured and shall be maintained by Insured annually in an amount equal in proportion to that in the original term, and Insured authorizes FIRST to (i) continue pre-authorized withdrawals until written notice of cancellation or Renewal Notice is received by FIRST and (ii) credit any excess or collect any downfall of down payment from the Insured; e) FIRST may decline any extension of credit or renewal of this Agreement in its sole and absolute discretion; and f) financing by FIRST for any renewal term will be calculated at current rates.

16. GOVERNING LAW. To the maximum extent permitted by law, this Agreement shall be deemed made in and governed by the laws applicable in the Province of Ontario, and the parties hereto irrevocably attorn to the non-exclusive jurisdiction of the courts of such Province in respect of matters arising from this Agreement. For insureds in the Provinces of Quebec and New Brunswick, this Agreement shall be governed by the laws of those provinces and the federal legislation applicable therein.

17. LIABILITY. Broker and Insured hereby release, remise and forever discharge FIRST of and from any and all actions, causes of action, suits, claims, demands and liabilities whatsoever which either of them hereinafter can, shall or may have for or by reason of or in any way arising out of any cancellation or termination of any Policies by FIRST or any insurer.

18. GENERAL. This Agreement may be executed in any number of counterparts, each shall be deemed an original, and all taken together shall constitute one and the same instrument. If any part of this Agreement is determined to be invalid or unenforceable, the remaining provisions of the Agreement shall continue in full force and effect. Acceptance of late or partial payments shall not be deemed a waiver by FIRST of any other provisions of this Agreement. The insured acknowledges and agrees that their personal information may be communicated, transmitted through, accessed, and/or stored in a jurisdiction outside the province or country where it is collected. This Agreement constitutes the entire agreement between FIRST and Insured with respect to the matters set out herein and may not be modified, except as agreed upon in writing by FIRST and Insured.

# EXHIBIT D

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| COACH USA, INC., *et al.*,[1] | Case No. 24-11258 (____) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING (A) PAYMENT OF PREPETITION
OBLIGATIONS INCURRED IN THE ORDINARY COURSE OF BUSINESS IN
CONNECTION WITH INSURANCE AND SURETY PROGRAMS, INCLUDING
PAYMENT OF POLICY PREMIUMS, BROKER FEES, AND CLAIMS
ADMINISTRATOR FEES, AND (B) CONTINUATION OF INSURANCE
PREMIUM FINANCING PROGRAM; (II) AUTHORIZING BANKS
TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER
REQUESTS RELATED THERETO; (III) SCHEDULING A FINAL
HEARING; AND (IV) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing*

*(A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in*

*Connection with Insurance and Surety Programs, Including Payment of Policy Premiums,*

*Broker Fees, and Claims Administrator Fees, and (B) Continuation of Insurance Premium*

*Financing Program; (II) Authorizing Banks to Honor and Process Check and Electronic*

*Transfer Requests Related Thereto; (III) Scheduling a Final Hearing; and (IV) Granting Related*

*Relief* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession

(collectively, the "Debtors"); and this Court having reviewed the Motion; and this Court having

found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/CoachUSA. The Debtors' mailing address is 160 S Route 17 North, Paramus, NJ 07652.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

*Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and this Court having found that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and this Court having considered the First Day Declaration; and a hearing having been held to consider the relief requested in the Motion; and upon the record of the hearing on the Motion and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and this Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are authorized to maintain the Insurance Programs and the Surety Program without interruption, and to renew, supplement, modify, or extend (including through obtaining "tail" coverage) the Insurance Programs, the Surety Program, or enter into new insurance policies or new surety bonds, and to incur and pay policy premiums, broker fees, and claims administrator fees arising thereunder or in connection therewith, in accordance with the same practices and procedures as were in effect prior to the Petition Date, or as may be determined by the Debtors in their business judgment.

31729336.1

3.      The Debtors are authorized, but not directed, to pay, honor, or otherwise satisfy premiums, claims, deductibles, retrospective adjustments, administrative fees, broker fees (including, without limitation, the Broker Fees), claims administrator fees (including, without limitation, the Claims Administrator Fees), and any other obligations that were due and payable or related to the period prior to the Petition Date on account of each of the Insurance Programs (including the Financed Insurance Program) and the Surety Program up to an aggregate amount of $976,667.

4.      The Debtors are authorized, but not directed, to perform under the Surety Indemnity Agreements, including maintaining, renewing, and/or providing credit support, letters of credit, or other collateral in connection therewith and consistent with past practice, and to enter into new or related agreements in the ordinary course of business.  Notwithstanding anything to the contrary Surety Indemnity Agreements, the Debtors' filing of these Chapter 11 Cases shall not constitute a default thereunder.

5.      The Debtors are authorized, but not directed, to (a) continue, in the ordinary course of business, the Financed Insurance Program, and renew the PFA and/or enter into new premium financing agreements, as necessary, under substantially similar terms, and (b) make payments under the Financed Insurance Program and the PFA and any renewed PFA or new premium financing programs as the same become due in the ordinary course of business.

6.      The final hearing shall take place on _____, 2024 at __:__ _.m. (prevailing Eastern Time).  Any objections or responses to the Motion shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2024 and served on (a) the Office of the United States Trustee for the District of Delaware (Attn: Richard Schepacarter (Richard.Schepacarter@usdoj.gov)), (b) Alston & Bird LLP, 90 Park Avenue, New York, New

31729336.1

York 10016 (Attn: J. Eric Wise (eric.wise@alston.com), Matthew K. Kelsey (matthew.kelsey@alston.com), and William Hao (william.hao@alston.com)), (c)  Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Rodney Square, Wilmington, Delaware 19801 (Attn: Joseph M. Mulvihill (jmulvihill@ycst.com) and Rebecca L. Lamb (rlamb@ycst.com)), (d) counsel to any statutory committee appointed in these Chapter 11 Cases, and (e) counsel to Wells Fargo Bank, National Association, (i) Goldberg Kohn, 55 E. Monroe St., Chicago, Illinois 60603 (Attn: William A. Starshak (William.Starshak@goldbergkohn.com), Dimitri G. Karcazes (Dimitri.Karcazes@goldbergkohn.com), Prisca M. Kim (prisca.kim@goldbergkohn.com), and Nicole P. Bruno (Nicole.Bruno@goldbergkohn.com)) and (ii) Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801 (Attn: John H. Knight (knight@rlf.com) and Paul N. Heath (heath@rlf.com)).  If no objections are timely filed, the Court may enter a final order without further notice or hearing.

7.      Nothing in the Motion or this Interim Order, or the Debtors' payment of any claims pursuant to this Interim Order, shall be deemed or construed as:  (a) an admission as to the validity of, or a promise to pay with respect to, any claim or lien against the Debtors or their estates, (b) a waiver of the Debtors' right to dispute any claim or lien, or (c) an admission of the priority status of any claim, whether under section 503(b)(9) of the Bankruptcy Code or otherwise.

8.      Nothing herein shall be deemed to constitute the postpetition assumption of any executory contract under section 365 of the Bankruptcy Code or authority to lift or modify the automatic stay set forth in section 362 of the Bankruptcy Code.

31729336.1

4

9.      The requirements set forth in Bankruptcy Rule 6003(b) are satisfied because the relief requested in the Motion, as granted hereby, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

12.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

## <u>EXHIBIT E</u>

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| COACH USA, INC., *et al.*,[1] | Case No. 24-11258 (____) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. ___ & ___** |

**FINAL ORDER (I) AUTHORIZING (A) PAYMENT OF PREPETITION
OBLIGATIONS INCURRED IN THE ORDINARY COURSE OF BUSINESS IN
CONNECTION WITH INSURANCE AND SURETY PROGRAMS, INCLUDING
PAYMENT OF POLICY PREMIUMS, BROKER FEES, AND CLAIMS
ADMINISTRATOR FEES, AND (B) CONTINUATION OF INSURANCE
PREMIUM FINANCING PROGRAM; (II) AUTHORIZING BANKS
TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER
REQUESTS RELATED THERETO; (III) SCHEDULING A FINAL
HEARING; AND (IV) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance and Surety Programs, Including Payment of Policy Premiums, Broker Fees, and Claims Administrator Fees, and (B) Continuation of Insurance Premium Financing Program; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); and this Court having reviewed the Motion; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/CoachUSA. The Debtors' mailing address is 160 S Route 17 North, Paramus, NJ 07652.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

31729336.1

*Amended Standing Order of Reference* from the United States District Court for the District of

Delaware dated as of February 29, 2012; and this Court having found that venue of these cases

and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court

having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court

having determined that it may enter a final order consistent with Article III of the United States

Constitution; and this Court having found that notice of the Motion has been given as set forth in

the Motion and that such notice is adequate and no other or further notice need be given; and this

Court having considered the First Day Declaration; and this Court having previously entered the

*Interim Order, (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary*

*Course of Business in Connection with Insurance and Surety Programs, Including Payment of*

*Policy Premiums, Broker Fees, and Claims Administrator Fees, and (B) Continuation of*

*Insurance Premium Financing Program; (II) Authorizing Banks to Honor and Process Check*

*and Electronic Transfer Requests Related Thereto; (III) Scheduling a Final Hearing; and*

*(IV) Granting Related Relief* [Docket No. ___ ]; and upon the record of the hearing on the

Motion and all of the proceedings had before this Court; and this Court having determined that

the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors,

and all other parties in interest; and this Court having determined that the legal and factual basis

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor,

      **IT IS HEREBY ORDERED THAT**:

    1.      The Motion is GRANTED on a final basis as set forth herein.

    2.      The Debtors are authorized to maintain the Insurance Programs and the Surety

Program without interruption, and to renew, supplement, modify, or extend (including through

obtaining "tail" coverage) the Insurance Programs, the Surety Program, or enter into new insurance policies or new surety bonds, and to incur and pay policy premiums, broker fees, and claims administrator fees arising thereunder or in connection therewith, in accordance with the same practices and procedures as were in effect prior to the Petition Date or as may be determined by the Debtors in their business judgment.

3. The Debtors are authorized, but not directed, to pay, honor, or otherwise satisfy premiums, claims, deductibles, retrospective adjustments, administrative fees, broker fees (including, without limitation, the Broker Fees), claims administrator fees (including, without limitation, the Claims Administrator Fees), and any other obligations that were due and payable or related to the period prior to the Petition Date on account of each of the Insurance Programs (including the Financed Insurance Program) and the Surety Program up to an aggregate amount of $976,667.

4. The Debtors are authorized, but not directed, to perform under the Surety Indemnity Agreements, including maintaining, renewing, and/or providing credit support, letters of credit, or other collateral in connection therewith and consistent with past practice, and to enter into new or related agreements in the ordinary course of business.  Notwithstanding anything to the contrary Surety Indemnity Agreements, the Debtors' filing of these Chapter 11 Cases shall not constitute a default thereunder.

5. The Debtors are authorized, but not directed, to (a) continue, in the ordinary course of business, the Financed Insurance Program, and renew the PFA and/or enter into new premium financing agreements, as necessary, under substantially similar terms, and (b) make payments under the Financed Insurance Program and the PFA and any renewed PFA or new premium financing programs as the same become due in the ordinary course of business.

6.      Nothing in the Motion or this Final Order, or the Debtors' payment of any claims pursuant to this Final Order, shall be deemed or construed as: (a) an admission as to the validity of, or a promise to pay with respect to, any claim or lien against the Debtors or their estates, (b) a waiver of the Debtors' right to dispute any claim or lien, or (c) an admission of the priority status of any claim.

7.      Nothing herein shall be deemed to constitute the postpetition assumption of any executory contract under section 365 of the Bankruptcy Code or authority to lift or modify the automatic stay set forth in section 362 of the Bankruptcy Code.

8.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

9.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

10.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.

31729336.1