## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| COACH USA, INC., *et al.*[1], | Case No. 24-11258 (____) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF SPENCER WARE IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

Spencer Ware, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am the Chief Restructuring Officer for the above-captioned debtors and debtors in possession (collectively, "Coach USA," the "Company," or the "Debtors").

2.     I have over 20 years of experience in corporate turnaround and restructuring.  I have served as the chief restructuring officer or in other officer roles, including as chief executive officer, for Eastern Mountain Sports, Bob's Stores, J.C. Penney, and BHCosmetics.  I have advised a wide range of organizations in connection with distressed situations, including CEVA Logistics, General Growth Properties, Port Authority of Puerto Rico, The Von Drehle Corporation, and SemGroup Energy Partners.  I received a Bachelor of Arts in Economics from Haverford College, attended the London School of Economics, and have achieved the designations of Certified Insolvency and Restructuring Advisor and Certified Turnaround Professional.

3.     The Company retained CR3 Partners, LLC in December of 2023, and I have been working closely with the Company and its management team from the outset of the engagement.

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/CoachUSA.  The Debtors' mailing address is 160 S Route 17 North, Paramus, NJ 07652.

I was appointed as Chief Restructuring Officer in connection with the commencement of these chapter 11 cases (the "Chapter 11 Cases"). As a result of my involvement with the Debtors, my review of Company documents, and my discussions with other members of the Debtors' management team and the Debtors' professionals, I am familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth in herein.

4.        On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

5.        I submit this Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and (b) "first day" motions, which are being filed contemporaneously with the voluntary petitions (collectively, the "First Day Motions"). The Debtors seek the relief set forth in the First Day Motions to minimize the impact of the commencement of these chapter 11 cases on their business as well as to ensure a smooth transition into chapter 11 for the Debtors' employees, customers, vendors, and suppliers. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise

31740781.1

had their contents explained to me, and it is my conclusion that the relief sought in each First Day Motion is essential to avoid immediate and irreparable harm and ensure the uninterrupted operation of the Debtors' business and the success of these Chapter 11 Cases.

6.      Part I of this Declaration provides an overview of the Debtors' business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings. Part II sets forth the support for the First Day Motions and the relief sought by such motions.

## PART I

### A.    Business Overview

7.      Coach USA is one of the leading providers of ground passenger transportation and mobility solutions in North America.  The Company is a trusted business partner providing many types of specialized ground transportation solutions to government agencies, airports, colleges and universities, and major corporations.  With 25 business segments throughout the United States and Canada employing approximately 2,700 employees and operating approximately 2,070 buses, the Coach USA network of companies carries millions of passengers throughout the United States and Canada each year.

8.      In addition to the household name "Coach USA," the Company operates under several other brands, including: Megabus, Coach Canada, Coach USA Airport Express, Dillon's Bus Company, and Go Van Galder.  Through its affiliates and subsidiaries, and under various brand names, the Company has been offering passenger transportation solutions for over 100 years.

31740781.1

9.      In April 2019, the private equity firm Variant Equity Advisors purchased Coach USA from Stagecoach Group plc in a transaction valued at approximately $270 million.  The 2019 transaction was funded in part by the Prepetition ABL Facility and SCUSI Note (both as defined herein and described further below).

10.     Coach USA provides a broad range of service offerings, generally categorized as follows:

| **Contract Services** | • Fixed route and commuter bus services for transit agencies and services for private corporations such as employee shuttles. |
| --- | --- |
| **Commuter and Scheduled Services** | • Reliable and convenient scheduled bus services for intra- and intercity, commuter, and leisure travels, as well as local transit bus services. |
| **Intercity & Retail** | • High-quality, affordable intercity bus carrier and asset-light retail platform offering state of the art services. |
| **Airport Services** | • Scheduled services to and from several major airport hubs. |
| **Charter Services** | • Charter services for large, national sporting events and concerts as well as school field trips, special events and tours. |

11.     The services provided by the Company are vital to North America's passenger transportation network.  Coach USA connects people with employment, education and training, healthcare, leisure, entertainment, and friends and relatives, as well as providing an essential link between rural and suburban communities and urban areas.  The Company provides these services through 25 distinct business segments described in further detail in Section I.B. below.

12.     At the core of the Debtors' business are its employees.  The Debtors' employees perform critical functions for the Debtors' business, including, among many other things, driving

the buses and other vehicles, providing maintenance for such vehicles, sales, accounting, legal, finance, management, supervisory, administrative functions, and customer service. The workforce totals approximately 2,700 full- and part-time employees, of which approximately 1,600 are members of collective bargaining units (together, the "Unions").

13.     The Company invests significant resources to recruit, train, and retain the best drivers and other employees, which is crucial to the Company's success and safety record. Since the onset of the COVID-19 pandemic, the Company, along with others in the transportation industry, has suffered from driver shortages, which has contributed to the challenge of recovering from the severe declines in ridership caused by the pandemic. In response thereto, in 2022, the Company implemented several initiatives to increase driver recruitment and retention, including increasing referral incentives for drivers and instituting a Company-wide rewards and recognition program.

14.     Coach USA has a strong reputation in the transportation industry for safety and features a best-in-class safety culture. Over the past several years, the Company has made substantial investments in new state-of-the-art safety technology, which includes fleet management systems, driver cameras, and training and evaluation systems. Most of the Company's buses and other vehicles are equipped with integrated cameras and other sensors to collect data points and events from which safety evaluations can be made on a day-to-day basis.

15.     The Company possesses a strong platform that is well-positioned for growth as demand for transportation services continues to rebound. Unfortunately, however, the slow pace of recovery from the ridership lows of the COVID-19 pandemic has negatively impacted the Company's liquidity position and its ability to service its existing debt. As described further below, prior to the Petition Date, the Company explored various strategic alternatives.

31740781.1

Ultimately, the Debtors, in consultation with the Prepetition ABL Lenders, determined that a series of sale transactions would likely create the most value for all stakeholders and preserve the most jobs. Accordingly, the Debtors have commenced these Chapter 11 Cases to, among other things, continue the sale process that began prepetition and consummate value-maximizing transactions. In addition, following the filing of these Chapter 11 Cases, the Debtors intend to commence an ancillary proceeding (the "Ancillary Proceeding") under Part IV of the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36 (as amended, the "CCAA"), in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").[2] Coach USA, Inc. as the proposed foreign representative for the Debtors in the Ancillary Proceeding, intends to seek recognition of these Chapter 11 Cases and certain orders entered in the Chapter 11 Cases.

**B.    The Company's Business Segments**

16.    The Debtors' transportation services operations span the continental United States and two provinces in Canada. These operations are organized in 25 distinct business segments (the "Business Segments") which provide the following services in various geographical locations:

| Business Segment | Location | Description |
|---|---|---|
| **Dillon's** | Hanover, MD | • Offers extensive, daily commuter services (under contract) to and from Washington, D.C. and the broader Maryland area<br>• Scheduled service contracts<br>• Contract services in Towson MD, as well as contracted scheduled service originating in Virginia |

---

[2]    The Debtors intend to propose that Alvarez & Marsal Canada Inc. be appointed by the Canadian Court as information officer in the CCAA proceedings (the "Information Officer"). The Information Officer will serve as an officer of the Canadian Court and report to the Canadian Court from time to time (including at the hearing on the initial application) on the status of these Chapter 11 Cases, the Debtors' proposed restructuring, and any other information that may be material to the Canadian Court.

| | | |
|---|---|---|
| **Elko** | Elko, NV | • Operates mining transportation contracts in the State of Nevada |
| **Montreal** | Montreal, Quebec (Canada) | • Offers local sightseeing and tour services through hop on/hop off routes on custom double-decker fleet<br><br>• Operates as Megabus Canada's easternmost embarkation point |
| **Olympia** | Elizabeth, NJ | • Provides airport scheduled service between Newark Liberty Airport and midtown New York City |
| **Rockland Coaches** | Paramus, NJ | • Primarily operates commuter routes to and from New York City. |
| **Shortline** | Chester, NY | • Offers extensive, daily scheduled service to and from New York City, the Catskills, Binghamton, Ithaca, Elmira, Utica and Stewart Airport |
| **Suburban Transit** | New Brunswick, NJ | • Primarily provides commuter scheduled service routes and charter work in Mercer, Middlesex, and Somerset Counties (New Jersey) |
| **Trentway \| Ontario** | Toronto, Ontario (Canada) | • Headquarters for Coach Canada and primary hub for Megabus Canada<br><br>• Offers scheduled service and airport transportation throughout Eastern Canada, linking to an expanding list of partner services<br><br>• Provides charter and tour options through Eastern Canada |
| **Van Galder** | Janesville, WI | • Primarily provides daily scheduled services between Wisconsin, Chicago airports, and downtown Chicago<br><br>• School bus contracts<br><br>• Serves thruway bus services |
| **Wisconsin Coach Lines** | Waukesha, WI | • Primarily provides daily scheduled airport services to and from O'Hare International Airport, charter services and contract local commuter/transit services<br><br>• Serves thruway bus services |
| **Megabus Retail** | N/A | • Flexible, asset-light solution provides opportunity for partnerships with bus operators interested in using the Megabus brand and retail platform to provide express intercity bus service<br><br>• Partner carriers provide their own buses, drivers, maintenance and insurance<br><br>• Megabus retail is equipped to handle digital advertising, inhouse graphic design work, social media management, content creation, marketing, |

| | | |
|---|---|---|
| | | customer surveys and campaign execution and analysis |
| **Perfect Body** | North Bergen, NJ | • In-house repairs and maintenance shop<br>• Also provides repairs and maintenance services to third parties |
| **ACL Atlanta** | Norcross, GA | • Provides charter buses in Atlanta and the surrounding Southeast |
| **All West** | Sacramento, CA | • Provides charter bus services in Sacramento, CA to/from other points on Northern and Southern California<br>• Certain charter tours including to Nevada<br>• Thruway bus services under contract |
| **Anaheim** | Anaheim, CA | • Recently ceased operations |
| **Butler** | Butler, PA / Erie, NY | • Primarily provides deluxe motorcoach tours and charter services to individuals and groups of all sizes surrounding the broader Butler, PA area<br>• Body shop conducting internal and third-party bus and other large vehicles repairs.<br>• Offers scheduled service in upstate New York |
| **Community Coach** | Paramus, NJ | • Three large transit contracts serving Passaic and Bergen counties (NJ) and the Brooklyn Navy Yard<br>• Commuter bus services to / from NJ to New York City<br>• Charter and event transportation, including sports and entertainment events to MetLife Stadium |
| **Kerrville** | San Antonio, TX | • Offers deluxe motorcoach charters and shuttles, customized group tour packages, casino trips, and convention coordinating and planning |
| **Lenzner** | Sewickley, PA | • Provides tour transportation to a variety of locations throughout the Northeast and Midwest, as well as custom tours for private groups<br>• Offers commercial and private charters for various sports teams |
| **Megabus Atlanta**<br>**Megabus Florida**<br>**Megabus Northeast**<br>**Megabus Texas** | Various | • Affordable intercity bus carrier with service to more than 2,200 origin and destination pairs throughout North America<br>• Point-to-point network with buses making few stops en-route to their destination |
| **ONE Bus** | Elizabeth, NJ | • Transit contract operating in Hudson County, NJ |
| **Powder River** | Gillette, WY | • Contracts with several large mining companies |

C.       **The Debtors' Organizational Structure**

17.      Debtors Project Kenwood, Holdings, Inc., Project Kenwood Intermediate

Holdings I, Inc., Project Kenwood Intermediate Holdings II, LLC, Projected Kenwood

Intermediate Holdings III, LLC, Project Kenwood Acquisition, LLC, Coach Administration, Inc.

and Coach USA, Inc. do not maintain active busing operations, but instead provide various

administrative functions or serve as holding companies.  Debtor Coach USA, Inc. is the direct or

indirect parent of all Debtors with ongoing operations.

18.      Though the Debtors' operations spread among the various divisions and entities,

several key functions are provided by just a handful of the entities.  For example, the Debtors'

buses are generally owned and titled with three Debtor entities: Debtors CAM Leasing, LLC,

Coach Leasing, Inc., and Trentway-Wagar (Properties) Inc. (collectively, the "Bus Owner

Debtors").  Through certain lease agreements, the Bus Owner Debtors lease buses to the other

Debtors.  Other functions are centralized at specific entities, including, but not limited to, Debtor

Paramus Northeast Mgt. Co. L.L.C. administering the Debtors' payroll and Debtor Coach USA,

Inc. administering numerous overhead functions, such as accounting, legal, and finance.

19.      Over the course of the Debtors' history, which includes some lines that have been

in service for more than 100 years, and for a variety of reasons, some of the Debtors no longer

maintain ongoing operations and have limited to no assets or liabilities.  Accordingly, those

entities will be wound down throughout these Chapter 11 Cases.

20.      A corporate organization chart reflecting the relationship between each of the

Debtors is attached hereto as Exhibit 1.[3]

---

[3]      GACCTO Limited, an Ontario corporation, is not a debtor in these Chapter 11 Cases, but rather it is a
dormant joint venture that is currently winding down.  Momentum Risk Retention Group, Inc., a South
Carolina corporation, is a captive insurer for the Company and it is not a debtor in these Chapter 11 Cases.

31740781.1

**D.**    <u>**Prepetition Indebtedness and Capital Structure**</u>

21.    As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $197.8 million including approximately $146.6 million in secured debt arising under the Prepetition ABL Agreement (as defined below), $37.7 million in unsecured debt arising under the Main Street Loan Credit Agreement (as defined below), and approximately $13.5 million owed to certain capital lessors who are secured by liens over certain of the Debtors' capital assets. In addition, the Debtors had outstanding approximately $35.6 million of letters of credit outstanding under the Prepetition ABL Agreement, which if drawn would be funded through the mechanics of the Prepetition ABL Agreement increasing the amount of funded debt thereunder.

22.    In addition, the Debtors' other unsecured obligations (including trade and other claims) as of the Petition Date total at least $134 million.

23.    As of the Petition Date, Debtor Holdings I (as defined below) had an outstanding secured debt obligation in the aggregate principal amount of $87.6 million arising under the SCUSI Note (as defined below).

**(i)  Prepetition ABL Facility**

24.    Pursuant to that certain Credit Agreement dated as of April 16, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition ABL Agreement</u>," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>Prepetition ABL Documents</u>"), among (a) Debtor Project Kenwood Intermediate Holdings III, LLC ("<u>Parent</u>"), Debtor Project Kenwood Acquisition, LLC ("<u>Administrative Borrower</u>"), certain other Debtors identified as borrowers thereunder (together

with the Administrative Borrower, the "Prepetition ABL Borrowers" and each a "Prepetition ABL Borrower"),[4] (b) certain other Debtors identified as guarantors thereunder (together with Parent, the "Prepetition ABL Guarantors," together with the Prepetition ABL Borrowers, the "Prepetition ABL Loan Parties"),[5] (c) Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "Prepetition ABL Administrative Agent"); (d) Wells Fargo Bank, National Association and MUFG Union Bank, N.A., as Joint Lead Arrangers and as Joint Book Runners, (e) MUFG Union Bank, N.A., as syndication agent (in such capacity, the "Prepetition ABL Syndication Agent"); (f) the "Lenders" (as defined in the Prepetition ABL Agreement) party thereto (and including the Prepetition ABL Administrative Agent and the Prepetition ABL Syndication Agent, the "Prepetition ABL Lenders"), the Prepetition ABL Lenders provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility").

25.     The Prepetition ABL Facility provided the Prepetition ABL Borrowers with, among other things, up to $185 million aggregate principal amount of Revolving Loans (as defined in the Prepetition ABL Agreement).  As of the Petition Date, the aggregate principal amount of loans, letters of credit, and Bank Product Obligations (as defined in the Prepetition ABL Agreement) outstanding under the Prepetition ABL Facility was not less than $180 million (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses

---

[4]     The green Debtor entities on the organization chart are Prepetition ABL Borrowers. *See* Exhibit 1.
[5]     The yellow Debtor entities on the organization chart are Prepetition ABL Guarantors.  *See* Exhibit 1.

and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors' obligations pursuant to, or secured by, the Prepetition ABL Documents, including all applicable "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations"), including not less than approximately (i) $144.3 million in outstanding Revolving Loans, (ii) $35.6 million in respect of letters of credit issued and outstanding, and (iii) $2.3 million in respect of Bank Product Obligations outstanding. The letters of credit outstanding under the Prepetition ABL Facility are collateral primarily for the Debtor's self-insured retention insurance program.

26.     The Prepetition ABL Facility obligations are secured by (i) first priority liens on substantially all of the Prepetition ABL Loan Parties' personal property assets, including receivables, inventory, general intangibles, intellectual property, documents, deposit accounts, equipment, fixtures, and inventory, all as set forth in that certain (i) Guaranty and Security Agreement (as may be amended, restated, supplemented, waived or otherwise modified from time to time), dated as of April 16, 2019, (ii) Canadian Guarantee and Security Agreement (as may be amended, restated, supplemented, waived or otherwise modified from time to time), dated as of April 16, 2019, (iii) Trademark Security Agreement (as may be amended, restated, supplemented, waived, or otherwise modified from time to time), dated as of April 16, 2019, and (iv) the other Loan Documents (as defined in the Prepetition ABL Agreement) and by two real properties, known as Elko Property (as defined below) and the Rockford Property (as defined

below), pursuant to that certain Mortgage and Assignment of Rents and Leases (as may be amended, restated, supplemented, waived or otherwise modified from time to time), dated as of February 7, 2024, and that certain Deed of Trust and Assignment of Rents and Leases (as may be amended, restated, supplemented, waived or otherwise modified from time to time), dated as of February 7, 2024 (such liens collectively, the "Prepetition ABL Liens" and such collateral, the "Prepetition ABL Collateral").

### (ii) Main Street Loan and Other Unsecured Debt

27.     Prior to the Petition Date, the Debtors entered into that certain Credit Agreement dated as of December 11, 2020 (as heretofore amended, supplemented or otherwise modified, the "Main Street Loan Credit Agreement" and together with the Prepetition ABL Agreement, the "Prepetition Credit Agreements") by and among Debtor Project Kenwood Acquisition, LLC (the "Main Street Loan Borrower") and Wells Fargo Bank, National Association, as lender (the "Main Street Lender").  A list of certain Debtor entities that are guarantors under the Main Street Loan Credit Agreement is attached hereto as Exhibit 2. Pursuant to the Main Street Loan Credit Agreement, the Main Street Lender agreed to extend a term loan in the aggregate principal amount of $37.7 million to the Main Street Borrowers.

28.     As of the Petition Date, the Main Street Borrowers owe approximately $37.9 million with respect to the term loan under the Main Street Loan Credit Agreement plus accrued and unpaid interest thereon and all other liabilities and obligations arising out of or in connection with the Main Street Loan Credit Agreement (collectively, the "Main Street Loan Debt").

29.     The Main Street Loan Debt is unsecured.

30.     The Debtors' unsecured obligations (including the Main Street Loan Debt, trade, and other claims) as of the Petition Date total at least $171.7 million.

31740781.1

### (iii)  SCUSI Note

31.     Prior to the Petition Date, Debtor Project Kenwood Intermediate Holdings I, Inc. ("Holdings I") entered into that certain secured term promissory note as obligor with SCUSI Limited ("SCUSI") as payee, dated as of April 16, 2019 (as heretofore amended, supplemented or otherwise modified, the "SCUSI Note").  Pursuant to the SCUSI Note, Holdings I agreed to pay SCUSI the principal amount of $87.6 million, with such obligations maturing on October 16, 2024.  In connection with the SCUSI Note, Holdings I entered into that certain pledge agreement by and between SCUSI and Holdings I, dated as of April 16, 2019 (the "SCUSI Pledge Agreement").  Pursuant to the SCUSI Pledge Agreement, Holdings I pledged all of its right, title, and interest in, among other things, the equity interests in Debtor Project Kenwood Intermediate Holdings II, LLC ("Holdings II"), which is the direct and wholly-owned subsidiary of Holdings I.

### E.     Events Leading To Commencement of the Chapter 11 Cases

32.     The Debtors suffered substantial declines during the COVID-19 pandemic, which triggered widespread business shutdowns and more lasting impacts upon commuting and travel patterns.  Indeed, during 2020, the Company ceased operations completely for extended periods of time in a number of markets due to lockdowns and other regulatory requirements, causing dramatic ridership declines and concomitant deterioration in revenue.  This created substantial strains on the Debtors' liquidity.  To keep the Company afloat and preserve its workforce, the Debtors explored their eligibility for various COVID-19 relief programs.  To that end, in the third quarter of 2020 the Company applied for and, in December 2020, received, a loan in the principal amount of $35 million through the Federal Reserve System's Main Street Lending Program, which was created under the Coronavirus Aid Relief & Economic Security (CARES)

31740781.1

Act.  The Main Street Loan Credit Agreement provided the Company with much-needed liquidity, which allowed it to weather the initial effects of the COVID-19 pandemic and preserve jobs.

33.      Furthermore, in July 2021, the Company applied for, and in August and October 2021 received, a total of $78.3 million in grants from the federal government's Coronavirus Economic Relief for Transportation Services program.

34.      During 2020, commuter ridership declined by 90% compared to pre-pandemic ridership.  While ridership has slowly increased over the past two years, it has not recovered to pre-pandemic levels.  Ridership in 2021 and 2022 were 26% and 39% of pre-pandemic levels, respectively.  By 2023, ridership had only reached 45% of pre-pandemic levels.

35.      As a result of the pandemic, operating revenues for the Company in 2020 declined by nearly 60% compared to 2019.  After the initial onset of the COVID-19 pandemic in the first quarter of 2020, the Company's revenues slowly rebounded, with revenues reaching nearly 58% of pre-pandemic levels in 2022.  At the same time, however, operating expenses increased disproportionately, largely due to rising fuel, insurance, labor costs and other inflationary impacts on the cost base.

36.      Additionally, the Company's post-pandemic recovery was slowed by numerous headwinds, such as the cultural shift towards a hybrid work environment in many markets, which results in fewer commuters, as well as difficulties in the labor market and in hiring enough drivers to service areas of business growth.  As the Company's slower than expected recovery continued to exert extreme pressure on the Debtors' liquidity, the Company's management began to explore strategic alternatives to enhance value, including a potential sale of its businesses, and other means of achieving profitability.

31740781.1

### (i)  Assessment of Strategic Alternatives

37.     In November 2023, the Company engaged Houlihan Lokey Capital, Inc.

("Houlihan") to assist it in evaluating all available options to preserve the Company as a going

concern, including potential refinancing, recapitalization, and sale transactions.  Although the

Prepetition ABL Loan Parties have made all required payments of principal and interest under

the Prepetition ABL Credit Agreement, the Debtors' lagging revenues resulted in a breach of

certain financial covenants, which triggered certain events of default thereunder. Together with

Houlihan, the Company engaged with the Prepetition ABL Lenders regarding various strategic

alternatives.

38.     On December 1, 2023, the Prepetition ABL Lenders and the Prepetition ABL

Loan Parties entered into that certain sixth amendment to the Prepetition ABL Credit Agreement

and Forbearance Agreement (the "First Forbearance Agreement").  Pursuant to the First

Forbearance Agreement, the Prepetition ABL Lenders agreed to forbear from exercising

remedies in connection with existing events of default for a certain period while the Debtors

continued to explore potential strategic and restructuring alternatives.

### (ii) Commencement of Sale and Marketing Process

39.     Since entering into the First Forbearance Agreement, the Company worked with

its advisors to conduct a thorough marketing and sale process.  Commencing on December 4,

2023, the Company and its advisors launched a marketing process for the sale of substantially all

of the Debtors' assets.  In conjunction with this process, the Company populated a data room

containing documents and information regarding the Debtors' businesses.  Houlihan contacted

over 154 potential purchasers, which resulted in 70 parties executing nondisclosure agreements

with the Company to further explore a transaction.

40.     The Debtors and their advisors set an initial deadline for the submission of indications of interest for January 12, 2024, although, thereafter, the Debtors received several additional indications of interests.  As of the Petition Date, 16 parties provided indications of interest.  The indications of interest were varied in scope and value.  For example, certain of the indications of interest contemplated liquidation of some or all of the Company's assets, at least one indication of interest was for the purchase of all of the Company's assets on a going concern basis,[6] and other indications of interest were only for specific business lines or divisions.  As described further in Section I.F. below, the prepetition sale marketing and sale process has resulted in (i) two going concern stalking horse bids for substantially all of the assets of 16 of the Debtors' Business Segments; and (ii) a stalking horse bid for the liquidation of 143 of the Debtor's double deck buses.

### (iii) Second Forbearance Agreement and Prepetition Undertakings of the Debtors Thereunder

41.     The forbearance period under the First Forbearance Agreement was set to expire during the Debtors' sales and marketing process.  For the Debtors to continue this process, the Prepetition ABL Lenders and the Prepetition ABL Loan Parties entered into that certain seventh amendment to the Prepetition ABL Credit Agreement and First Amendment to Forbearance Agreement (the "Second Forbearance Agreement").  The Second Forbearance Agreement extended the forbearance period to February 4, 2024, and set forth various restructuring milestones, including the sale of certain real property (as described below), and required the Prepetition ABL Loan Parties to comply with specified budget variance reporting covenants.

---

[6]     This indication of interest was subsequently revised to include only a subset of the Business Segments and later was withdrawn as the buyer no longer remained interested in the opportunity.

31740781.1

### a.    Sale and Leaseback of New Brunswick Property

42.    Pursuant to the Second Forbearance Agreement, the Debtors were required to enter a sale leaseback transaction for the real property located at 710 and 750 Somerset Street, New Brunswick, New Jersey 08901 (the "New Brunswick Property"), which was used by the Debtors in connection with their operations pursuant to a lease (the "New Brunswick Lease") with an unaffiliated third party (the "New Brunswick Landlord").   Under the New Brunswick Lease, the Debtors held a purchase option for the New Brunswick Property in the amount of approximately $4.9 million (the "Strike Price").   In or around August 2023, the Debtors retained a broker, Transwestern, in connection with the New Brunswick Property and determined that the value of the New Brunswick Property was significantly higher than the Strike Price.   As a result of Transwestern's marketing process, a buyer emerged to purchase the New Brunswick Property for consideration totaling $16 million and an agreement to lease back the New Brunswick Property to the Debtors for their continued use of the premises in connection with their operations (the "New Brunswick Sale and Leaseback Transaction").

43.    On or about November 22, 2023, the Debtors informed the New Brunswick Landlord of their intention to exercise the purchase option under the New Brunswick Lease.   On January 16, 2024, the Debtors closed on the purchase of the New Brunswick Property from the New Brunswick Landlord for the Strike Price and on January 16, 2024, the Debtors consummated the sale leaseback transaction (the "New Brunswick Transaction"), resulting in approximately $8.225 million in net proceeds to the Debtors.   The proceeds from the New Brunswick Transaction provided the Debtors with much needed liquidity to continue operating their businesses.

**b.    Appointment of Independent Directors**

44.    Pursuant to the Second Forbearance Agreement, the Company was required to appoint at least one independent director satisfactory to the Prepetition ABL Administrative Agent and the Prepetition ABL Lenders.  On January 10, 2024, during the Company's continued pursuit of a sale transaction of some or all of its assets, Debtor Coach USA, Inc. appointed two independent directors to its board of directors (the "Former CUSA Independent Directors").[7]

45.    On April 10, 2024, the Former CUSA Independent Directors resigned from Debtor Coach USA, Inc.'s board of directors.[8] In anticipation of a potential bankruptcy filing, the Former CUSA Independent Directors were replaced on April 22, 2024, by two seasoned restructuring professionals—Thomas FitzGerald and Lawrence Hirsh, who are both serving as independent directors of each of the Debtors.

**c.    Transfer of Real Properties**

46.    Also pursuant to the Second Forbearance Agreement, as an inducement to support the Company with additional funding, the Prepetition ABL Lenders required certain unencumbered real property be added to their collateral base, thereby constituting Prepetition ABL Collateral securing the Prepetition ABL Obligations. Per its agreement with the Prepetition ABL Lenders, the Debtors transferred title to certain real property to a newly formed affiliate entity, Debtor CUSARE, Inc.  Specifically, Debtor Sam Van Galder, Inc. transferred to Debtor

---

[7]    Coach USA is the direct or indirect parent of each of the Debtors that are domiciled in Canada, which include 3329003 Canada Inc., Megabus Canada Inc., 3376249 Canada Inc., 4216849 Canada Inc., Trentway-Wagar (Properties) Inc., Trentway-Wagar Inc., and Douglas Braund Investments Limited (collectively, the "Canadian Debtors"). The board composition for the Canadian Debtors has remained unchanged since April of 2019.

[8]    Pursuant to the terms of their respective engagement letters, the Former CUSA Independent Directors agreed to endeavor in good faith to join the boards of directors or managers, as applicable, of certain other Debtors.  Despite the best efforts of the Debtors, the Former CUSA Independent Directors did not join any boards of directors or managers of any other Debtor.

CUSARE, Inc. title to the real property located at 7595 Walton Street, Rockford, Illinois 61108 (the "Rockford Property") and Debtor Elko, Inc. transferred to Debtor CUSARE, Inc. title to the real property located at 4105 W. Idaho Street, Elko, Nevada 89801 (the "Elko Property" and together with the Rockford Property, the "Real Properties"). Thereafter, Debtor CUSARE, Inc. executed security instruments thereby granting the Prepetition ABL Administrative Agent security interests in the Real Properties, recording the same on or about February 20, 2024.

47.     On or around January 25, 2024, the forbearance period under the Second Forbearance Agreement was terminated pursuant to that certain Notice of Continuance of Existing Defaults, Termination of Forbearance Period, Discretionary Advances and Reservation of Rights. Notwithstanding the termination of the forbearance period under the Second Forbearance Agreement, the Prepetition ABL Administrative Agent did not commence the exercise of remedies and the Debtors and their advisors continued the sale and marketing process. Additionally, the Debtors continued to work diligently with the Prepetition ABL Lenders to reach consensus with respect to how best to maximize the value of the Debtors' enterprise. As a result, the Debtors were able to negotiate a path forward for the Company that will save at least 2,129 jobs and maximize value for all stakeholders as described further below.

**(iv) The Debtors' Efforts to Obtain Debtor in Possession Financing**

48.     The Debtors lack the funds necessary to maintain their operations or to administer these Chapter 11 Cases. Without access to debtor in possession financing and the ability to use cash collateral, the Debtors would be unable to, among other things, meet employee payroll obligations, make payments to vendors, and operations would immediately cease. This would result in significant destruction to the Debtors' estates and harm all stakeholders.

31740781.1

49.     The debtor in possession facility (the "DIP Facility") extended by the Prepetition

ABL Lenders, in their capacity as postpetition lenders together with Wells Fargo Bank, National

Association (in its capacity as administrative agent and collateral agent under such DIP Facility,

the "DIP Agent") (the "DIP Lenders"), provides the Prepetition ABL Borrowers, in their

capacity as borrowers under the DIP Facility (the "Borrowers") with approximately $20 million

of new money financing which will enable the Debtors to fund operations, meet various

obligations as they become due, and effectively administer these Chapter 11 Cases.

50.     The DIP Facility also represents the best financing available to the Debtors.

Before entry into the postpetition credit agreement, Houlihan launched a marketing process to

gauge third-party interest in providing postpetition financing to the Debtors.  Of the 11 parties

that engaged with Houlihan, none were willing to extend financing on a junior basis to the

Prepetition ABL Facility.  Similarly, no party submitted a proposal for financing on terms that

were more favorable than the DIP Facility.

51.     Additional information regarding the DIP Facility can be found in the *Declaration

of John Sallstrom in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing

the Debtors to Obtain Postpetition Secured Financing; (II) Authorizing the Debtors' Use of Cash

Collateral; (III) Granting Adequate Protection to Prepetition ABL Parties; (IV) Scheduling a

Final Hearing; and (V) Granting Related Relief* (the "DIP Declaration"), filed

contemporaneously herewith.

**F.      Restructuring Goals: Preserving Jobs, Maintaining Service and Maximizing
          Value**

52.     The Debtors commenced these Chapter 11 Cases to continue the process towards

achieving value maximizing transactions.  The Company will utilize the chapter 11 filings to

stabilize operations, continue the sale process commenced prepetition, and consummate value

31740781.1

maximizing transactions, and preserve as many jobs and business lines on a going-concern basis as possible. As noted above, the Debtors have been conducting a sale and marketing process with respect to substantially all of their assets since December 2023.

53.     As a result of those efforts, the Debtors enter these Chapter 11 Cases with three proposed sale transactions supported by stalking horse asset purchase agreements:

**(i)** a proposed transaction with an affiliate of The Renco Group, Inc. ("NewCo") for substantially all of the assets of the following businesses on a going concern basis (the "NewCo Stalking Horse APA"): Dillon's, Elko, Megabus Retail, Montreal, Olympia, Trentway/Ontario, Perfect Body, Rockland, Shortline, Suburban, Van Galder, and Wisconsin (the "NewCo Business Segments" or "NewCo Assets"),[9]

**(ii)** a proposed transaction with AVALON Transportation, LLC or its designee ("Avalon") for substantially all of the assets of the following businesses on a going concern basis (the "Avalon Stalking Horse APA"): Lenzner, Kerrville, All West, and ACL Atlanta (the "Avalon Business Segments" or the "Avalon Assets"), and

**(iii)** a proposed transaction with ABC Bus, Inc. ("ABC") (the "ABC Stalking Horse APA," together with the NewCo Stalking Horse APA and Avalon Stalking Horse APA, the "Stalking Horse APAs") with respect to 143 double deck buses (the "ABC Assets").

54.     Pursuant to the NewCo Stalking Horse APA, NewCo will assume $130 million of the secured indebtedness held by the Prepetition ABL Lenders and Postpetition Lenders along

---

[9]     Pursuant to the NewCo Stalking Horse APA, the NewCo Assets also include all IP assets and certain contracts and other assets held by Remaining Business Segments Megabus Northeast and Community Coach. For the avoidance of doubt, the Megabus operations in the United States are Remaining Business Segments, except for Megabus Retail. Megabus Retail is a NewCo Business Segment, and the Megabus operations in Canada are part of NewCo Business Segments: Montreal and Trentway/Ontario.

with certain other specified liabilities, including the assumption of 22 CBAs with 16 Unions covering approximately 1,000 Union employees associated with the NewCo Business Segments. The proposed transaction will enable the NewCo Business Segments to continue operations and growth and preserve over 1,797 Union and non-Union jobs.  NewCo also intends to retain certain members of the Debtors' current management team, which will allow NewCo to emerge from these Chapter 11 Cases led by key members with decades of experience with Coach USA.

55.     Pursuant to the Avalon Stalking Horse APA, Avalon has agreed to purchase substantially all of the assets of the Avalon Business Segments on a going concern basis.  Avalon has also agreed to recognize the only Union with a CBA relating to the Avalon Business Segments—which is at Lenzner—and has agreed to accept the terms of the CBA subject only to the necessary changes needed to provide substantially equivalent benefits and policies to Avalon's benefit plans and policies, as well as to offer employment to at least 80% of the Debtors' approximately 332 employees that work for the Avalon Business Segments.

56.     Pursuant to the ABC Stalking Horse APA, the Debtors would liquidate substantially all of the double deck buses held by the Debtors in the United States.

57.     The Debtors intend to promptly file their Bidding Procedures and Sale Motion (the "Bidding Procedures Motion")[10] to seek Court approval to expeditiously conduct an auction for all of their Assets, with the Stalking Horse APAs as a baseline for their respective Assets.

---

[10]     Contemporaneously with the filing of the First Day Motions, the Debtors filed the *Debtors' Motion for Entry of (A) an Order (I) Approving Bid Procedures in Connection with the Sale of the Debtors' A&GP Assets, (II) Designation of Stalking Horse Bidder and Stalking Horse Bidder Protections, (III) Scheduling Auction and Hearing to Approve Sale of Assets, (IV) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of Sale, (V) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (VI) Approving Form and Manner of Notice Thereof, and (VII) Granting Related Relief, and (B) an Order Authorizing and Approving (I) the Sale of the Debtors' A&GP Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief.*

31740781.1

With respect to the assets of the Debtors' nine remaining Business Segments—namely Butler (including charter bus and body shop operations), Powder River, Anaheim,[11] Community Coach, ONE Bus, Megabus Atlanta, Megabus Florida, Megabus Northeast, and Megabus Texas (the "Remaining Business Segments" or the "Remaining Assets")[12]—the Debtors intend to seek Court approval pursuant to the Bidding Procedures Motion to continue the prepetition marketing process and hold an auction for those assets as well.

58.     Thus, the Debtors intend to continue operating their Business Segments in the ordinary course pending the results of the court-supervised sale process.  If, pursuant to the sale and marketing process, a going concern transaction does not materialize with respect to some or all of the Remaining Business Segments, the Debtors will seek to winddown their operations.   In preparation for this possibility, prior to the Petition Date the Debtors and their advisors engaged with representatives from various collective bargaining units for employees of the Remaining Business Segments regarding the potential shutdown of these businesses.

59.     Together, the Stalking Horse APAs represent going concern sales of 16 of the Debtors' 25 Business Segments, encompassing approximately 2,129 employees, and the liquidation of substantially all of the double deck buses no longer used by the Company's Business Segments, all subject to higher and better offers.  The sale of the NewCo Business Segments and Avalon Business Segments will ensure uninterrupted passenger transportation services to millions of passengers throughout the United States and Canada, many of whom rely on the Debtors' transportation network.

---

[11]     The Anaheim Business Segment was closed prior to the Petition Date.

[12]     As noted above at fn. 10, all IP assets and certain contracts and other assets held by Remaining Business Segments Megabus Northeast and Community Coach are part of the NewCo Assets and will not be offered for sale separately.

31740781.1

## PART II

60.     The Debtors filed the First Day Motions concurrently with the filing of their

chapter 11 petitions. The Debtors request that each of the following First Day Motions be

granted, as each constitutes a critical element in achieving a successful and smooth transition to

chapter 11:

- **Debtor in Possession Financing Motion**. *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing; (II) Authorizing the Debtors' Use of Cash Collateral; (III) Granting Adequate Protection to Prepetition ABL Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief.*

- **Cash Management Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of the Cash Management System; (II) Authorizing Maintenance of the Existing Bank Accounts; (III) Authorizing Continued Use of Existing Business Forms; (IV) Authorizing Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims; and (V) Granting Related Relief.*

- **Wages Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Wages, Salaries, and Other Compensation; (II) Authorizing Certain Employee Benefits and Other Associated Obligations; (III) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief.*

- **Vendors Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, 503(b)(9) Claimants, and Lien Claimants; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief.*

- **Utilities Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, (IV) Setting a Final Hearing Related Thereto, and (V) Granting Related Relief.*

- **Insurance and Surety Bond Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in connection with Insurance and Surety Programs, including Payment of Policy Premiums, Self-Insured Retention Fees, Broker Fees, and Claims Administrator Fees, and (B) Continuation of Insurance Premium Financing Program; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief.*

- **Taxes Motion**. *Debtors' Motion for Entry of Interim and Final Orders, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief.*

- **Customer Programs**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief.*

- **Foreign Representatives Motion**. *Debtors' Motion for Entry of an Order (I) Authorizing Coach USA, Inc. to act as Foreign Representative of the Debtors and (II) Granting Related Relief.*

- **Creditor Matrix Redaction Motion**. *Debtors' Motion for Entry of an Order (I) Authorizing the Redaction of Certain Personally Identifiable Information in the Debtors' Creditor Matrix and (II) Granting Related Relief.*

- **Joint Administration Motion**. *Debtors' Motion for Entry of Order (I) Authorizing the Joint Administration of the Debtors' Chapter 11 Cases, and (II) Granting Related Relief.*

- **Kroll Retention Application**. *Debtors' Application for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent.*

- **NOL Motion**. *Debtors' Motion for Entry of Interim and Final Orders Establishing Certain Notice and Hearing Procedures for (I) Certain Transfers of Equity in (A) Project Kenwood Holdings, Inc., (B) Project Kenwood Intermediate Holdings I, Inc., (C) Project Kenwood Intermediate Holdings II, LLC and (D) Project Kenwood Intermediate Holdings III, LLC, and (II) Certain Claims of Worthlessness With Respect to the Foregoing Equity Interests.*

61.     Several of the First Day Motions request authority to pay certain prepetition

claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part,

that the Court shall not consider motions to pay prepetition claims during the first 21 days

following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid

immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly

tailored their requests for immediate authority to pay certain prepetition claims to those

circumstances where the failure to pay such claims would cause immediate and irreparable harm

to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

31740781.1

62.     Contemporaneously with the filing of the First Day Motions, the Debtors have also submitted a certification of counsel requesting entry of an *Emergency Order Authorizing (A) The Limited Continued Use of the Debtors' Cash Management System and Existing Bank Accounts, and (B) the Pre-Funding of Certain Prepetition Employee Obligations, on a Limited Basis, Pending First Day Hearing* (the "Emergency Order").  As set forth in the proposed Emergency Order, the Debtors require authority to continue use of their existing cash management system and fund their current payroll to pre-fund certain employee obligations in an amount not to exceed $3.75 million pending the First Day Hearing (the "Emergency Relief").  The Emergency Relief is necessary to avoid disruption to the Debtors' operations and employee morale that would result from failing to timely meet payroll and the Office of the United States Trustee and the DIP Agent have no objection to entry of the Emergency Order in advance of the first day hearing.

63.     I have consulted with the Company and the Debtors' advisors regarding the relief requested in the First Day Motions, and understand each of the First Day Motions and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate, and each such factual statement is incorporated herein by reference.

64.     I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, equityholders, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these Chapter 11 Cases. I further believe that failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, for the reasons set forth herein and in

31740781.1

each respective First Day Motion, I believe that the Court should grant the relief requested in each of the First Day Motions.

## <u>CONCLUSION</u>

65.     The Debtors' ultimate goal in these Chapter 11 Cases is to consummate value-maximizing sale transactions for the benefit of all stakeholders. In the near term, however, to minimize any loss of value of to their businesses and assets during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these proceedings, with as little interruption or disruption to the Debtors' operations as possible.

66.     I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful chapter 11 process and sale of the Debtors' businesses will be substantially enhanced.

67.     I declare under the penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

Respectfully submitted,

**COACH USA, Inc.,** *et al.*

*/s/Spencer Ware*
By: Spencer Ware
Title: Chief Restructuring Officer

Dated: June 11, 2024

31740781.1

28

## **EXHIBIT 1**

**COACH USA ORGANIZATIONAL CHART**

31740781.1

# Coach USA Organizational Chart

100% ownership unless otherwise indicated

*GACCTO Limited is 50% owned by Greyhound Canada Transportation ULC

*Coach USA, Inc. also holds 19,000 preference shares of Trentway-Wagar (Properties), Inc.



## **EXHIBIT 2**

## **DEBTOR ENTITIES THAT ARE GUARANTORS UNDER THE MAIN STREET LOAN CREDIT AGREEMENT**

| |
|---|
| All West Coachlines, Inc. |
| 349 First Street Urban Renewal Corp. |
| American Coach Lines of Atlanta, Inc. |
| Barclay Airport Service, Inc. |
| Barclay Transportation Services, Inc. |
| Butler Motor Transit, Inc. |
| Cam Leasing, LLC |
| Central Cab Company |
| Central Charters & Tours, Inc. |
| Chenango Valley Bus Lines, Inc. |
| Coach Leasing, Inc. |
| Coach USA Administration, Inc. |
| Coach USA, Inc. |
| Coach USA Illinois, Inc. |
| Coach USA MBT, LLC |
| Colonial Coach Corporation |
| Community Coach, Inc. |
| Community Transit Lines, Inc. |
| Community Transportation, Inc. |
| Dillon's Bus Service, Inc. |
| Elko, Inc. |
| Gad-About Tours, Inc. |
| Hudson Transit Corporation |
| Hudson Transit Lines, Inc. |
| Independent Bus Company, Inc. |
| Kerrville Bus Company, Inc. |
| Lakefront Lines, Inc. |
| Megabus Canada, Inc. |
| Megabus Northeast, LLC |
| Megabus Southeast, LLC |
| Megabus West, LLC |
| Clinton Avenue Bus Company |

| |
|---|
| Lenzner Tours, Inc. |
| Voyavation, LLC |
| Megabus USA, LLC |
| Midtown Bus Terminal of New York, Inc. |
| The Bus Exchange, Inc. |
| Olympia Trails Bus Company, Inc. |
| Orange, Newark, Elizabeth Bus, Inc. |
| Pacific Coast Sightseeing Tours & Charters, Inc. |
| Perfect Body Inc. |
| Powder River Transportation Services, Inc. |
| Project Kenwood Intermediate Holdings III, LLC |
| Rockland Coaches, Inc. |
| Rockland Transit Corporation |
| Route 17 North Reality, LLC |
| Sam Van Galder, Inc. |
| Short Line Terminal Agency, Inc. |
| Suburban Management Corp. |
| Suburban Transit Corp. |
| Transportation Management Services, Inc. |
| Trentway-Wagar Inc. |
| Trentway-Wagar (Properties) Inc. |
| TRI-State Coach Lines, Inc. |
| TRT Transportation, Inc. |
| Wisconsin Coach Lines, Inc. |
| 3329003 Canada, Inc. |
| 3376249 Canada, Inc. |
| 4218649 Canada, Inc. |
| Coach USA Tours-Las Vegas, Inc. |
| Commodore Tours, Inc. |
| Community Bus Lines, Inc. |
| Community Tours, Inc. |
| Douglas Braund Investments Limited |
| International Bus Services, Inc. |
| Limousine Rental Service Inc. |
| Paramus Northeast MGT. Co., L.L.C. |
| Red & Tan Enterprises SL Capital Corp. |
| Suburban Trails, Inc. |