**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| COACH USA, INC., *et al.*,[1] | Case No. 24-11258 (MFW) |
| Debtors. | (Joint Administration Requested) |
| | **Proposed Hearing Date:**<br>**July 16, 2024 at 2:00 p.m. (ET)** |
| | **Proposed Objection Deadline:**<br>**At (or before) the hearing** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING (I) THE
DEBTORS' DESIGNATION OF THE STALKING HORSE BIDDER FOR CERTAIN OF
THE DEBTORS' ASSETS AS SET FORTH IN THE STALKING HORSE AGREEMENT,
(II) THE DEBTORS' ENTRY INTO THE STALKING HORSE AGREEMENT, AND
(III) THE BID PROTECTIONS AND (B) GRANTING RELATED RELIEF**

Coach USA, Inc. and its affiliated debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors" or the "Company") hereby move the

Court (this "Motion" or "Stalking Horse Supplement") for the entry of an order, pursuant to

sections 105(a), 363, 365, and 1113 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 2002-1, 6004-1, 9006-1, and 9013-1(m) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), (A)(i) approving the designation of the GP Stalking

Horse Bidder (as defined below, and the bid thereunder, the "GP Stalking Horse Bid"), (ii)

approving the Debtors' entry into the GP Stalking Horse APA (as defined below), (iii) approving

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/CoachUSA.  The Debtors' mailing address is 160 S Route 17 North, Paramus, NJ 07652.

the bid protections provided to the GP Stalking Horse Bidders, including the payment of a break-up fee and the reimbursement of expenses, and (B) granting related relief. In support of this Motion, the Debtors rely on the *Supplemental Declaration of John Sallstrom in Support of the Motion* (the "Supp. Sale Declaration"), and respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503, 507, and 1113 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, 9008, and 9014, and Local Rules 2002-1, 6004-1, 9006-1, and 9013-1(m).

## PRELIMINARY STATEMENT

3.      Following the filing of the Bidding Procedures Motion[2] on June 12, 2024, which seeks, *inter alia*, approval of Bidding Procedures for the Debtors' Assets and the designation of

---

[2]      The "Bidding Procedures Motion" is the *Debtors' Motion for Entry of (A) An Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Designating Stalking Horse Bidders and Stalking Horse Bidder Protections, (III) Scheduling Auction for and a Hearing to Approve the Sale of Assets, (IV) Approving Notice of Respective Date, Time and Place for Auction and for a Hearing on Approval of the Sale, (V) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (VI) Approving Form and Manner of Notice Thereof, and (VII) Granting Related Relief; and (B) Orders Authorizing and Approving (I) The Sale of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests, (II) The Assumption and Assignment of Certain Executory Contracts, and Unexpired Leases, and (III) Granting Related Relief*

NewCo, Avalon, and ABC Stalking Horse Bidders, the Debtors continued their value-maximizing marketing process to solicit potential proposals for a portion of or all or substantially all of their assets.  As part of such process, the Debtors continued their pre-petition discussions with Great Plains Crew Change Company, LLC (the "GP Stalking Horse Bidder" or "Great Plains") regarding a potential stalking horse bid for the purchase of substantially all of the assets of the Powder River business segment as well as a portion of the  Butler business segment on a going concern basis, which were a subset of the Remaining Assets. Supp. Sale Decl. at ¶10.

4.      These continued negotiations have resulted in an agreement for the GP Stalking Horse Bidder to purchase the GP Assets (defined below), and, on July 5, 2024, the Debtors and Great Plains entered into the GP Stalking Horse APA, which embodies the GP Stalking Horse Bid. *Id*. at ¶13.

5.      Additionally, the Debtors believe that the marketing process to date has also generated considerable interest in the Debtors' Assets other than the GP Assets, and therefore believe that designation of the GP Stalking Horse Bid will not detract from the Debtors' ability to maximize the value of the remainder of the Assets.  Importantly, the GP Stalking Horse Bid also does not foreclose going concern bidders from making bids on all of the Debtors' Assets, including the GP Assets, or for other bidders to include the GP Assets as part of their bids, which may take varying other forms.

**BACKGROUND**

## I.      General Case Background

6.      On June 11, 2024 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

---

[Docket No. 20] (the "Bidding Procedures Motion"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Bidding Procedures Motion.

Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

7.      On the Petition Date, the Debtors filed a motion seeking joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. On June 25, 2024, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed, pursuant to section 1102 of the Bankruptcy Code, the Creditors' Committee. No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases.

8.      Information regarding the Debtors' history and business operations, capital structure, and the events leading up to the commencement of the Chapter 11 Cases can be found in *Declaration of Spencer Ware in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 15] (the "First Day Declaration").

## II.     Background Related to the Sale Process

9.      Information regarding the proposed sale process, the prepetition marketing and sales efforts, and the sale of the NewCo, Avalon, ABC, and Remaining Assets, can be found in the Bidding Procedures Motion and the Sale Declaration.[3]

## III.    The Sale of the GP Assets

10.     The Debtors entered into an asset purchase agreement with Great Plains Crew Change Company, LLC or its designee (as amended, supplemented, or otherwise modified by the

---

[3]      The "Sale Declaration" is the *Declaration of John Sallstrom in Support of Debtors' Motion for Entry of (A) An Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Designating Stalking Horse Bidders and Stalking Horse Bidder Protections, (III) Scheduling Auction for and a Hearing to Approve the Sale of Assets, (IV) Approving Notice of Respective Date, Time and Place for Auction and for a Hearing on Approval of the Sale, (V) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (VI) Approving Form and Manner of Notice Thereof, and (VII) Granting Related Relief; and (B) Orders Authorizing and Approving (I) The Sale of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests, (II) The Assumption and Assignment of Certain Executory Contracts, and Unexpired*

parties thereto, and including the schedules and exhibits attached thereto, the "GP Stalking Horse APA")—which provides for the purchase of substantially all of the assets of the Debtors' Powder River business segment as well as a portion of the Butler business segment (the "GP Business Segments"),[4] and such other assets as identified in the GP Stalking Horse APA (collectively, the "GP Assets"), on a going concern basis, for total cash consideration of $8,652,196 plus the assumption of certain assumed liabilities as set forth in the GP Stalking Horse APA. Supp. Sale Decl. at ¶¶10-13.

11.    Additionally, the GP Stalking Horse APA includes Great Plains' commitment to offer employment to over 100 of the Debtors' current employees at the GP Business Segments, which represents 99% of the Debtors' current employees at the Powder River business segment and the Butler business segment other than the Erie location, on an aggregate basis. With respect to the Erie location, Great Plains has committed under the GP Stalking Horse APA to offer employment to at least 10% of the Debtors' employees at that location upon request by the Debtors in the event the proposed sale process does not result in a going concern sale in connection with that location. Moreover, as set forth below, the GP Stalking Horse Bid provides for a cash deposit of 100% of the cash amount of the purchase price, helping to ensure a timely close under the terms and conditions of the GP Stalking Horse APA. *Id.* at ¶15.

12.    If this Motion is approved, the Remaining Assets of the Debtors will no longer include the GP Assets. Except as set forth herein, this Stalking Horse Supplement does not seek to materially change any other terms of the Bidding Procedures, including not limited to, the sale

---

*Leases, and (III) Granting Related Relief* [Docket No. 21] (the "Sale Declaration").

[4]    The GP Assets do not include assets, contracts, and leases solely related to the operations of the Butler business segment in Erie, PA.

timeline, provisions governing qualifications of bidders, or provisions governing the auction

process.

## RELIEF REQUESTED

13.    By this Motion, the Debtors seek entry of an order, substantially in the form

attached hereto as Exhibit A (the "Order"):

     a.     authorizing the Debtors to select the GP Stalking Horse Bidder as the
Stalking Horse Bidder for the GP Assets;

     b.     authorizing and approving the terms of and the Debtors' entry into the GP
Stalking Horse APA, and the bid thereunder (the "GP Stalking Horse
Bid"), substantially in the form and substance attached to the Bidding
Procedures Order as Exhibit 1, including approval of the bid protections
provided for therein; and

     c.     related relief.

14.    The Debtors have filed the form of Sale Order for the sale of the GP Assets

herewith as Exhibit D to the GP Stalking Horse APA.

## THE GP STALKING HORSE BID

15.    While the Debtors were unable to execute a stalking horse agreement with respect

to any of the Remaining Assets prior to the Petition Date, the Debtors, with the assistance of

their advisors, continued the pursuit of potential going concern transactions for the Remaining

Business Segments postpetition.[5] The Debtors determined that it that it would be in the best

interests of the estate to enter into a stalking horse bid for the GP Assets with the GP Stalking

Horse Bidder.  Supp. Sale Decl. at ¶¶10-12, 17-19.

16.    After the filing of the Bidding Procedures Motion, as noted above, the Debtors

continued to engage in negotiations with potential bidders regarding the terms of a stalking horse

---

[5]    The Debtors expressly reserved the right to supplement the Bidding Procedures Motion to seek approval of
any additional stalking horse agreements with respect to the Remaining Assets prior to the bidding
procedures hearing. Bidding Procedures Motion, ¶15.

proposal for various of the Remaining Assets.  As part of that process, Great Plains expressed continued interest in serving as stalking horse bidder for the GP Assets.  In conjunction with Houlihan Lokey and the Debtors' other advisors, the Debtors negotiated with Great Plains to further develop the terms of its bid.  After multiple rounds of negotiations, Great Plains proposed a bid for the GP Assets in exchange for $8,652,196 in cash, plus the assumption of certain liabilities, which would be subject to higher or otherwise better bids. *Id*. at ¶10.

17.     The Debtors evaluated the specific terms of Great Plains' proposal with the goal of maximizing recovery for all stakeholders, and among other things, the Debtors analyzed: (a) the amount of consideration provided; (b) the structure of the proposed transaction; (c) the requested bid protections and any possible impact on the sale of the Purchased Assets and the Debtors' other assets; and (d) risks relating to the bid. *Id*. at ¶11.

18.     After extensive negotiations and diligence, the Debtors, in consultation with their advisors, determined that the stalking horse proposal made by Great Plains is in the best interests of the Debtors, and on July 5, 2024, the Debtors and Great Plains entered into the GP Stalking Horse APA. *Id*. at ¶¶12-13

19.     Following arms'-length and good faith negotiations, the Debtors and the GP Stalking Horse Bidder have agreed upon the GP Stalking Horse APA, whereby the GP Stalking Horse Bidder will purchase the GP Assets.  The Debtors submit that the GP Stalking Horse APA promotes competitive bidding and maximizes of the value of the GP Assets by establishing a baseline bid for the GP Assets, which is subject to higher and otherwise better offers at the Auction. *Id*. at ¶¶14 & 19.

20.     The material terms of the GP Stalking Horse APA and the Order are summarized

in the following table:[6]

| Term (Agreement Citation) | Detail |
|---|---|
| **Provisions Providing Bid Protections to "Stalking Horse" Bidder**<br><br>**Local Rule 6004-1(c)(i)(C)** | GP Assets Sale:  The Debtors seek authority through this Motion to provide the GP Stalking Horse Bidder with certain bid protections in the event an Alternative Transaction (as defined in the GP Stalking Horse APA) is consummated with respect to all or any portion of the GP Assets, including: (a) a breakup fee equal to 3% of the base purchase price (i.e. $259,566); (b) reimbursement of the GP Stalking Horse Bidder's actual, reasonable, documented, out-of-pocket costs and expenses up to a maximum amount of $86,522; and (c) the requirement that the aggregate of the Qualified Bid(s) for the GP Assets be a price equal to or greater than (x) the amount of the total purchase price consideration set forth in the GP Stalking Horse APA, (y) the GP Assets Bid Protections (as defined below) of $346,088, and (z) an overbid amount of $200,000. |
| **Sellers** | Powder River Transportation Services, Inc.; Butler Motor Transit, Inc.; Gad-About Tours, Inc.; Transportation Management Services, Inc.; Elko, Inc.; Coach Leasing, Inc.; CAM Leasing, LLC; Coach USA, Inc.; and Coash USA Administration, Inc. (collectively, the "Sellers" and individually each a "Seller") |
| **Stalking Horse Bidder**<br><br>**(Recitals)**<br><br>**Local Rule 6004-1(b)(iv)(A)** | Great Plains Crew Change Company, LLC or its designee(s) (the "Purchaser").<br><br>The Purchaser is not an insider, as defined in section 101(31) of the Bankruptcy Code. |
| **Consideration**<br><br>**(Art. 3.1)**<br><br>**Local Rule 6004-1(b)(iv)(N)** | In consideration for the Purchased Assets, the Purchaser shall pay the sum of the following:<br><br>• the "all cash" sum in the amount of $8,652,196 (such amount, the "Cash Amount"); plus<br>• the aggregate amount of the Cure Costs assumed by the Purchaser up to the Cure Costs Cap; plus<br>• the aggregate amount of Employee PTO assumed by the Purchaser up to a maximum of $23,100; plus<br>• the aggregate amount of the Assumed Liabilities; less<br>• the amount of Prepayment/Deposits which Sellers have not paid or turned over to Purchaser at the Closing; less<br>• the amount of the Cure Costs assumed by the Purchaser in excess of the Cure Costs Cap; less |

[6]      The following summary is provided for convenience purposes only. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the GP Stalking Horse APA, attached to the Order as Exhibit 1.  To the extent any of the terms below are inconsistent with the GP Stalking Horse APA, the GP Stalking Horse APA shall control in all respects.

| Term (Agreement Citation) | Detail |
|---|---|
| | • the amount of Employee PTO assumed by the Purchaser in excess of $23,100.<br><br>The aggregate Purchase Price shall be reduced by one percent (1.0%) for every thirty (30) day period (or part of a thirty (30) day period) that the Closing occurs after August 19, 2024, for any reason whatsoever. |
| **Agreements with Management**<br><br>**Local Rule 6004-1(b)(iv)(B)** | N/A |
| **Releases**<br><br>**(Art. 7.5)**<br><br>**Local Rule 6004-1(b)(iv)(C)** | Effective as of the Closing, the Purchaser, on behalf of itself and its successors, assigns, Representatives, administrators and agents, and any other person or entity claiming by, though, or under any of the foregoing, does hereby unconditionally and irrevocably release, waive and forever discharge each Seller and each of the Sellers' past and present directors, officers, employees, advisors, accountants, investment bankers, attorneys, and agents from any and all claims, demands, damages, judgments, causes of action and liabilities or any nature whatsoever, whether or not known, suspected or claimed, arising directly or indirectly from any act, omission, event or transaction occurring (or any circumstances existing) with respect to the Business on or prior to the Closing; provided, however, that nothing contained therein shall release any rights or Claims which constitute Purchased Assets or rights or Claims under or acts, omission, event or transaction occurring with respect to the GP Stalking Horse APA, the Ancillary Documents and the transactions contemplated by the GP Stalking Horse APA.<br><br>Effective as of the Closing, each Seller, on behalf of itself and its successors, assigns, Representatives, administrators and agents, and any other person or entity claiming by, though, or under any of the foregoing, does hereby unconditionally and irrevocably release, waive and forever discharge Purchaser and each of the Purchaser's past and present directors, officers, employees, advisors, accountants, investment bankers, attorneys, and agents from any and all claims, demands, damages, judgments, causes of action and liabilities or any nature whatsoever, whether or not known, suspected or claimed, arising directly or indirectly from any act, omission, event or transaction occurring (or any circumstances existing) with respect to the Business on or prior to the Closing, provided, however, that nothing contained therein shall release any rights under or acts, omission, event or transaction occurring with respect to the GP Stalking Horse APA, the Ancillary Documents and the transactions contemplated by the GP Stalking Horse APA. |
| **Private Sale/No Competitive Bidding**<br><br>**Local Rule 6004-1(b)(iv)(D)** | The Debtors are proposing, and subject to the GP Stalking Horse Bid Protections, the GP Stalking Horse APA contemplates, an open marketing and auction process, subject to receiving a higher or better offer on or before the Bid Deadline. |

| Term (Agreement Citation) | Detail |
|---|---|
| **Closing Deadlines**<br><br>**(Art. 9.1(c))**<br><br>**Local Rule 6004-1(b)(iv)(E)** | The GP Stalking Horse APA may be terminated by the Seller or the Purchaser upon ten (10) calendar days' written notice if the Closing shall not have occurred on or prior to first Business Day which is 120 days after the Petition Date (the "Termination Date"). |
| **Good Faith Deposit**<br><br>**(Art. 3.3)**<br><br>**Local Rule 6004-1(b)(iv)(F)** | Within three (3) Business Days of the execution and delivery by the Parties of the GP Stalking Horse APA, the Purchaser shall deposit into an escrow account (the "Escrow Account") with Young Conaway Stargatt & Taylor, LLP, as escrow agent (the "Escrow Holder") an amount equal to the Cash Amount (the "Good Faith Deposit") in immediately available funds, pursuant to the bid requirements described in the Bidding Procedures. The Good Faith Deposit has been funded by the Purchaser pursuant to the Bidding Procedures.  Following the execution of the GP Stalking Horse APA by Sellers, the Good Faith Deposit Funds shall become nonrefundable upon the termination of GP Stalking Horse APA by Sellers pursuant to Section 9.1(d) (which such termination right is restricted, as provided below) and shall be refunded to the Purchaser upon the termination of the GP Stalking Horse APA for any other reason, including under Sections 9.1(a), 9.1(b), (c), (e), (f), or (g).  At the Closing, the Good Faith Deposit Funds shall be paid over to Sellers; provided, however, to the extent that the Good Faith Deposit Funds exceed the Adjusted Cash Amount, Sellers and Purchaser shall direct the Escrow Holder to remit such excess to Purchaser (rather than the Sellers) at Closing. In the event the Good Faith Deposit Funds become nonrefundable as provided therein before the Closing by reason of a termination pursuant to Section 9.1(d), the Escrow Holder shall immediately disburse the Good Faith Deposit Funds to Sellers to be retained by Sellers for their own account. Sellers' retention of the Good Faith Deposit Funds pursuant to the preceding sentence shall constitute liquidated damages for the Purchaser's breach, and, except for the loss of the Good Faith Deposit Funds, the Purchaser shall not have any further liability to Sellers and Sellers shall not have any further remedy against Purchaser. If the transactions contemplated therein terminate in accordance with the termination provisions thereof by any reason other than pursuant to Section 9.1(d) before the Sale Order is entered by the Bankruptcy Court, the Escrow Holder shall return to the Purchaser the Good Faith Deposit Funds. |
| **Interim Arrangements**<br><br>**(Art. 6.2)**<br><br>**Local Rule 6004-1(b)(iv)(G)** | From and after the date thereof until the earlier of the Closing Date and the termination of the GP Stalking Horse APA in accordance with the terms of Section 9 thereof, Sellers shall (a) maintain the Purchased Assets and operate and carry on the Business in the Ordinary Course of Business, and (b) not move to a different location any Purchased Equipment from the Assumed Leased Real Property, except as otherwise expressly required by the GP Stalking Horse APA or the Bankruptcy Case or with the consent of the Purchaser, which consent shall not be unreasonably withheld, conditioned, or delayed. Consistent with the foregoing and to the extent permitted or required in the Bankruptcy Case, Sellers shall use commercially reasonable efforts to (a) continue operating the Business as a going concern, and (b) maintain the Purchased Assets and the assets and properties of, or used by, Sellers relating to the |

| Term (Agreement Citation) | Detail |
|---|---|
| | Business consistent with the assumptions set forth in the Approved Budget (as defined in the DIP Credit Agreement) prepared by Sellers pursuant to the DIP Credit Agreement and approved by the Bankruptcy Court. In a manner that is reasonable and consistent with a debtor in possession, Sellers shall use commercially reasonable efforts to maintain the Purchased Vehicles in good operating condition, reasonable wear and tear excepted. Notwithstanding anything to the contrary in Section 6.2, the pendency of the Bankruptcy Case and the effects thereof shall in no way be deemed a breach of this Section 6.2. Absent Purchaser's prior written consent, Sellers shall not increase or modify the wages, salaries or benefits of any of Seller Employees nor shall they enter into any new or modified employment agreements with Seller Employees, notwithstanding the foregoing, Purchaser's consent shall not be required for Sellers' hiring and firing of employees in the normal course of business. |
| **Use of Proceeds** (Art. 3.2) **Local Rule 6004-1(b)(iv)(H)** | At the Closing, the Purchaser shall satisfy the Purchase Price as follows: <br> 1. to the extent that the Good Faith Deposit Funds are less than the Adjusted Cash Amount, the Purchaser shall deliver an amount equal to such shortfall via wire transfer of immediately available funds to the accounts designated by Sellers; <br> 2. the Purchaser shall pay directly to the obligees identified on Schedule 2.5 the Cure Costs or has otherwise assumed such Cure Costs applicable to the Purchased Assets; provided, however, that the Purchaser shall only be obligated to pay or assume a Cure Cost if it has assumed the underlying Liability to such obligee under the GP Stalking Horse APA; and <br> 3. with respect to the Assumed Liabilities, the Purchaser shall assume such Assumed Liabilities at the Closing and satisfy such Assumed Liabilities in accordance with their terms. |
| **Tax Exemptions** (Art. 7.1(b)) **Local Rule 6004-1(b)(iv)(I)** | It is the intention of the Parties that the transactions contemplated by the GP Stalking Horse APA be exempt from any sales Tax, use Tax, real property transfer or gains Tax, real property records recordation fees, documentary stamp Tax or similar Tax incurred in connection with the GP Stalking Horse APA or attributable to the sale or transfer of the Purchased Assets ("Transfer Taxes") pursuant to section 1146(a) of the Bankruptcy Code and any similar exemption provided by a state or local Legal Requirement. To the extent any Transfer Tax is not exempt in accordance with section 1146(a) of the Bankruptcy Code or any available exemption under an applicable state or local Legal Requirement, such Transfer Taxes shall be borne 50% by the Purchaser on one hand, and 50% by the Sellers on the other hand. The Party responsible under applicable Legal Requirements for filing Tax Returns and other documentation with respect to any Transfer Taxes shall properly file such Tax Returns and other documentation on a timely basis (and the other Party shall reasonably cooperate with respect thereto as necessary) and timely pay all such Transfer Taxes to the appropriate Governmental Authority. The other Party shall promptly reimburse the filing Party for fifty percent (50%) of the reasonable filing costs with respect to such Transfer Taxes upon receipt of proof of payment from the filing Party. Each Party agrees to use its, and to cause its |

| Term (Agreement Citation) | Detail |
|---|---|
| | Affiliates to use, commercially reasonable efforts to mitigate, reduce, or eliminate any Transfer Taxes. |
| **Record Retention** **(Arts. 7.1(c) & 7.7)** **Local Rule 6004-1(b)(iv)(J)** | The Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax, in each case, for any Pre-Closing Tax Period or Straddle Period. The Purchaser and Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for any Pre-Closing Tax Period or Straddle Period until the expiration of the applicable statute of limitations of the taxable period for which such Tax Returns and other documents related. Sellers and the Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business for any Pre-Closing Tax Period or Straddle Period.

In order to facilitate Sellers' efforts to (i) administer and close the Bankruptcy Case, and (ii) prepare tax returns (together, the "Post-Close Filings"), for a period of one (1) year following the Closing, the Purchaser shall permit Sellers and Sellers' counsel and accountants (collectively, "Permitted Access Parties") during regular business hours, with reasonable notice, reasonable access to the financial and other books and records that comprised part of the Purchased Assets that are required to complete the Post-Close Filings, which access shall include (A) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such required documents and records and (B) the Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they require, but only to the extent such Permitted Access Parties furnish the Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the costs and expenses of such copies and any such other costs the Purchaser incurs in connection with providing the Permitted Access Parties access to such records; provided, however, that the foregoing rights of access shall not be exercisable in such a manner as to interfere with the normal operations of the Purchaser's business. Notwithstanding anything contained in Section 7.7 to the contrary, in no event shall Sellers have access to any information that, based on advice of the Purchaser's counsel, could (1) reasonably be expected to create liability under applicable Legal Requirement, or waive any legal privilege, (2) result in the discharge of any Trade Secrets of the Purchaser, its Affiliates or any third parties or (3) violate any obligation of the Purchaser with respect to confidentiality. |
| **Sale of Avoidance Actions** **(Art. 2.1(n))** | The Purchased Assets include the Waived Avoidance Actions, which are Avoidance Actions against (i) the holder of a trade payable incurred in connection with the Business, (ii) a vendor or other creditor who received a payment within the ninety (90) days prior to the Petition Date from a Seller on |

| Term (Agreement Citation) | Detail |
|---|---|
| **Local Rule 6004-1(b)(iv)(K)** | a trade payable incurred in connection with the Business or (iii) the counterparty to an Assumed Contract, Assumed Equipment Leases or Assumed Real Property Leases, provided, that such Waived Avoidance Actions shall be waived by Sellers and the Purchaser prior to or as of Closing. Avoidance Actions does not include claims against "Insiders" as that term is defined in section 101(31) of the Bankruptcy Code or the Administrative Agent or DIP Lender, all of which shall remain with the Debtors. |
| **No Successor Liability** <br><br> **(Art. 1.1(mmmmm))** <br><br> **Local Rule 6004-1(b)(iv)(L)** | If the GP Stalking Horse Bidder is the Successful Bidder for the GP Assets, the Debtors intend to seek entry of a Sale Order that provides, among other things, that the GP Stalking Horse Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to the Debtors. |
| **Free and Clear of Unexpired Leases or Other Rights** <br><br> **(Art. 1.1(mmmmm))** <br><br> **Local Rule 6004-1(b)(iv)(M)** | The Debtors intend to seek entry of a Sale Order that provides, among other things, Court approval of the sale of the Purchased Assets free and clear of all Claims and Encumbrances as specifically set forth in the GP Stalking Horse APA and pursuant to (among other provisions) sections 105, 363, and 365 of the Bankruptcy Code. |
| **Relief from Bankruptcy Rule 6004(h)** <br><br> **Local Rule 6004-1(b)(iv)(O)** | As noted below, the Debtors are seeking a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h). |

21.    As set forth above, the GP Stalking Horse APA contains certain key provisions, each of which were specifically negotiated for by the GP Stalking Horse Bidder and which are a condition required by the GP Stalking Horse Bidder for the deal. The GP Stalking Horse APA contains a provision for (a) reimbursement of reasonable and documented fees and expenses of the GP Stalking Horse Bidders not to exceed $86,522 (the "GP Purchaser Expense Reimbursement") following the termination of the GP Stalking Horse APA under certain circumstances, and (b) a breakup fee equal to $259,566, which represents 3% of the cash purchase price (the "GP Break-Up Fee", and together with the GP Purchaser Expense Reimbursement, the "GP Bid Protections"), payable in certain events, including in the event that

the Debtors consummate an Alternative Transaction (as defined in the GP Stalking Horse APA) with respect to all or any portion of the GP Assets. *Id*. at ¶14.

22.     The GP Stalking Horse APA further provides for the purchase of the intellectual property, and personal property therein, as well as the assumption and assignment of the contracts and leases, respectively set forth in Schedules 2.1(b) and 2.1(c) therein.  The Accounts Receivables associated with the GP Assets are not being acquired as part of the GP Assets. Additionally, GP Stalking Horse APA includes Great Plains' commitment to offer employment to over 100 of the Debtors' current employees at the GP Business Segments.  Moreover, the GPA Stalking Horse APA provides that the Good Faith Deposit is for the entirety of the $8,652,196 cash amount, as opposed to the 10% deposit required for Qualified Bids under the Bidding Procedures. *Id*. at ¶15.

23.     The Debtors submit that the terms set forth above and in the GP Stalking Horse APA are the result of extensive, good-faith, arms'-length negotiations, and the GP Stalking Horse APA is currently the highest and best proposal for the GP Assets.  Further, the payment of the GP Bid Protections will not diminish the Debtors' estates as any Alternative Transaction or competing bid must exceed the bid set forth in the GP Stalking Horse APA by an amount that exceeds the sum of the GP Break-Up Fee and GP Purchaser Expense Reimbursement by at least $200,000, increasing the ultimate value of the sale to the benefit of the Debtors' stakeholders and parties in interest. *Id*. at ¶¶17-19.  Accordingly, the Debtors' proposed entry into the GP Stalking Horse APA for the GP Assets is in the best interest of the Debtors' estates, constitutes a sound exercise of the Debtors' business judgment, and should be approved.

## BASIS FOR RELIEF REQUESTED

**A.**     ***The Court Should Authorize Entry Into the GP Stalking Horse APA and Approve the GP Bid Protections.***

24.     The Court should approve Debtors' entry into the GP Stalking Horse APA and the proposed GP Bid Protections. The Debtors believe that the presence of the GP Stalking Horse Bidder will set a floor for the value of the GP Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the assets for the benefit of the Debtors' estates, their creditors and all other parties in interest. In the event that the GP Stalking Horse Bidder is not the winning bidder at the Auction for the GP Assets, but the GP Stalking Horse Bidder represents the second highest or best bid, it will be obligated to serve as a "backup" bidder (provided the Alternative Transaction is for all of the same assets as the GP Stalking Horse APA).  Supp. Sale Decl. at ¶19.

25.     The Court should also approve the proposed GP Bid Protections for the GP Stalking Horse APA.  The GP Bid Protections are a necessary condition for the GP Stalking Horse Bidder to enter into the GP Stalking Horse APA. Absent approval of the GP Bid Protections for the GP Stalking Horse Bidder, the Debtors may lose the opportunity to obtain the highest and otherwise best offer for the GP Assets through the Auction process. *Id*. at ¶¶16 & 19.

26.     Bidding incentives and protections such as these GP Bid Protections are valuable to chapter 11 debtors and have become a recognized practice in chapter 11 cases because they enable a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is reasonable and appropriate, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. *Id*. at ¶21.

27.     "The Third Circuit has expressly recognized as an administrative claim a stalking horse bidder's claim for a break-up fee and expense reimbursement if granting such a claim

provides a benefit to the estate." *In re Women First Healthcare, Inc*., 332 B.R. 115, 121 (Bankr.

D. Del. 2005). Such payments may be necessary to preserve the value of a debtor's estate if

assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that

otherwise would not have been made and without which bidding would have been limited." *In re*

*O'Brien Envtl. Energy, Inc*., 181 F.3d at 533. Further, if the availability of such payments were

to induce a bidder to research the value of the debtor and convert the value to a dollar figure on

which other bidders can rely, the bidder may have provided a benefit to the estate by increasing

the likelihood that the price at which the debtor is sold will reflect its true worth. *See id*.; *see also*

*In re Reliant Energy Channel View L*P, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a

break-up fee should be approved if it is necessary to entice a party to make the first bid or if it

would induce a stalking horse bidder to remain committed to a purchase).

28.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the

lower court as relevant in deciding whether to award a break-up fee:

a.      the presence of self-dealing or manipulation in negotiating the break-up fee;

b.      whether the fee harms, rather than encourages, bidding;

c.      the reasonableness of the break-up fee relative to the purchase price;

d.      whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the Auction;

e.      the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.      the correlation of the fee to a maximum value of the debtor's estate;

g.      the support of the principal secured creditors and creditors' committees of the break-up fee;

h.      the benefits of the safeguards to the debtor's estate; and

i.     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 536.

29.     While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the GP Bid Protections here.

30.     First, the GP Stalking Horse Bidder would not enter into the GP Stalking Horse APA without the GP Bid Protections. In addition, the GP Stalking Horse Bid attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the GP Stalking Horse Bidder heavily negotiated, including, among other things, the GP Stalking Horse APA and the schedules thereto, in making its bid. In sum, if the GP Assets are sold to a Successful Bidder other than the GP Stalking Horse Bidder, the Sale likely will be the result of the GP Stalking Horse Bidder's crucial role as an initial bidder generating interest in the GP Assets and establishing an acceptable price and offer against which other parties can bid. Indeed, the Debtors receive substantial value through the GP Stalking Horse Bid because it establishes not only a floor value for the GP Assets but also a path to monetize those assets without any material representations or warranties by the Debtors.

31.     Moreover, this Court has on several recent occasions approved the grant of superpriority administrative expense status to claims for break-up fees and expense reimbursements. *See, e.g.*, *In re Exide Holdings, Inc*., No. 20-11157 (CSS) (Bankr. D. Del. June 19, 2020) (authorizing priority expense status for break-up fee and expense reimbursement); *In re Bumble Bee Parent, Inc*., No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (same); *In re Scottish Holdings, Inc*., No. 18-10160 (LSS) (Bankr. D. Del. Feb. 28, 2018) (same); *In re*

*Terravia Holdings, Inc.*, No. 17-11655 (CSS) (Bankr. D. Del. Aug. 22, 2017) (same); *In re*

*Ensequence Inc.*, No. 18-10182 (KG) (Bankr. D. Del. Mar. 26, 2018) (same); *In re CIBER, Inc.*,

No. 17-10772 (BLS) (Bankr. D. Del. May 2, 2017) (same).  In addition, the Debtors submit that

the proposed GP Break-Up Fee of $259,566, representing 3% of the Purchase Price (as defined

in the GP Stalking Horse APA) and GP Purchaser Expense Reimbursement of $86,522,

representing approximately 1% of the Purchase Price for the GP Assets are reasonable given the

total amount of the Sale and the complexity associated therewith.  *See, e.g.*, *In re Celadon Grp.,*

*Inc.*, Case No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [Docket No. 219] (authorizing a

break-up fee of up to 3% of the purchase price plus an expense reimbursement of 1.5% of the

purchase price); *In re Bumblebee Parent Inc.*, Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19,

2019) [Docket No. 171] (approving a break-up fee of up to $23,125,000 (approximately 2.5%),

plus a separate expense reimbursement in the maximum amount of $2.5 million); *see also* 3

Collier on Bankruptcy P 363.02 (16th 2019) ("Courts have adopted as a rule of thumb a

limitation on a breakup or topping fee of about 3 percent of the consideration the buyer will pay

for the assets, including assumption of liabilities, although courts have approved higher amounts,

up to about 5 percent of the consideration, in unusual circumstances."). Here, the GP Bid

Protections are reasonable and appropriate and are not expected to chill bidding.  *See* Supp. Sale

Decl. at ¶21.

## **REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)**

32.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 14 days after entry of

the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy

Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or

unexpired . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

33.     The Debtors submit that cause exists to justify a waiver of the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d), as promptly closing the Sale is of critical importance.  The Debtors therefore request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## RESERVATION OF RIGHTS

34.     Nothing contained herein is intended, or should be construed, as an admission of the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claim. Nothing contained herein is intended, or should be construed, as an approval, assumption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

## NOTICE

35.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the 30 largest unsecured claims on a consolidated basis against the Debtors; (c) proposed counsel for the Creditors' Committee and any other official committee appointed in the Chapter 11 Cases; (d) counsel to Wells Fargo Bank, National Association in its capacity as DIP Agent and Prepetition ABL Administrative Agent; (e) counsel to the Stalking Horse Bidders; (f) the United States Attorney for the District of Delaware; (g) the attorneys general for each of the states in which the Debtors conduct business operations; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) all known taxing authorities for the jurisdictions to which the Debtors are subject; (k) all environmental authorities having jurisdiction over any of the GP Assets; (l) all state, local or federal agencies, including any departments of transportation, having jurisdiction

over any aspect of the Debtors' business operations; (m) all entities known or reasonably believed to have asserted a lien on any of the GP Assets; (n) counterparties to the Debtors' executory contracts and unexpired leases; (o) all persons that have expressed to the Debtors an interest in a transaction with respect to the GP Assets during the past six (6) months; (p) the State of Texas, acting through the Texas Department of Transportation; (q) the office of unclaimed property for each state in which the Debtors conduct business; (r) the Pension Benefit Guaranty Corporation; (s) the Surface Transportation Board and all other Governmental Authorities (as defined in the NewCo Stalking Horse APA) with regulatory jurisdiction over any consent required for the consummation of the transactions; (t) the Federal Motor Carrier Safety Administration; (u) the Federal Trade Commission; (v) the U.S. Department of Justice; (w) each of the Unions; and (x) those parties who have formally filed a request for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 at the time of service.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

*[The remainder of this page is intentionally left blank]*

Dated:  July 5, 2024
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/Joseph M. Mulvihill*
Sean M. Beach (No. 4070)
Joseph M. Mulvihill (No. 6061)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:         sbeach@ycst.com
               jmulvihill@ycst.com
               rlamb@ycst.com
               bcarver@ycst.com

*- and -*

**ALSTON & BIRD LLP**
J. Eric Wise (admitted *pro hac vice*)
Matthew K. Kelsey (admitted *pro hac vice*)
William Hao (admitted *pro hac vice*)
90 Park Avenue
New York, New York 10016
Telephone:     (212) 210-9400
Facsimile:     (212) 210-9444
Email:         eric.wise@alston.com
               matthew.kelsey@alston.com
               william.hao@alston.com

*Proposed Counsel to the Debtors and Debtors in Possession*