# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| COACH USA, INC., *et al.*,[1] | Case No. 24-24-11258 (MFW) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF JOHN SALLSTROM IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING (I) THE DEBTORS' DESIGNATION OF THE STALKING HORSE BIDDER FOR CERTAIN OF THE DEBTORS' ASSETS AS SET FORTH IN THE STALKING HORSE AGREEMENT, (II) THE DEBTORS' ENTRY INTO THE STALKING HORSE AGREEMENT, AND (III) THE BID PROTECTIONS AND (B) GRANTING RELATED RELIEF**

John Sallstrom, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am a Director in the Financial Restructuring Group for Houlihan Lokey, an investment banking and advisory firm with its principal office at 10250 Constellation Blvd., 5th Floor, Los Angeles, CA 90067.

2. Houlihan Lokey has been engaged to serve as proposed investment banker to Coach USA, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" or the "Company").

3. I submit this declaration in support of *Debtors' Motion for Entry of an Order (A) Approving (I) the Debtors' Designation of the Stalking Horse Bidder for Certain of the Debtors' Assets as Set forth in the Stalking Horse Agreement, (II) the Debtors' Entry into the Stalking Horse Agreement, and (III) the Bid Protections and (B) Granting Related Relief* (the "Motion" or "Stalking Horse Supplement").[2]

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/CoachUSA. The Debtors' mailing address is 160 S Route 17 North, Paramus, NJ 07652.

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

1

4. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, personal knowledge gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management or members of Houlihan Lokey, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs. I have reviewed and I am familiar with the Motion, the GP Stalking Horse APA, and the Bidding Procedures and I am authorized to submit this declaration. If called upon to testify, I could and would testify competently to the facts set forth herein.

## Qualifications

5. I am a member of Houlihan Lokey's Financial Restructuring Group. While working at Houlihan Lokey over the course of 12 years, I have gained significant experience advising clients in restructuring transactions across a diverse range of industries. I specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions, raising capital for troubled businesses and advising debtors and creditor constituencies in bankruptcy proceedings. My distressed sale and restructuring experiences include advising distressed companies, official committees of creditors and other significant stakeholders, including the following bankruptcies: Cineworld Group plc, Catalina Marketing Corporation, Garrett Motion Inc., RentPath Holdings, Inc., Aceto Corporation, ATD Corporation and Westinghouse Electric Company LLC, among others.

6. Houlihan Lokey is global investment bank with 36 locations worldwide and over 1,800 financial professionals with expertise in mergers and acquisitions, capital markets, financial restructuring, and financial and valuation advisory. The firm was ranked as the No. 1 investment bank for all global M&A transactions in 2023, the No. 1 global restructuring advisor in 2023, and

the No. 1 global M&A fairness opinion advisor over the past 25 years, all based on number of transactions and according to data provided by LSEG (formerly Refinitiv). Houlihan Lokey serves more than 2,000 clients annually ranging from closely held companies to global corporations.

7. Houlihan Lokey's Financial Restructuring Group, which has more than 275 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest involved in financially troubled companies based in a variety of industries and requiring complex financial restructurings, both in and outside of bankruptcy. Houlihan Lokey has been, and is, involved in a number of large restructuring cases in the United States. In particular, Houlihan Lokey has extensive experience in providing advisory services to debtors and creditors in complex sale transactions pursuant to section 363 of the Bankruptcy Code.

8. Among other advisory services, Houlihan Lokey has: (a) familiarized itself with the assets and operations of the Debtors; (b) reviewed the Debtors' liquidity and projected cash flow; (c) assisted the Debtors in evaluating financing alternatives; and (d) helped the Debtors prepare for a potential chapter 11 filing.  Houlihan Lokey has run and continues to pursue a marketing process to identify potential investors or purchasers to engage in a strategic merger, acquisition or other corporate transaction to acquire all or portions of the Debtors as a going concern or otherwise. I also have participated in (a) discussions among the Debtors, their creditors and other interested parties and (b) meetings with the Debtors' Board of Directors to keep the Board apprised of the restructuring process and provide advice regarding strategic alternatives, including a chapter 11 process.

9. Since Houlihan Lokey's engagement on or about November 7, 2023, I, along with other members of the team at Houlihan Lokey, have worked closely with the Debtors' senior

management team, CR3 Partners ("CR3"), and Alston & Bird LLP, the Debtors' proposed co-counsel in these Chapter 11 Cases, and have become knowledgeable about the Debtors' business, finances, operations and systems to allow us to provide an assessment of, and demonstrate the need for, a proposed process and timeline for the sale of the Debtors' assets in the event that a standalone restructuring cannot be accomplished.

### The GP Stalking Horse Bid

10. After the filing of the Bidding Procedures Motion on June 12, 2024, the Debtors continued to engage in negotiations with potential bidders regarding the terms of a stalking horse proposal for various of the Remaining Assets. As part of that process, Great Plains Crew Change Company, LLC (the "GP Stalking Horse Bidder" or "Great Plains") expressed continued interest in serving as stalking horse bidder for the purchase of substantially all of the assets of the Powder River business segment as well as a portion of the Butler business segment on a going concern basis, which were a subset of the Remaining Assets. In conjunction with Houlihan Lokey and the Debtors' other advisors, the Debtors continued their pre-petition negotiations with Great Plains extensively to further develop the terms of its bid. After multiple rounds of negotiations, Great Plains proposed a bid for the GP Assets (as defined below) in exchange for $8,652,196 in cash plus the assumption of certain assumed liabilities as set forth in the GP Stalking Horse APA, which would be subject to higher or otherwise better bids.

11. The Debtors evaluated the specific terms of Great Plains' proposal with the goal of maximizing recovery for all stakeholders, and among other things, the Debtors analyzed: (a) the amount of consideration provided; (b) the structure of the proposed transaction; (c) the requested bid protections and any possible impact on the sale of the Purchased Assets and the Debtors' other assets; and (d) risks relating to the bid.

12. The Debtors determined, with the assistance of their advisors, that the GP Stalking Horse APA contained the most favorable terms available at this time for the sale of substantially all of the assets of the Debtors' Powder River business segment as well as a portion of the Butler business segment (the "GP Business Segments") and such other assets as identified in the GP Stalking Horse APA (collectively, the "GP Assets") on a going concern basis.

13. As a result, on July 5, 2024, the Debtors executed the GP Stalking Horse APA, which agreement shall serve as the stalking horse agreement for the GP Assets at the Auction (to the extent the Debtors receive another Qualified Bid for the GP Assets prior to the Bid Deadline). The GP Stalking Horse APA provides for total consideration for the GP Assets for total cash consideration of $8,652,196 plus the assumption of certain assumed liabilities as set forth in the GP Stalking Horse APA.

14. Pursuant to the GP Stalking Horse APA, the Debtors have agreed, after arms'-length negotiations with the GP Stalking Horse Bidder and subject to Court approval, to provide the GP Stalking Horse Bidder with bid protections in the form of for (a) reimbursement of reasonable and documented fees and expenses of the GP Stalking Horse Bidders not to exceed $86,522 (the "GP Purchaser Expense Reimbursement") following the termination of the GP Stalking Horse APA under certain circumstances, and (b) a breakup fee equal to $259,566, which represents 3% of the cash purchase price (the "GP Break-Up Fee", and together with the GP Purchaser Expense Reimbursement, the "GP Bid Protections"), payable in certain events, including in the event that the Debtors consummate an Alternative Transaction (as defined in the GP Stalking Horse APA) with respect to all or any portion of the GP Assets.

15. The GP Stalking Horse APA further provides for the purchase of intellectual property, and personal property therein, as well as the assumption and assignment of the

contracts and leases, respectively set forth in Schedules 2.1(b) and 2.1(c) therein. The Accounts Receivables associated with the GP Assets are not being acquired as part of the GP Assets. Additionally, the GP Stalking Horse APA includes Great Plains' commitment to offer employment to over 100 of the Debtors' current employees at the GP Business Segments, which represents 99% of the Debtors' current employees at the Powder River business segment and the Butler business segment other than the Erie location, on an aggregate basis. With respect to the Erie location, Great Plains has committed under the GP Stalking Horse APA to offer employment to at least 10% of the Debtors' employees at that location upon request by the Debtors in the event the proposed sale process does not result in a going concern sale in connection with that location. Moreover, the GPA Stalking Horse APA provides for a cash deposit of 100% of the cash amount of the purchase price, helping to ensure a timely close under the terms and conditions of the GP Stalking Horse APA.

16. The GP Bid Protections are a necessary condition for the GP Stalking Horse Bidder to enter into the GP Stalking Horse APA, as the GP Stalking Horse Bidder was unwilling to hold open its offer without assurance of payment of the key provisions set forth above under the conditions set forth in the GP Stalking Horse APA. Further, the payment of the GP Bid Protections will not diminish the Debtors' estates as any Alternative Transaction (as defined in the GP Stalking Horse APA) or competing bid must exceed the bid set forth in the GP Stalking Horse APA by an amount that exceeds the sum of the GP Break-Up Fee and GP Purchaser Expense Reimbursement by at least $200,000, increasing the ultimate value of the sale to the benefit of the Debtors' stakeholders and parties in interest.

17. The GP Stalking Horse Bid constitutes the best offer reasonably available for the GP Assets at this time. It is my opinion that subjecting the GP Stalking Horse Bid to the

competitive bidding and auction process established by the Bidding Procedures will enable the Company to solicit higher or otherwise better bids for the benefit of all stakeholders. The goal of the Debtors' continued postpetition sale process is now to leverage the GP Stalking Horse APA to have new or existing bidders submit offers for the GP Assets in accordance with the Bidding Procedures. I believe that this process is the best option reasonably available given the circumstances to generate the greatest level of interest in purchasing the GP Assets and to reach the Company's objective of achieving the highest value available at this time for its stakeholders.

18. Given the breadth of this marketing effort, I believe many of the potential buyers that are most likely to make Qualified Bids on the GP Assets have already been contacted by Houlihan Lokey as part of the sale process, have had the opportunity to make proposals, and are aware of the Debtors' goal of effectuating a prompt sale process to achieve the highest value available.

19. In addition, that the presence of the GP Stalking Horse Bidder will set a floor for the value of the respective Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the assets for the benefit of the Debtors' estates, their creditors and all other parties in interest. In the event that the GP Stalking Horse Bidder is not the winning bidder at the Auction for the GP Assets, but the GP Stalking Horse Bidder represents the second highest or best bid, it will be obligated to serve as a "backup" bidder (provided the Alternative Transaction is for the same assets as the GP Stalking Horse APA.

20. Bidding incentives and protections such as these GP Bid Protections are valuable to chapter 11 debtors and have become a recognized practice in chapter 11 cases because they enable a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is reasonable and appropriate, while providing the debtor with the potential of obtaining an

enhanced recovery through an auction process.

21. I believe that the Debtors' decision to offer the GP Bid Protections are (a) commensurate to the benefits conferred upon the Debtors' estates by the GP Stalking Horse Bidder; (b) reasonable and appropriate in light of the circumstances and the size and nature of the proposed sale and the efforts that have been and will be expended by the GP Stalking Horse Bidder; and (c) are not expected to chill bidding on the GP Assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 5, 2024
Minneapolis, Minnesota

*/s/ John Sallstrom*
John Sallstrom