## EXHIBIT A

**Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**by and among**

**the Sellers set forth on Schedule A**

**and**

**Great Plains Crew Change Company, LLC or its designee(s)**

**Dated as of July 8, 2024**

# TABLE OF CONTENTS

**Page**

**SECTION 1 DEFINITIONS** ............................................................................... **2**

    1.1    Definitions ................................................................................. 2

    1.2    Other Definitional and Interpretive Matters ........................... 14

**SECTION 2 PURCHASE AND SALE** ............................................................... **15**

    2.1    Purchased Assets ..................................................................... 15

    2.2    Excluded Assets ...................................................................... 18

    2.3    Assumed Liabilities ................................................................ 19

    2.4    Excluded Liabilities ................................................................ 19

    2.5    Assignments; Cure Amounts .................................................. 21

    2.6    Further Assurances ................................................................. 22

**SECTION 3 PURCHASE PRICE AND CLOSING** .......................................... **23**

    3.1    Purchase Price ......................................................................... 23

    3.2    Closing Date Payment ............................................................ 23

    3.3    Good Faith Deposit ................................................................ 24

    3.4    Allocation of Purchase Price .................................................. 24

    3.5    Closing Date ........................................................................... 25

    3.6    Deliveries of the Purchaser .................................................... 25

    3.7    Deliveries of Sellers ............................................................... 25

**SECTION 4 REPRESENTATIONS AND WARRANTIES OF SELLERS** ......... **26**

    4.1    Organization of Sellers .......................................................... 26

    4.2    Subsidiaries ............................................................................ 27

    4.3    Authority of Sellers ................................................................ 27

    4.4    Title to the Purchased Assets; Sufficiency ............................ 27

    4.5    Consent and Approvals ........................................................... 27

    4.6    Real Property .......................................................................... 28

    4.7    Regulatory Matters; Permits .................................................. 28

    4.8    Litigation ................................................................................ 28

    4.9    Vehicles and Tires .................................................................. 29

    4.10   Intellectual Property ............................................................... 29

    4.11   Material Contracts and Agreements ....................................... 30

    4.12   Labor Relations ...................................................................... 30

    4.13   Employee Benefits ................................................................. 31

    4.14   NO OTHER REPRESENTATIONS ...................................... 31

**SECTION 5 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ......... **32**

    5.1    Organization and Authority of the Purchaser ........................ 32

-i-

5.2     Litigation ........................................................................................... 32
5.3     No Brokers ......................................................................................... 33
5.4     Adequate Assurances Regarding Assumed Contracts, Assumed Equipment
        Leases and Assumed Real Property Leases; Good Faith ...................................... 33
5.5     Financing ........................................................................................... 33
5.6     Ownership of Sellers ............................................................................ 33
5.7     No Inducement or Reliance; Independent Assessment ....................................... 33

**SECTION 6 ACTION PRIOR TO THE CLOSING DATE** ........................................... **34**

6.1     Access to Information ........................................................................... 34
6.2     Conduct of Business Prior to the Closing Date .................................................. 35
6.3     Notification of Breach; Disclosure ............................................................ 35
6.4     Insurance ........................................................................................... 36
6.5     Bankruptcy Court Approval; Procedures ....................................................... 36
6.6     Bankruptcy Filings ............................................................................... 36
6.7     Vacation of Assumed Leased Real Property. .................................................... 38
6.8     Vehicle Titles ..................................................................................... 38

**SECTION 7 ADDITIONAL AGREEMENTS** ........................................................... **38**

7.1     Taxes ................................................................................................ 38
7.2     Employees and Employee Benefit Plans ......................................................... 39
7.3     Collection of Receivables........................................................................ 42
7.4     Asset Transfer...................................................................................... 43
7.5     Mutual Release. ................................................................................... 43
7.6     Adequate Assurances Regarding Assumed Contracts, Assumed Equipment
        Leases and Assumed Real Property Leases ..................................................... 43
7.7     Reasonable Access to Records and Certain Personnel........................................ 44
7.8     Relocation and Storage of Vehicles ........................................................... 44

**SECTION 8 CONDITIONS TO CLOSING** ............................................................. **44**

8.1     Conditions to Obligations of Each Party ....................................................... 44
8.2     Conditions to Obligations of the Purchaser.................................................... 45
8.3     Conditions to Obligations of Sellers ........................................................... 45

**SECTION 9 TERMINATION** ............................................................................. **46**

9.1     Termination ........................................................................................ 46
9.2     Effect of Termination ............................................................................ 47
9.3     Purchaser's Right to Exclude Certain Contracts and Leases. ............................... 47
9.4     Good Faith Deposit ............................................................................... 47
9.5     Purchaser Protections. ........................................................................... 48

**SECTION 10 SURVIVAL**................................................................................................ **48**

**SECTION 11 GENERAL PROVISIONS** ........................................................................ **48**

    11.1    Confidential Nature of Information.................................................... 48
    11.2    No Public Announcement ................................................................. 49
    11.3    Notices.............................................................................................. 49
    11.4    Successors and Assigns .................................................................... 50
    11.5    Entire Agreement; Amendments; Schedules..................................... 51
    11.6    Waivers............................................................................................. 51
    11.7    Expenses ........................................................................................... 51
    11.8    Partial Invalidity ............................................................................. 51
    11.9    Execution in Counterparts ............................................................... 51
    11.10  Governing Law................................................................................. 51
    11.11  No Third Party Beneficiaries............................................................ 52

## SCHEDULES

| Section | Schedule |
|---------|----------|
| Preamble | List of Sellers |
| 1.2 | Seller Employees |
| 2.1(a) | Equipment |
| 2.1(b) | Assumed and Rejected Contracts |
| 2.1(c) | Assumed and Rejected Real Property Leases |
| 2.1(d) | Permits |
| 2.1(e) | Intellectual Property |
| 2.1(f) | Documents |
| 2.1(g) | Telephone and Other Directory Listings |
| 2.1(h) | Purchased Deposit |
| 2.1(j) | Assumed Equipment Leases |
| 2.1(q) | Purchased Vehicles |
| 2.1(r) | Other Purchased Assets |
| 2.2(n) | Additional Excluded Assets |
| 2.3(f) | Prepayments/Deposits |
| 2.5 | Cure Costs |
| 2.6(c)(iv) | Email Addresses to be Forwarded |
| 3.4 | Purchase Price Allocation |
| 4.2 | Subsidiaries |
| 4.5 | Governmental Consents |
| 4.6(b) | Leased Real Property |
| 4.6(c) | Environmental |
| 4.7(a) | Material Permits |
| 4.9(a) | Purchased Vehicles |
| 4.10(a) | Intellectual Property |
| 4.11 | Material Contracts and Agreements |
| 4.12 | Collective Bargaining Agreements |
| 4.13(a) | Certain Seller Plans |
| 4.13(d) | Material Seller Plans |
| 5.3 | Brokers |
| 7.2(a) | Employee Benefit Plans |

## EXHIBIT LIST

| EXHIBIT A | - | FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT |
|-----------|---|---------------------------------------------|
| EXHIBIT B | - | FORM OF BIDDING PROCEDURES ORDER |
| EXHIBIT C | - | FORM OF BILL OF SALE |
| EXHIBIT D | - | FORM OF SALE ORDER |

*Execution Version*

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of July 8, 2024 (the "Agreement Date"), by and among the entities set forth on Schedule A hereto (collectively, the "Sellers" and individually each a "Seller"), and Great Plains Crew Change Company, LLC, a Delaware limited liability company or its designee(s) (the "Purchaser"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Section 1.1.

**WHEREAS**, Sellers are in the business of providing, among other things, motorcoach services, including motorcoach charters, tours and sightseeing, commuter transportation, airport and casino shuttles, and contract services for municipalities and corporations, throughout the United States (solely with respect to the business operations in connection with the Powder River and Butler Business Segments, excluding operations at the Erie, Pennsylvania location, as those terms are defined and described in the First Day Declaration, the "Business");

**WHEREAS**, on or about June 11, 2024, Sellers, together with certain of their Affiliates and subsidiaries, commenced voluntary cases (the "Bankruptcy Case") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), the date of the commencement of the Bankruptcy Case in the Bankruptcy Court being the "Petition Date";

**WHEREAS**, Sellers desire to sell, transfer and assign to the Purchaser, all of the Purchased Assets, and the Purchaser desires to purchase, acquire and accept from Sellers all of the Purchased Assets, and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties intend to effectuate the transactions contemplated by this Agreement pursuant to sections 105, 363 and 365 of the Bankruptcy Code;

**WHEREAS**, the Parties intend, among other things, that following the execution of this Agreement, the Purchaser will be a "stalking horse bidder" pursuant to the Bidding Procedures for the Purchased Assets;

**WHEREAS**, in the absence of the Sellers' acceptance of a higher and better bid(s) made in accordance with the Bidding Procedures, the Purchaser will purchase, acquire and accept and the Sellers will sell, transfer and assign all of the Sellers' right, title and interest in and to the Purchased Assets and the Purchaser will assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in this Agreement, pursuant to, among other provisions thereof, section 363 of the Bankruptcy Code, free and clear of Encumbrances (except for Permitted Encumbrances), Indebtedness and Liabilities, and in accordance with the Bidding Procedures and subject to entry of the Sale Order by the Bankruptcy Court; and

**WHEREAS**, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and

for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## SECTION 1
## DEFINITIONS

1.1    <u>Definitions</u>. In this Agreement, the following terms have the meanings specified or referred to in this <u>Section 1.1</u> and shall be equally applicable to both the singular and plural forms.

(a)    "<u>Accounts Receivable</u>" means, with respect to the Business, all accounts receivable and other rights to payment generated by the Business prior to the Closing Date and the full benefit of all security for such accounts receivable or rights to payment, including all accounts receivable in respect of goods shipped or products sold or services rendered to customers of the Business prior to the Closing Date, any other miscellaneous accounts receivable of the Business that arose prior to the Closing Date, and any claim, remedy or other right of the Business related to any of the foregoing.

(b)    "<u>Action</u>" means any action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

(c)    "<u>Administrative Agent</u>" means Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent for the lenders under the Credit Agreement.

(d)    "<u>Adjusted Cash Amount</u>" means the Cash Amount, <u>*minus*</u> (i) any Prepayment/Deposits Credit, <u>*minus*</u> (ii) any Excess Cure Costs, <u>*minus*</u> (iii) any Excess Employee PTO, <u>*minus*</u> (iv) any Closing Delay Adjustment, and <u>*minus*</u> or <u>*plus*</u>, as applicable (v) any adjustment pursuant to <u>Section 7.1(a)</u>.

(e)    "<u>Affiliate</u>" means, as to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

(f)    "<u>Agreement</u>" has the meaning specified in the preamble.

(g)    "<u>Agreement Date</u>" has the meaning specified in the preamble.

(h)    "<u>Allocation</u>" has the meaning specified in <u>Section 3.4</u>.

(i)    "<u>Alternative Transaction</u>" has the meaning specified in <u>Section 9.1</u>.

(j)    "<u>Ancillary Documents</u>" means the Bill of Sale, the Assumption and Assignment Agreement, the Assignment of Trademarks, the Assignment of Domain Names, the

Assumption and Assignment of Leases, and each other agreements, documents or instruments (other than this Agreement) executed and delivered by the Parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

(k)     "Asset Assignee" has the meaning specified in Section 7.4.

(l)     "Assignment of Domain Names" has the meaning specified in Section 3.7(b).

(m)     "Assignment of Trademarks" has the meaning specified in Section 3.7(b).

(n)     "Assumed Contracts" has the meaning specified in Section 2.1(b).

(o)     "Assumed Equipment Leases" has the meaning specified in Section 2.1(j).

(p)     "Assumed Liabilities" has the meaning specified in Section 2.3.

(q)     "Assumed Leased Real Property" means any Leased Real Property that is the subject of an Assumed Real Property Lease.

(r)     "Assumed Real Property Leases" has the meaning specified in Section 2.1(c).

(s)     "Assumption and Assignment Agreement" means the Assumption and Assignment Agreement in substantially the form of Exhibit A.

(t)     "Assumption and Assignment of Leases" has the meaning specified in Section 3.7(f).

(u)     "Assumption Notice" has the meaning specified in the Bidding Procedures Order.

(v)     "Auction" has the meaning set forth in the Bidding Procedures.

(w)     "Avoidance Actions" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code, other than claims against "Insiders" as that term is defined in section 101 (31) of the Bankruptcy Code), the Administrative Agent, or DIP Lender.

(x)     "Bankruptcy Case" has the meaning specified in the recitals.

(y)     "Bankruptcy Code" means title 11 of the United States Code, sections 101-1532.

(z)     "Bankruptcy Court" has the meaning specified in the recitals.

(aa)     "Bidding Procedures" means, collectively, the bidding procedures attached as Exhibit B to the Bidding Procedures Order, together with any such changes thereon or

supplements thereto, if any, as shall have been made in accordance with the Bidding Procedures Order.

(bb)    "Bidding Procedures Order" means the Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014 Approving (I) Bidding Procedures, (II) Form and Manner of Sale Notices, and (III) Sale Hearing Date, a form of which is attached hereto as Exhibit B.

(cc)    "Bid Protections" has the meaning set forth in Section 9.5.

(dd)    "Bill of Sale" means a Bill of Sale in substantially the form attached hereto as Exhibit C.

(ee)    "Break-Up Fee" has the meaning set forth in Section 9.5.

(ff)    "Business" has the meaning specified in the recitals.

(gg)    "Business Day" means any day of the year on which banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close

(hh)    "Cash and Cash Equivalents" means all Sellers' cash (including petty cash and checks received or in transit, including all checks and drafts that have been submitted, posted or deposited, prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper and government securities and other cash equivalents.

(ii)    "Cash Amount" has the meaning specified in Section 3.1(a).

(jj)    "Claim" has the meaning given that term in section 101(5) of the Bankruptcy Code.

(kk)    "Closing" has the meaning specified in Section 3.5.

(ll)    "Closing Date" has the meaning specified in Section 3.5.

(mm)    "Closing Delay Adjustment" has the meaning specified in Section 3.1.

(nn)    "Code" means the United States Internal Revenue Code of 1986, as amended.

(oo)    "Collective Bargaining Agreements" has the meaning specified in Section 4.12.

(pp)    "Confidentiality Agreement" means that certain Confidentiality Agreement dated February 17, 2024, by and between Coach USA, Inc. and Wynne Transportation Holdings, LLC, an Affiliate of Purchaser.

(qq)  "Contract" means any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral), and any amendment thereto, that is legally binding, other than a Lease, to which a Seller is party.

(rr)  "Copyrights" means all United States and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals and extensions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

(ss)  "Credit Agreement" means the Credit Agreement, dated as of April 16. 2019, among Project Kenwood Acquisition, LLC as the borrower, certain other borrowers party thereto, the lenders from time to time party thereto and the Administrative Agent (as amended, modified or supplemented from time to time in accordance therewith).

(tt)  "Cure Costs" has the meaning specified in Section 2.5(a).

(uu)  "Cure Costs Cap" means $46,200 in the aggregate for all Cure Costs applicable to the Purchaser.

(vv)  "Customer Contracts" means any Contracts between any of the Sellers and its customers, charter companies or travel agents to provide motorcoach services, including motorcoach charters, tours and sightseeing, commuter transportation, airport and casino shuttles, and contract services for municipalities and corporations, each as part of the Business and for which the service has not been performed prior to the Closing Date.

(ww)  "DIP Agent" means Wells Fargo, National Association, in its capacity as administrative agent and collateral agent for the DIP Lenders.

(xx)  "DIP Credit Agreement" means that certain Debtor-in-Possession Credit Agreement, dated as of June 11, 2024, among the debtors in the Bankruptcy Case, the lenders from time-to-time party thereto, and the DIP Agent (as may be amended, modified or supplemented from time to time in accordance therewith).

(yy)  "DIP Lender" means the lenders from time-to-time party to the DIP Credit Agreement.

(zz)  "Documents" means all books, records (including, without limitation, vehicle maintenance records), files, invoices, inventory records, product specifications, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, correspondence, data, records and laboratory books and credit records of customers (including all data and other information in electronic form, or otherwise stored on discs, tapes or other media) to the extent used in or to the extent relating to the Purchased Assets.

(aaa)    "Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet

(bbb)    "Eligible Employee" has the meaning specified in Section 7.2(b).

(ccc)    "Employee PTO" has the meaning specified in Section 2.3(d).

(ddd)    "Encumbrance" means any interest, charge, lien, Claim, mortgage, lease, sublease, license or use and occupancy rights or agreement, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, survey exception, reciprocal easement, or other similar restriction or encumbrance of any kind.

(eee)    "Environmental Laws" means any Legal Requirement or agreement with any Governmental Authority (i) relating to pollution (or the cleanup thereof or the filing of information with respect thereto), human health or the protection of air, surface water, ground water, drinking water supply, land (including land surface or subsurface), plant and animal life or any other natural resource, or (ii) concerning exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production or disposal of Regulated Substances, in each case as amended and as now or hereafter in effect. The term "Environmental Laws" includes any common law or equitable doctrine (including injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to or threatened as a result of the presence of, exposure to, or ingestion of, any Regulated Substance.

(fff)    "Environment Material Adverse Effect" means, with respect to any Assumed Leased Real Property, that there has been or is a Release of any Regulated Substances in violation of the Environmental Laws on or affecting any Assumed Leased Real Property, which (i) has not been fully remediated in accordance with the Environmental Laws as approved by a Governmental Authority, and (ii) imposes a liability not covered by insurance or in excess of insurance coverage which obligates or imposes, or Purchaser reasonably determines that it would be reasonably likely to obligate or impose, Liability on the tenant under the Assumed Real Property Lease for the Assumed Leased Real Property to incur material cost and expense to remediate such Assumed Leased Real Property so that it is in compliance with Environmental Laws.

(ggg)    "Equipment" means all furniture, fixtures, equipment, computers, printers, computer disks and software, machinery, tools, apparatus, appliances, Inventory, signage, supplies, vehicles, forklifts, vehicle lifts, fuel and oil storage containers and pumps (including the contents thereof) and all other tangible personal property of every kind and description.

(hhh)    "Erie Contracts" has the meaning specified in Section 2.2(m).

(iii)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(jjj)    "ERISA Affiliate" means any Person that would be considered a single employer with a Seller under Sections 414(b), (c), (m) or (o) of the Code.

(kkk)    "<u>Escrow Account</u>" has the meaning specified in <u>Section 3.3</u>.

(lll)    "<u>Escrow Holder</u>" has the meaning specified in <u>Section 3.3</u>.

(mmm)    "<u>Excess Cure Costs</u>" has the meaning specified in <u>Section 3.1(f)</u>.

(nnn)    "<u>Excess Employee PTO</u>" has the meaning specified in <u>Section 3.1(g)</u>.

(ooo)    "<u>Excluded Assets</u>" has the meaning specified in <u>Section 2.2</u>.

(ppp)    "<u>Excluded Contracts</u>" has the meaning specified in <u>Section 2.2(d)</u>.

(qqq)    "<u>Excluded Leases</u>" has the meaning specified in <u>Section 2.2(e)</u>.

(rrr)    "<u>Excluded Liabilities</u>" has the meaning specified in <u>Section 2.4</u>.

(sss)    "<u>Expense Reimbursement</u>" has the meaning specified in <u>Section 9.5</u>.

(ttt)    "<u>Filing</u>" has the meaning specified in the recitals.

(uuu)    "<u>Final Order</u>" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by Legal Requirement, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

(vvv)    "<u>First Day Declaration</u>" means the *Declaration of Spencer Ware in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* filed in the Sellers' Bankruptcy Case.

(www)    "<u>Fraud</u>" means actual, intentional, willful or knowing fraud under Delaware Law (and not solely a constructive fraud, equitable fraud or negligent misrepresentation or omission, or any form of fraud based on recklessness or negligence) by or on behalf of a party to this Agreement in the making of a representation or warranty set forth in this Agreement or in any certificate delivered pursuant to <u>Section 8.2</u> of this Agreement at the Closing.

(xxx)    "<u>Good Faith Deposit</u>" has the meaning specified in <u>Section 3.3</u>.

(yyy)    "<u>Good Faith Deposit Funds</u>" means the Good Faith Deposit, plus any and all interest or income earned thereon as of the Business Day immediately prior to the date of determination.

(zzz)    "<u>Governmental Authority</u>" means any federal, state, local or foreign governmental entity or any subdivision, agency, instrumentality, authority, department, commission, board, bureau, official or other regulatory, administrative or judicial authority thereof or any federal, state, local or foreign court, tribunal or arbitrator or any self-regulatory organization, agency or commission.  Governmental Authority shall include the Bankruptcy Court.

(aaaa)    "<u>Governmental Consents</u>" has the meaning specified in <u>Section 4.5</u>.

(bbbb)    "<u>Hired Employees</u>" means those Sellers' Employees who accept the Purchaser's offer of employment and commence working for the Purchaser on the Closing Date.

(cccc)    "<u>Improvements</u>" means the buildings, plants, structures, fixtures, systems, facilities, infrastructure and other improvements affixed or appurtenant to real property.

(dddd)    "<u>Indebtedness</u>" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business (other than the current liability portion of any indebtedness for borrowed money)); (iii) all obligations of such Person under leases required to be capitalized in accordance with generally accepted accounting principles in the United States; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof); (vi) all obligations with respect to any factoring programs of a Seller; (vii) all obligations secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by each Seller, whether or not the obligations secured thereby have been assumed; (viii) all obligations of each Seller to purchase or otherwise pay for merchandise, materials, supplies, services or other property under an arrangement which provides that payment for such merchandise, materials, supplies, services or other property shall be made regardless of whether delivery of such merchandise, materials, supplies, services or other property is ever made or tendered; and (ix) all obligations of the type referred to in clauses (i) through (viii) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations.

(eeee)    "<u>Intellectual Property</u>" means all intellectual property rights of any kind owned, used, held for use, or licensed (as licensor or licensee) by a Seller and used solely and exclusively in connection with the operation of the Business, including all Software, Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, customer contact and supplier lists and agreements , rights related to any websites, marketing materials, and all other information as to sources of supply and relationships with suppliers and customers, including rights to the associated logos and names, all rights to privacy and personal information, and all rights and remedies related thereto (including the right to sue for and recover damages, profits and any other remedy in

connection therewith) for past, present or future infringement, misappropriation or other violation relating to any of the foregoing.

(ffff)    "<u>Inventory</u>" means inventory, spare parts, stocks of diesel fuel and other gasoline products.

(gggg)    "<u>IRS</u>" means the United States Internal Revenue Service.

(hhhh)    "<u>Leased Real Property</u>" means the leased real property listed or described on <u>Schedule 4.6(b)</u>, including any Improvements to such Leased Real Property.

(iiii)    "<u>Leases</u>" means leases with respect to the Leased Real Property.

(jjjj)    "<u>Legal Requirement</u>" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, principle of common law, regulation, statute or treaty.

(kkkk)    "<u>Liability</u>" means any debt, loss, Claim, damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including any liabilities under Environmental Laws and all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

(llll)    "<u>Material Adverse Effect</u>" means any fact, event, development, circumstance, occurrence or effect (collectively, "<u>Effect</u>") (i) that has a material adverse effect on the condition (financial or otherwise), business, assets, properties, liabilities, operations or results of operations of the Business or the Purchased Assets, taken as a whole; provided, however, that none of the following shall be taken into account in determining whether there has been, is, or would reasonably be expected to be a Material Adverse Effect for purposes of this clause (i): (A) changes in general economic or political conditions, (B) changes in Legal Requirements, (C) changes generally affecting the industry in which the Business operates, (D) acts of war, sabotage or terrorism, (E) (1) the commencement of the Bankruptcy Case or the events and conditions related or leading up thereto, (2) the effects that customarily result from the commencement of a case under chapter 11 of the Bankruptcy Code, and (3) any defaults under agreements as a result of the commencement of the Bankruptcy Case that have no effect under the terms of the Bankruptcy Code or where the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code, (F) any failure by Sellers to meet any internal or published budgets, projections or forecasts (it being understood that the underlying causes of such failure, to the extent not otherwise excluded by other clauses of this definition, may be taken into account in determining the occurrence of a Material Adverse Effect), (G) any action taken (or omitted to be taken) by Sellers (x) that is expressly required by this Agreement or (y) at the express written request of Purchaser, or (H) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions, epidemics, pandemics or disease outbreaks and other force majeure events; provided, further, however, that, with respect to clauses (A), (B), (C), (D), and (H), such Effect shall be taken into account in determining whether a Material Adverse

Effect has occurred to the extent it has a disproportionate adverse effect on the Business, taken as a whole, relative to other participants in the industries in which the Business operates; or (ii) that prevents or materially impairs or materially delays, or would reasonably be expected to prevent or materially impair or materially delay, the ability of Sellers to consummate the transactions contemplated by this Agreement.

(mmmm)    "Material Permits" has the meaning specified in Section 4.7(a).

(nnnn)    "Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

(oooo)    "Next-Highest Bidder" has the meaning set forth in the Bidding Procedures Order.

(pppp)    "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

(qqqq)    "Ordinary Course of Business" means, with respect to the Business, the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of the applicable Seller in the ordinary and usual course) through the date hereof, consistent in nature, scope and magnitude with past practice prior to the Petition Date.

(rrrr)    "Party" or "Parties" means, individually or collectively, the Purchaser and Sellers.

(ssss)    "Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, technology, inventions (whether or not patentable or reduced to practice) or improvements thereto.

(tttt)    "PBGC" means Pension Benefit Guaranty Corporation.

(uuuu)    "Permits" means all franchises, grants, authorizations, registrations, licenses, permits (including operating permits), easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority that are necessary for Sellers to own, lease and operate its properties and assets or to carry on the Business as it is now being conducted or as is presently intended to be conducted.

(vvvv)    "Permitted Access Parties" has the meaning specified in Section 7.7.

(wwww)    "Permitted Encumbrances" means (i) Encumbrances that constitute Assumed Liabilities, (ii) statutory liens for current Taxes and assessments (A) not yet due and payable, including liens for ad valorem Taxes and statutory liens not yet due and payable arising other than by reason of any default by a Seller , or (B) being contested in good faith, (iii) easements, covenants, conditions, restrictions and other similar matters of record affecting any Leased Real Property, which are not, individually or in the aggregate, materially adverse to the value or operation of the Business or the Purchased Assets or which do not materially interfere with the

current operation of any Leased Real Property, (iv) any Encumbrance or Claim affecting any Leased Real Property (or the owner, lessor or lessee thereof) that does not individually or in the aggregate interfere in any material respect with the present use of the property subject thereto, (v) the leasehold estate or any sublease, license, or rights of occupancy in any Leased Real Property subject to an Assumed Real Property Lease where a Seller is lessor, (vi) Legal Requirements now or hereafter in effect relating to Leased Real Property that do not, in the aggregate, materially interfere with the present use of the Leased Real Property subject thereto; provided, that, in each case enumerated in this definition, such Encumbrance shall only be a Permitted Encumbrance if it cannot be satisfied solely through the payment of money or otherwise removed, discharged, released or transferred, as the case may be, pursuant to section 363(f) of the Bankruptcy Code under the Sale Order or otherwise.

(xxxx)    "Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

(yyyy)    "Petition Date" has the meaning specified in the recitals.

(zzzz)    "Post-Close Filings" has the meaning specified in Section 7.7.

(aaaaa)    "Pre-Closing Tax Period" means any taxable period ending on or before the day prior to the Closing Date and the portion of any Straddle Period through the end of the day prior to the Closing Date.

(bbbbb)    "Prepayments/Deposits" means prepayments, advanced payments or deposits collected by Sellers from customers, charter companies or travel agents of the Business with respect to services to be rendered after the Closing Date by Sellers to such customers, charter companies or travel agents.

(ccccc)    "Prepayment/Deposits Credit" has the meaning specified in Section 3.1(e).

(ddddd)    "Purchase Price" has the meaning specified in Section 3.1.

(eeeee)    "Purchased Assets" has the meaning specified in Section 2.1.

(fffff)    "Purchased Deposits" means all deposits, advanced payments, security deposits, retainers and prepayments made by Sellers with respect to the Business under an Assumed Contract, Assumed Equipment Leases or Assumed Real Property Lease, including security deposits for rent (including such deposits made by Sellers, as lessee, or to Sellers, as lessor, in connection with the Assumed Real Property Leases), deposits made with respect to vehicle operating leases to the extent related to the Purchased Assets (pro-rated for the actual number of vehicles purchased) and prepaid charges and expenses of, and advance payments made by, Sellers, with respect to the Business, other than the Utility Escrow and any deposits or prepaid charges and expenses paid in connection with or relating primarily to any Excluded Assets or any Excluded Liability. For the avoidance of doubt, Purchased Deposits includes only those deposits and payments made pursuant to an Assumed Contract, Assumed Equipment Leases or Assumed Real Property Lease.

(ggggg)    "Purchased Vehicles" has the meaning specified in Section 2.1(q).

(hhhhh)    "Purchaser" has the meaning specified in the preamble.

(iiiii)    "Regulated Substances" means pollutants, contaminants, hazardous or toxic substances, compounds or related materials or chemicals, hazardous materials, hazardous waste, flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products (including waste petroleum and petroleum products) as regulated under applicable Environmental Laws.

(jjjjj)    "Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Regulated Substances through or in the air, soil, surface water, groundwater or property.

(kkkkk)    "Representative" means with respect to a particular Person, any duly authorized director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

(lllll)    "Sale Motion" means the motion, pleading or other filing of the Sellers seeking entry of the Bidding Procedures Order and the Sale Order.

(mmmmm)"Sale Order" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit D (with such other changes as may be mutually reasonably acceptable to the Parties), pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, *inter alia*, the sale of the Purchased Assets to the Purchaser on the terms and conditions set forth herein free and clear of all Liabilities, Indebtedness and Encumbrances (other than Permitted Encumbrances), the assumption and assignment of the Assumed Liabilities, and the assumption and assignment of the Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases to the Purchaser and (ii) containing certain findings of facts, including a finding that the Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

(nnnnn)    "Savings Plan" has the meaning specified in Section 7.2(d)(iii).

(ooooo)    "Schedules" means the disclosure schedules attached hereto that Sellers have prepared and delivered to the Purchaser pursuant to the terms of this Agreement, setting forth information regarding the Business, the Purchased Assets, the Assumed Liabilities and other matters with respect to the Seller Entities as set forth therein.

(ppppp)    "Seller Employees" means the active employees of Sellers employed as of the Closing Date for the Business in accordance with the terms hereof and working at a Leased Real Property listed on Schedule 1.2, excluding (i) persons hired to perform central or shared functions, (ii) officers, and (iii) inactive employees who are on leave or disability.

(qqqqq)    "Seller Plan" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans that are "pension plans" (as defined

in Section 3(2) of ERISA) and all employee benefit plans that are 'welfare benefit plans' (as defined in Section 3(1) of ERISA) and any other employee benefit or compensation arrangements or payroll practices (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, survivor benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock or other equity compensation plans, arrangements or policies) of Sellers and (ii) all employment, termination, bonus, severance, change in control or other similar contracts, agreements or arrangements, in each case to which a Seller is a party, with respect to which any Seller has any Liability, that are maintained by a Seller, or to which a Seller contributes or is obligated to contribute with respect to its current or former directors, officers, consultants and employees, in each case that covers one or more Seller Employees.

(rrrrr)    "Sellers" has the meaning specified in the preamble.

(sssss)    "Software" means all computer software programs (whether in source code, object code, or other form) and systems, databases and platforms owned, licensed or used by Sellers, including all databases, compilations, tool sets, compilers, higher level or "proprietary" languages, related documentation, technical manuals and materials, and any licenses to use or other rights relating to the foregoing.

(ttttt)    "Straddle Period" means any taxable period that includes but does not end on the day prior to the Closing Date.

(uuuuu)    "Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means any federal, state, local, foreign or other income, alternative, minimum, alternative minimum, add-on minimum, franchise, capital stock, net worth, capital, profits, intangibles, inventory, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest, penalties and fines thereon and additions thereto whether disputed or not).

(vvvvv)    "Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax including any combined, consolidated or unitary returns of any group of entities.

(wwwww) "Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names (including all assumed or fictitious names under which the Business is conducted), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

(xxxxx)    "Trade Secrets" means confidential or proprietary information and trade secrets (including ideas, research and development, know-how, formulae, compositions, processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals).

(yyyyy)    "Transfer Taxes" has the meaning specified in Section 7.1(b).

(zzzzz)    "Transportation Laws" means all U.S. and non-U.S. Legal Requirements intended to prohibit, restrict or regulate actions and activities of motor passenger carriers.

(aaaaaa)    "Union" has the meaning specific in Section 4.12.

(bbbbbb)    "United States" and "U.S." mean the United States of America.

(cccccc)    "Utility Escrow" means the adequate assurance deposit made by Sellers in connection with the continued provision of post-petition utility services pursuant to an order of the Bankruptcy Court filed after the Petition Date.

(dddddd)    "Vehicles" means all motor vehicles, buses, motor coaches, vans, trucks and other rolling stock and all assignable warranties related thereto.

(eeeeee)    "Waived Avoidance Actions" means Avoidance Actions against (i) the holder of a trade payable incurred in connection with the Business, (ii) a vendor or other creditor who received a payment within the ninety (90) days prior to the Petition Date from a Seller on a trade payable incurred in connection with the Business or (iii) the counterparty to an Assumed Contract, Assumed Equipment Leases or Assumed Real Property Leases.

(ffffff)    "WARN" means the Worker Adjustment and Retraining Notification Act of 1988, as amended or any similar state or local law.

1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)    Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. All Exhibits and Schedules are subject to the mutual agreement of the Parties at the

-14-

time of execution of this Agreement by all of the Parties, except as otherwise provided in Sections 2.1(b) and 2.1(c). Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

       (iv)    Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only, shall include the plural and vice versa.

       (v)    Headings. The provision of a Table of Contents, the division of this Agreement into Sections, subsections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

       (vi)    Herein. The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

       (vii)    Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

       (b)    No Strict Construction. The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## SECTION 2
## PURCHASE AND SALE

       2.1    Purchased Assets. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, each Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to the Purchaser, and the Purchaser shall purchase, free and clear of all Liabilities, Indebtedness and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances), all right, title and interest in, to or under all of the following properties, contractual rights, rights, Claims and assets of such Seller (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, and, in addition, certain specified assets utilized in the operations at the Erie, Pennsylvania location (herein collectively called the "Purchased Assets"):

       (a)    all Equipment set forth on Schedule 2.1(a), and all additional Equipment owned (or leased under an Assumed Equipment Lease set forth on Schedule 2.1(j)) by a Seller, used in connection with the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets or otherwise located on the Assumed Leased Real Property set forth on Schedule 2.1(c); but excluding any Equipment designated as an Excluded Asset by the Purchaser on Schedule 2.1(a);

(b)      all Customer Contracts and all other Contracts listed or described on Schedule 2.1(b), under the heading "Contracts Being Assumed" (the "Assumed Contracts"); provided, however, that (i) the Assumption Notice may not be sent without prior written notice to the Purchaser, and (ii) the Purchaser, in its absolute discretion and prior to the sending of the Assumption Notice, may add any Contracts to Schedule 2.1(b) or redesignate any Contracts from under the heading "Contracts Being Rejected" to under the heading "Contracts Being Assumed" in accordance with the Bidding Procedures Order; provided, further, however, if the Purchaser adds or redesignates any such Contracts, the Purchaser shall pay the Cure Costs related to any such added or redesignated Contracts, not to exceed the Cure Costs Cap;

(c)      all Leases, and rights thereunder, listed under the heading "Leases Being Assumed" on Schedule 2.1(c) (such Leases, the "Assumed Real Property Leases"); provided, however, that (i) the Assumption Notice may not be sent without prior written notice to the Purchaser, and (ii) the Purchaser, in its absolute discretion and prior to the sending of the Assumption Notice, may add any Leases of Leased Real Property to Schedule 2.1(c) or redesignate any Leases of Leased Real Property from under the heading "Leases Being Rejected" to under the heading "Leases Being Assumed" in accordance with the Bidding Procedures Order; provided, further, however, if the Purchaser adds or redesignates any such Leases, the Purchaser shall pay the Cure Costs related to any such added or redesignated Leases, not to exceed the Cure Costs Cap;

(d)      the Permits set forth on Schedule 2.1(d) and pending applications therefor, in each case to the extent assignable or transferable;

(e)      the Intellectual Property set forth on Schedule 2.1(e) (including all goodwill associated therewith) and related rights and property, including but not limited to all related manuals and documentation;

(f)      all Documents of such Seller with respect to the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets, except those (i) relating solely to any Excluded Asset or Excluded Liability; or (ii) relating to employees of such Seller who are not Hired Employees or (iii) containing any personally identifiable information except for such Documents identified on Schedule 2.1(f);

(g)      all telephone, telex and telephone facsimile numbers and other directory listings set forth on Schedule 2.1(g), to the extent assignable and the right to receive and retain such Sellers' mail and other communications;

(h)      all Prepayments/Deposits and all Purchased Deposits set forth on Schedule 2.1(h);

(i)      insurance claims, proceeds and insurance awards but only with respect to insurance claims, proceeds and insurance awards paid or due on account of (a) physical damage to real or personal property that is to be sold or transferred to Purchaser as a Purchased Asset, and then only to the extent that such physical damage arises prior to or on the Closing Date and remains unrepaired on the Closing Date or (b) a Permitted Encumbrance or Assumed Liability;

(j)        the operating and capitalized equipment leases listed or described on Schedule 2.1(j) (the "Assumed Equipment Leases");

(k)        any rights, claims (including, without limitation, commercial, tort, contractual and insurance-related), credits, refunds, causes of action, choses in action, rights of recovery and rights of setoff of such Seller against third parties arising out of events occurring prior to the Closing Date with respect to the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to such Seller excluding only the rights, claims, refunds, causes of action, chooses in action, rights of recovery and rights of setoff that are identified as Excluded Assets in Section 2.2;

(l)        all goodwill and other intangible assets with respect to the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets;

(m)        any proprietary rights with respect to the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding (i) reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants, and (ii) and all data that constitutes personally identifiable information;

(n)        the Waived Avoidance Actions; provided, that such Waived Avoidance Actions shall be waived and released by Sellers as of Closing Date;

(o)        all advertising, marketing and promotional materials, studies, reports and all other printed or written materials;

(p)        all rights of such Seller under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with the Hired Employees or any employees of such Seller terminated within twelve (12) months prior to the Closing Date, or with any agents of such Seller or with third parties;

(q)        the Vehicles (including all contract rights, tires, tire rims, tires parts, service equipment, supplies and other personal property related thereto) listed on Schedule 2.1(q) (the "Purchased Vehicles");

(r)        the additional assets, properties, privileges, rights (including prepaid expenses) and interests of such Seller solely and exclusively relating to the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased

Assets of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, in each case that is listed on Schedule 2.1(r) provided, however, none of the Parties hereto intends that the Purchaser, or any of its Affiliates, shall be deemed to be a successor to Sellers with respect to any Purchased Assets; and

(s)    the Inventory relating to the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets.

2.2    Excluded Assets. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to the Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" shall mean:

(a)    all Cash and Cash Equivalents (other than Prepayments/Deposits), Accounts Receivable and Claims between the Sellers;

(b)    all shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller;

(c)    all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

(d)    any Contracts listed under the heading "Contracts Being Rejected" on Schedule 2.1(b) or any Contracts not listed or described under the heading "Contracts Being Assumed" on Schedule 2.1(b) (the "Excluded Contracts"), and all expenses and obligations arising under Excluded Contracts;

(e)    all Leases of Leased Real Property, and rights thereunder, listed under the heading "Leases Being Rejected" on Schedules 2.1(c) or any Leases of Leased Real Property not listed or described under the heading "Leases Being Assumed" on Schedules 2.1(c) (the "Excluded Leases"), and all expenses and obligations arising under Excluded Leases;

(f)    any rights, claims or causes of action of Sellers (i) under this Agreement or the Ancillary Documents or (ii) against "Insiders" as that term is defined in section 101 (31) of the Bankruptcy Code or the Administrative Agent or DIP Lender;

(g)    all receivables, claims or causes of action related to any Excluded Asset;

(h)    all insurance policies of Sellers and all rights under any insurance policies, except as provided by Section 2.1(i) of this Agreement;

(i)    the Avoidance Actions other than Waived Avoidance Actions;

(j)    all Documents relating solely to an Excluded Asset or an Excluded Liability;

(k)　　　Tax Returns and tax-related records of each Seller, any and all Claims, rights, or interests of Sellers in or with respect to any refund, rebate, abatement (or other recovery for Taxes), or any other Tax asset with respect to the Business or the Purchased Assets, together with any interest due thereon or penalty rebate arising therefrom, for any Pre-Closing Tax Period (or portion thereof);

(l)　　　the Utility Escrow;

(m)　　　all of the following assets relating solely to the Butler Motor Transit operation in Erie, PA (i) all Collective Bargaining Agreements, including, without limitation, that certain Collective Bargaining Agreement between Amalgamated Transit Union Local 1342 and Coach USA - Erie, and (ii) all other Contracts and Leases (collectively, the "Erie Contracts"); and

(n)　　　all other assets of Sellers as set forth on Schedule 2.2(n).

2.3　　　Assumed Liabilities. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, the Purchaser shall execute and deliver to Sellers the Assumption and Assignment Agreement pursuant to which the Purchaser shall assume and agree to discharge, when due (in accordance with its respective terms and subject to the respective conditions thereof, or as otherwise agreed to between the holder of such liability and the Purchaser), only the following Liabilities (without duplication) (collectively, the "Assumed Liabilities") and no others:

(a)　　　subject to Section 2.5(a), any and all Liabilities relating to or arising under the Assumed Contracts, Assumed Equipment Leases and the Assumed Real Property Leases applicable to the Purchaser, to be performed by the Purchaser after the Closing Date or arising after the Closing Date;

(b)　　　all other Liabilities arising out of the conduct of the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets or ownership of the Purchaser's Purchased Assets to be performed after the Closing Date or arising after the Closing Date, but only to the extent the Liabilities arise or accrue after the Closing Date from the post-Closing Date conduct of the Business by the Purchaser;

(c)　　　all Cure Costs;

(d)　　　accrued paid-time-off and vacation pay owed to Sellers' Employees who are offered employment by the Purchaser and accept such employment on the terms offered by the Purchaser as set forth in Section 7.2 (collectively, "Employee PTO");

(e)　　　all Taxes for which Purchaser is liable pursuant to this Agreement;

(f)　　　all obligations of Sellers with respect to Prepayments/Deposits outstanding as of the Closing Date but solely to the extent that such Prepayments/Deposits have been either (i) turned over to the Purchaser at the Closing, or (ii) credited against the Purchase Price.  A list of the Prepayments/Deposits is set forth on Schedule 2.3(f).

2.4　　　Excluded Liabilities. Notwithstanding any provision in this Agreement to the contrary, other than the Assumed Liabilities, the Purchaser shall not assume and shall not be

obligated to assume or be obligated to pay, perform or otherwise discharge any Liability of Sellers, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers (collectively the "Excluded Liabilities"). For the avoidance of doubt, the Excluded Liabilities with respect to Sellers include, but are not limited to, the following:

(a)    any Liability of any Seller which is not an Assumed Liability (including, without limitation, any Liability relating to the Erie Contracts);

(b)    any Liability of Sellers, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Seller;

(c)    any Liability related to any Action;

(d)    any Liability (i) for any real property taxes, personal property taxes, and other ad valorem taxes with respect to the Purchased Assets for any Pre-Closing Tax Period and the pre-Closing portion of any Straddle Period (determined in accordance with Section 7.1(a)) and (ii) any other Taxes of Sellers, in each case except as provided in Section 7.1(b);

(e)    any Liability incurred by Sellers or their respective directors, officers, stockholders, agents or employees (acting in such capacities) after the Closing Date and then only to the extent not an Assumed Liability;

(f)    any Liability of Sellers to any Person on account of any Action that arose, and relates to facts, circumstances or events that existed or occurred, solely and exclusively before the Closing and then only to the extent not an Assumed Liability, and further including any claims based on successor liability under any applicable Legal Requirement;

(g)    any Liability relating to or arising out of the ownership or operation of an Excluded Asset;

(h)    all checks and drafts that have been written or submitted by any Seller prior to the close of business on the Closing Date but have not yet cleared;

(i)    any Liability of Sellers under any Indebtedness, including Indebtedness under the Credit Agreement and the DIP Credit Agreement, any Indebtedness owed to any stockholder or other Affiliate of any Seller, and any Contract evidencing any such financing arrangement;

(j)    the obligation to pay the amounts owed (and no other Liabilities) for goods or services received by any Seller in the Ordinary Course of Business in respect of any trade and vendor accounts payable arising after the Petition Date, other than any such Liabilities that are Assumed Liabilities;

(k)    any Liability to current or former employees of Seller, including any Liability under WARN or under any key employee retention plan or key employee incentive plan

implemented by the Sellers or approved by the Bankruptcy Court, except to the extent of Employee PTO expressly assumed by Purchaser herein; and

(l)        other than as specifically set forth herein, fees or expenses of Sellers incurred with respect to the transactions contemplated herein.

2.5    Assignments; Cure Amounts.

(a)        Sellers shall transfer and assign all Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases to the Purchaser, and the Purchaser shall assume all Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases from Sellers, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order. In connection with such assumption and assignment, the Purchaser shall cure all monetary defaults under such Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases to the extent required by section 365(b) of the Bankruptcy Code and any amounts offset, recouped or otherwise credited or agreed to by a counterparty under any Assumed Contract, Assumed Equipment Lease and Assumed Real Property Lease (all such amounts, the "Cure Costs").  For the avoidance of doubt, the Purchaser shall pay all Cure Costs for each Contract or Lease added or redesignated pursuant to the last proviso of Section 2.1(b) or 2.1(c). The Cure Costs for each Assumed Contract, Assumed Equipment Lease and Assumed Real Property Lease as of the date hereof are set forth opposite the name of such Assumed Contract, Assumed Equipment Lease and Assumed Real Property Lease set forth on Schedule 2.5 (which schedule is not intended to be updated in connection with the Closing), and which Cure Costs will be determined and approved by the Bankruptcy Court as part of the Sale Order.

(b)        The Sale Order shall provide that as of the Closing, Sellers shall assign to the Purchaser the Assumed Contracts, the Assumed Equipment Leases and the Assumed Real Property Leases. The Assumed Contracts, the Assumed Equipment Leases and the Assumed Real Property Leases shall be identified by the name and date of the Assumed Contracts, the Assumed Equipment Leases and the Assumed Real Property Leases (if available), the other party to the Assumed Contract, Assumed Equipment Lease or Assumed Real Property Lease, as the case may be, and the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order, a motion for authority to assume and assign such Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases, or any notice in accordance with the Bidding Procedures Order. Such exhibit or notice shall also (i) set forth the amounts necessary to cure any defaults under each of the Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases as determined by the Seller party thereto based on Sellers' books and records or as otherwise determined by the Bankruptcy Court, and (ii) delineate a procedure for transferring to the Purchaser the rights to any Purchased Deposits in the form of cash or letters of credit on deposit with the other party to any Assumed Real Property Lease. Sellers shall be responsible for due and proper notice to all counterparties to any Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases.

(c)        In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject

to any approval of the Bankruptcy Court that may be required, cooperate with the Purchaser in endeavoring to obtain such consent and this Agreement shall not operate as an assignment thereof in violation of any such license, certificate, approval, authorization, Lease, Contract or other commitment.

  2.6 <u>Further Assurances</u>.

   (a)  At the Closing, and at all times thereafter as may be necessary, Sellers (as applicable) and the Purchaser shall execute and deliver such other instruments of transfer as shall be reasonably necessary to vest in the Purchaser title to the Purchased Assets free and clear of all Claims and Encumbrances (other than Permitted Encumbrances), and such other instruments as shall be reasonably necessary to evidence the assignment by Sellers by the Purchaser or its designee of the Assumed Liabilities, including the Assumed Contracts, Assumed Equipment Leases and the Assumed Real Property Leases. Sellers and the Purchaser shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated hereby; provided, however, Sellers' compliance with their respective obligations under this Section 2.6(a) shall, in each case, to the extent it is not a document, instrument or other item which Sellers are required to deliver pursuant to Section 3.7 or pursuant to the terms of this Agreement (other than this Section 2.6(a)), be conditioned upon the Purchaser's advancement of any reasonable out-of-pocket expense to be incurred by Sellers in connection therewith. At the Closing, and at all times thereafter as may be necessary, the Purchaser shall reasonably cooperate with Sellers at Sellers' request to facilitate the procurement, possession and return to Sellers of any Excluded Assets, including any equipment subject to an operating or capitalized lease that does not constitute an Assumed Equipment Lease.

   (b)  At the Closing, and at all times thereafter as may be necessary, Sellers shall, at the reasonable request and expense of the Purchaser, execute, deliver, and file, or cause to be executed, delivered, and filed, such other instruments of conveyance and transfer and take such other actions as the Purchaser may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement and to vest in the Purchaser good and marketable title to the Intellectual Property included in the Purchased Assets, including executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the prior chain of title with respect to ownership of the Intellectual Property included in the Purchased Assets.

   (c)  Between the date hereof and the Closing Date, Sellers shall use reasonable best efforts to obtain a transition services agreement, for the benefit of and on terms reasonably acceptable to Sellers and Purchaser, with any other purchaser of Excluded Assets that acquires the software and electronic business records and data used in connection with or needed to operate the Business to address the issues of (i) Purchaser receiving access to and the right to copy financial and other books and records that relate to the Purchased Assets, (ii) a mechanism for reconciling the collection of post-Closing accounts receivables that belong to Purchaser or the other purchasers of Excluded Assets and the remission/turnover of such collections (after they become good, available funds) to the correct purchaser; (iii) for a mutually acceptable period of time after the Closing not to (a) extend job offers to any Sellers' Employees hired by another purchaser unless such employee is no longer employed by that purchaser nor (b) directly solicit

business from the non-shared and shared customers of the businesses being acquired by the other purchaser in their respective metropolitan area; and (iv) an agreement to maintain and not change the forwarding of the emails listed on Schedule 2.6(c)(iv) hereto or a period of not less than 180 days after Closing.

(d)        At or prior to Closing, Sellers shall arrange for (i) its third party vendors to copy all of the current and historical customer-related data related to the Business currently on Distinctive and other software and download such data on to Purchaser's systems, (ii) the emails of the customers of the Business to be removed from the software used for advertisings and blast emails being transferred over to another purchaser and (iii) the emails associated with Business listed on Schedule 2.6(c)(iv) to be automatically forwarded to a new email address to be designated by Purchaser.

## SECTION 3
## PURCHASE PRICE AND CLOSING

3.1    <u>Purchase Price</u> . Subject to the terms and conditions set forth in this Agreement, the purchase price to be paid (or assumed) by the Purchaser in exchange for the Purchased Assets (the "<u>Purchase Price</u>") shall be the sum of the following:

(a)        the "all cash" sum in the amount of $8,652,196 (such amount, the "Cash Amount"); <u>plus</u>

(b)        the aggregate amount of the Cure Costs assumed by the Purchaser up to the Cure Costs Cap; <u>plus</u>

(c)        the aggregate amount of Employee PTO assumed by the Purchaser up to a maximum of $23,100; <u>plus</u>

(d)        the aggregate amount of the Assumed Liabilities; <u>less</u>

(e)        the amount of Prepayment/Deposits which Sellers have not paid or turned over to Purchaser at the Closing (the "<u>Prepayment/Deposits Credit</u>"); <u>less</u>

(f)        the amount of the Cure Costs assumed by the Purchaser in excess of the Cure Costs Cap (such amount, the "<u>Excess Cure Costs</u>"); <u>less</u>

(g)        the amount of Employee PTO assumed by the Purchaser in excess of $23,100 (such amount, the "<u>Excess Employee PTO</u>")

The aggregate Purchase Price shall be reduced by one percent (1.0%) for every thirty (30) day period (or part of a thirty (30) day period) that the Closing occurs after August 19, 2024, for any reason whatsoever (the "<u>Closing Delay Adjustment</u>").

3.2    <u>Closing Date Payment</u>. At the Closing, the Purchaser shall satisfy the Purchase Price as follows:

(a)  to the extent that the Good Faith Deposit Funds are less than the Adjusted Cash Amount, the Purchaser shall deliver an amount equal to such shortfall via wire transfer of immediately available funds to the accounts designated by Sellers;

(b)  the Purchaser shall pay directly to the obligees identified on Schedule 2.5 the Cure Costs or has otherwise assumed such Cure Costs applicable to the Purchased Assets; provided, however, that the Purchaser shall only be obligated to pay or assume a Cure Cost if it has assumed the underlying Liability to such obligee under this Agreement; and

(c)  with respect to the Assumed Liabilities, the Purchaser shall assume such Assumed Liabilities at the Closing and satisfy such Assumed Liabilities in accordance with their terms.

3.3    Good Faith Deposit.  Within three (3) Business Days of the execution and delivery by the Parties of this Agreement, the Purchaser shall deposit into an escrow account (the "Escrow Account") with Young Conaway Stargatt & Taylor, LLP, as escrow agent (the "Escrow Holder") an amount equal to the Cash Amount (the "Good Faith Deposit") in immediately available funds, pursuant to the bid requirements described in the Bidding Procedures.  The Good Faith Deposit has been funded by the Purchaser pursuant to the Bidding Procedures.  Following the execution of this Agreement by Sellers, the Good Faith Deposit Funds shall become nonrefundable upon the termination of this Agreement by Sellers pursuant to Section 9.1(d) (which such termination right is restricted, as provided below) and shall be refunded to the Purchaser upon the termination of this Agreement for any other reason, including under Sections 9.1(a), 9.1(b), (c), (e), (f) or (g).  At the Closing, the Good Faith Deposit Funds shall be paid over to Sellers; provided, however, to the extent that the Good Faith Deposit Funds exceed the Adjusted Cash Amount, Sellers and Purchaser shall direct the Escrow Holder to remit such excess to Purchaser (rather than the Sellers) at Closing. In the event the Good Faith Deposit Funds become nonrefundable as provided herein before the Closing by reason of a termination pursuant to Section 9.1(d), the Escrow Holder shall immediately disburse the Good Faith Deposit Funds to Sellers to be retained by Sellers for their own account. Sellers' retention of the Good Faith Deposit Funds pursuant to the preceding sentence shall constitute liquidated damages for the Purchaser's breach, and, except for the loss of the Good Faith Deposit Funds, the Purchaser shall not have any further liability to Sellers and Sellers shall not have any further remedy against Purchaser. If the transactions contemplated herein terminate in accordance with the termination provisions hereof by any reason other than pursuant to Section 9.1(d) before the Sale Order is entered by the Bankruptcy Court, the Escrow Holder shall return to the Purchaser the Good Faith Deposit Funds.

3.4    Allocation of Purchase Price. For tax reporting purposes only, the Purchase Price, Assumed Liabilities, and all other amounts treated as consideration for applicable tax purposes shall be allocated among the Purchased Assets in a manner mutually agreeable to the Purchaser and Sellers (the "Allocation"). The Allocation shall be done in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and the principles set forth on Schedule 3.4, and the Purchaser and Sellers shall cooperate in good faith to agree upon the Allocation within one-hundred twenty (120) days of the Closing Date. Neither the Purchaser nor any Seller shall take any position on any Tax Return or with any Governmental Authority that is inconsistent with the Allocation, except as required by law. In the event that any Governmental Authority disputes the Allocation, Sellers or the Purchaser, as the case may be, shall promptly

notify the other Party of the nature of such dispute. The Purchaser and Sellers agree to prepare and timely file all applicable IRS forms required in connection with the transactions contemplated by this Agreement, including Form 8594, and other governmental forms, to cooperate with each other in the preparation of such forms and to furnish each other with a copy of such forms prepared in draft, within a reasonable period prior to the filing due date thereof.

3.5     Closing Date. Upon the terms and conditions set forth in this Agreement the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Alston & Bird LLP located at 90 Park Avenue, New York, New York 10016, as promptly as practicable, and at no time later than the third Business Day, following the date on which the conditions set forth in SECTION 8 have been satisfied or waived (other than the conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place or time as the Purchaser and Sellers may mutually agree. The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date". The Closing shall be deemed to have occurred at 12:01 a.m. (Eastern standard time) on the Closing Date.

3.6     Deliveries of the Purchaser.   At or prior to the Closing, the Purchaser shall deliver to Sellers:the Assumption and Assignment Agreement, and each other Ancillary Document to which the Purchaser is a party, duly executed by the Purchaser;

(b)     the payment pursuant to Section 3.2(a);

(c)     the officer's certificates required to be delivered pursuant to Section 8.3(a)(i) and (ii); and

(d)     such other assignments and instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request.

3.7     Deliveries of Sellers. At or prior to the Closing, Sellers shall deliver to the Purchaser:

(a)     the Bill of Sale, the Assumption and Assignment Agreement and each other Ancillary Document to which a Seller is a party, as applicable to Purchaser (or Asset Assignee, as applicable), duly executed by each Seller;

(b)     instruments of assignment of the Trademarks (the "Assignment of Trademarks") and Domain Names (the "Assignment of Domain Names") that are owned by each Seller and included in the Purchased Assets, to Purchaser (or Asset Assignee, as applicable), if any, duly executed by the applicable Sellers, in form for recordation with the appropriate Governmental Authorities, in form and substance reasonably acceptable to the Parties, and any other assignments or instruments with respect to any Intellectual Property included in the Purchased Assets for which an assignment or instrument is required to assign, transfer and convey such assets to the Purchaser;

(c)     a copy of the final Sale Order;

(d)     the officer's certificate required to be delivered pursuant to Section 8.2(a)(i) and (ii);

(e)     a complete and duly executed IRS Form W-9 by each Seller;

(f)     instruments of assumption and assignment of the Assumed Real Property Leases in form and substance reasonably acceptable to the Parties (the "Assumption and Assignment of Leases"), duly executed by the applicable Sellers, in form for recordation with the appropriate public land records, if necessary, and any other related documentation or instruments necessary for the conveyance of any Assumed Real Property Lease to the Purchaser (or Asset Assignee, as applicable);

(g)     (i) all lease files for the Assumed Real Property Leases (including copies of any plans or drawings of any Assumed Leased Real Property), and (ii) keys for, and/or the access codes for any electronic security system located at any Assumed Leased Real Property;

(h)     a certificate of good standing, or equivalent document, for each Seller, as certified by the applicable Government Authority;

(i)     a certificate of an authorized Person of each Seller, dated the Closing Date, in form and substance reasonably satisfactory to the Purchaser, as to, with respect to such Seller, (i) such Seller's authorization to execute and perform its obligations under this Agreement and the Ancillary Documents to which such Seller is a party; and (ii) incumbency and signatures of the authorized Persons of such Seller executing this Agreement and any such Ancillary Documents; and

(j)     all instruments and documents necessary to release any and all Encumbrances (other than Permitted Encumbrances), including appropriate UCC financing statement amendments (including termination statements).

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, except as set forth in the Schedules, with disclosure of any item in any section or subsection of the Schedules deemed disclosed with respect to the section or subsection of this Agreement to which it corresponds and any other section or subsection of this Agreement to the extent the applicability of such disclosure is reasonably apparent on its face (without any requirement that the other Sections be cross-referenced), Sellers represents and warrants to the Purchaser as follows:

4.1     Organization of Sellers. Each Seller is an entity duly incorporated or organized, as the case may be, validly existing and in good standing under the laws of its state of incorporation or formation. Each Seller is in good standing in each jurisdiction in which the ownership or leasing of its properties or the conduct of its businesses requires such qualification, except where failure to so qualify or be in good standing would not have a Material Adverse Effect. Each Seller has full corporate or similar power and authority to own or lease and to operate and use the Purchased Assets owned or leased by it and to carry on the Business as now conducted.

4.2    <u>Subsidiaries</u>. Except as set forth on <u>Schedule 4.2</u>, no Seller has any subsidiaries.

4.3    <u>Authority of Sellers</u>.

(a)    Each Seller has full power and authority to execute, deliver and, subject to the entry of the Sale Order, perform its obligations under, and consummate the transactions contemplated by, this Agreement and each of the Ancillary Documents to which such Seller is a party, and to sell, transfer and assign the Purchased Assets to the Purchaser in accordance with the terms of this Agreement. The execution, delivery and performance of this Agreement and such Ancillary Documents by such Seller, and consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by all required action on the part of such Seller and, subject to the entry of the Sale Order, does not require any authorization or consent of any shareholders or members of such Seller that has not been obtained. This Agreement has been duly authorized, executed and delivered by such Seller and, subject to the entry of the Sale Order, is the legal, valid and binding obligation of such Seller enforceable in accordance with its terms, and each of the Ancillary Documents to which such Seller is a party has been duly authorized by such Seller and upon execution and delivery by such Seller and subject to the entry of the Sale Order, will be a legal, valid and binding obligation of such Seller enforceable in accordance with its terms.

(b)    Subject to receipt of the Governmental Consents, and after giving effect to the Sale Order, none of the execution and delivery of this Agreement or any of the Ancillary Documents by each Seller, the consummation by such Seller of any of the transactions contemplated hereby or thereby, or compliance with or fulfillment of the terms, conditions and provisions hereof or thereof by such Seller, will conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default, or permit the acceleration of any Liability or loss of a material benefit, or result in the creation of any Encumbrance on any of the Purchased Assets (in each case with or without notice or lapse of time or both), under (i) any charter (or similar governing instrument) or by-laws (or similar governing document) of such Seller, (ii) any Permits of such Seller, (iii) any Order to which such Seller is bound or any Purchased Asset is subject or (iv) any Legal Requirement affecting such Seller or the Purchased Assets.

4.4    <u>Title to the Purchased Assets; Sufficiency</u>. Sellers have, and, upon delivery to the Purchaser on the Closing Date of the instruments of transfer contemplated by <u>Section 3.7</u>, and subject to the terms of the Sale Order, Sellers will thereby transfer to Purchaser, good and valid title to, or, in the case of property leased or licensed by Sellers or its subsidiaries, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the Purchased Assets, free and clear of all Liabilities, Indebtedness or Encumbrances, except for the Assumed Liabilities and Permitted Encumbrances.

4.5    <u>Consent and Approvals</u>. To the knowledge of Sellers, <u>Schedule 4.5</u> sets forth a true and complete list of each material consent, waiver, authorization or approval of any Governmental Authority or of any other Person, and each declaration to or filing or registration with any such Governmental Authority, that is required in connection with the execution and delivery of this Agreement and the Ancillary Documents by Sellers or the performance by Sellers of their obligations thereunder (the "<u>Governmental Consents</u>").

4.6     Real Property.

(a)        [intentionally removed]

(b)        Leased Real Property. Schedule 4.6(b) sets forth a true and complete list of (i) all Leases with respect to which a Seller is a lessee and (ii) all Leases with respect to which a Seller is a lessor, in each case solely and exclusively related to the Business.  All of the Assumed Real Property Leases are in full force and effect and are valid and enforceable against the Sellers, and, to the knowledge of Sellers, each other party thereto, in accordance with their terms, except to the extent enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws of general applicability relating to or affecting creditor's rights.  To the knowledge of the Sellers, no Seller has unilaterally released or waived any of its rights under any of the Assumed Real Property Leases to which it is a party. No Seller has received any written notice of (i) violations of building codes and/or zoning ordinances or other Legal Requirement affecting the Leased Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, in each case, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Leased Real Property as currently operated as of the Agreement Date.

(c)        Environmental.  Except to the extent set forth in Schedule 4.6(c), each Seller represents and warrants that to its knowledge, no Regulated Substance has been Released or otherwise exists in, on, under or onto the Leased Real Property. Sellers further represent and warrant that, to their knowledge, they have materially complied with all Environmental Laws.  To their knowledge, Sellers have not received any written notice from any third party or Governmental Authority that any Regulated Substance has been Released on the Leased Real Property.

4.7     Regulatory Matters; Permits.

(a)        All of the material Permits that are necessary for the operation of the Business as currently conducted and the ownership of the Purchased Assets are held by a Seller and are in full force and effect (collectively, the "Material Permits"). Schedule 4.7(a) sets forth a true, complete and correct list of all Material Permits held by Sellers as of the Agreement Date.

(b)        Sellers are in material compliance with their respective obligations under each of the Material Permits, and no condition exists that without notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit except for such failures to be in compliance or defaults that would not have, individually or in the aggregate, a Material Adverse Effect.

(c)        Each Material Permit is valid and in full force and effect and there is no Action, notice of violation, order of forfeiture or complaint against Sellers relating to any of the Material Permits pending or to the knowledge of Sellers, threatened, before any Governmental Authority.

4.8     Litigation. Except as disclosed in documents filed prior to the date hereof in connection with the Bankruptcy Case, as of the date hereof:

(a)        there is no Action with a claim amount exceeding $25,000 pending or, to the knowledge of Sellers, threatened against a Seller (with respect to the Business) or any of the Purchased Assets or the Business that if resolved adversely to a Seller would result in or that would reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect or Environmental Material Adverse Effect; and

(b)        there is no Order against a Seller (with respect to the Business), the Business, the Purchased Assets or any of the Assumed Liabilities that would result in or would reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect or Environmental Material Adverse Effect.

4.9     Vehicles and Tires.

(a)        Schedule 4.9(a) contains the following information as of the date hereof:

(i)        a list of all Purchased Vehicles; and

(ii)        for each Purchased Vehicle, (A) owner or lessee thereof, (B) whether such Purchased Vehicle is owned or leased, (C) the respective vehicle identification number or equivalent thereof and (D) the manufacturer and model year.

(b)        To Sellers' knowledge, none of the Purchased Vehicles has been the subject of theft, loss, casualty, or destruction (except for such thefts, losses, casualties, and destruction that are within the range customarily experienced in the Ordinary Course of Business and would not result in or would reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect).

(c)        Except as set forth in Schedule 4.9(a), to Sellers' knowledge, none of the Purchased Vehicles have been parked or sitting idle for more than 90 days or the tires on the Purchased Vehicles have otherwise been subject to "Abuse" such that the tires need to be replaced at Sellers' expense pursuant to the Sellers' tire lease agreement.

(d)        The number of Purchased Vehicles is equal to 106, which includes zero Purchased Vehicles that are leased.

4.10     Intellectual Property.

(a)        Schedule 4.10(a) sets forth a true, correct and complete list, in all material respects, of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights; and (iv) all Domain Names, in each case that is owned by any Seller and that is material to the Business.  Sellers own, or have a valid right to use, all of the Intellectual Property set forth on Schedule 4.10(a), and all such Intellectual Property is subsisting and, to the knowledge of Sellers, valid and enforceable.

(b)        Except as would not reasonably be expected to have a Material Adverse Effect, (i) the conduct of the Business by Sellers as currently conducted does not infringe,

-29-

misappropriate or otherwise violate any Person's Intellectual Property, and there has been no such claim or Action asserted or threatened in writing and that has not been resolved in the past four (4) years against any Seller, or to the knowledge of Sellers, any other Person, and (ii) to the knowledge of Sellers, no Person (including any current or former officer, director, employee or contractor of any Seller), is infringing, misappropriating or otherwise violating any Intellectual Property owned by any Seller, or to which any Seller has any exclusive license, in the conduct of the Business, and no such claims or Actions have been asserted or threatened in writing and that have not been resolved against any Person by any Seller, or, to the knowledge of Sellers, any other Person, in the past four (4) years.

(c)       Sellers have taken commercially reasonable measures to protect the confidentiality of their respective Trade Secrets, except as would not reasonably be expected to have a Material Adverse Effect.

4.11    Material Contracts and Agreements. Schedule 4.11 sets forth a list of all Contracts related to the Business with a dollar amount owed that exceeded $25,000 in the calendar year 2023 or, for new Contracts (*i.e.*, not renewals or extensions of existing Contracts) executed on January 1, 2024 or later, that are expected to exceed $25,000 in the calendar year 2024. All of the Assumed Contracts are in full force and effect and are valid and enforceable against the applicable Seller, and, to the knowledge of Sellers, each other party thereto, in accordance with their terms, except to the extent enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws of general applicability relating to or affecting creditor's rights. No Seller has unilaterally released or waived any of its rights under any of the Assumed Contracts to which it is a party.

4.12    Labor Relations. Schedule 4.12 identifies each collective bargaining agreement covering Seller Employees to which any Seller and the applicable union (the "Union") are parties (the "Collective Bargaining Agreements"). To the knowledge of the Sellers, no union is contemplating material changes to the terms of the applicable Collective Bargaining Agreement, and Sellers have made available to the Purchaser true and correct copies of all material correspondence that has occurred between such Seller and such union within that past two (2) years. Except as would not reasonably be expected to have a Material Adverse Effect, to the Sellers' knowledge, (a) each Seller is in compliance with all Legal Requirements applicable to the Seller Employees respecting employment and employment practices, employment standards, terms and conditions of employment, and wages and hours (including those relating to exempt/non-exempt classification of employees); (b) no Seller has received written notice of any unfair labor practice complaint pending before any Governmental Authority with respect to any of the Seller Employees; (c) no Seller has received notice that any pending representation petition respecting the Seller Employees has been filed with any Governmental Authority; (d) the applicable Seller is in compliance with its obligations under the Collective Bargaining Agreements; (e) no arbitration proceeding arising out of or under the Collective Bargaining Agreement is pending against any Seller; and (f) there is no labor strike, slowdown, work stoppage, or lockout actually pending or, to Sellers' knowledge, threatened against any Seller in respect of the Purchased Assets or the Business. There are no Contracts with any Seller Employee for employment or for severance, termination, retention, change of control or similar payments other than employment Contracts for indefinite duration that are terminable without cause (and without any obligations arising from such termination without cause).

4.13    <u>Employee Benefits</u>.

(a)        <u>Schedule 4.13(a)</u> lists each Seller Plan (or any benefit plans, programs or arrangements of an ERISA Affiliate that would be a Seller Plan if such ERISA Affiliate were a Seller) (i) that is, or has been within the past six (6) years, a Title IV Plan or subject to Section 412 of the Code; (ii) that is maintained by more than one employer within the meaning of Section 413(c) of the Code; (iii) that is subject to Sections 4063 or 4064 of ERISA.  No Seller Plan is (A) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA; or (B) an "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) that is not intended to be qualified under Section 401(a) of the Code.

(b)        (i) No Seller has terminated any Title IV Plan within the last six (6) years or incurred any outstanding liability under Section 4062 of ERISA to the PBGC, or to a trustee appointed under Section 4042 of ERISA; (ii) all premiums due the PBGC with respect to the Title IV Plans set forth in <u>Schedule 4.13(a)</u> have been timely and completely paid; (iii) no Seller has filed a notice of intent to terminate any Title IV Plan set forth in <u>Schedule 4.13(a)</u> and has not adopted any amendment to treat such Title IV Plan as terminated; and (iv) the PBGC has not instituted, or to Sellers' knowledge, threatened to institute, proceedings to treat any Title IV Plan set forth in <u>Schedule 4.13(a)</u> as terminated.

(c)        No Seller nor any ERISA Affiliate has, within the past six (6) years, withdrawn from a Multiemployer Plan in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205 of ERISA, respectively, so as to result in an unsatisfied liability, contingent or otherwise (including the obligations pursuant to an agreement entered into in accordance with Section 4204 of ERISA), of a Seller or such ERISA Affiliate.

(d)        <u>Schedule 4.13(d)</u> sets forth each material Seller Plan.  No Seller is subject or party to any Multiemployer Plan, and there are no unfunded or existing claims related to any Multiemployer Plan. For each Seller Plan under which any Seller Employee (or their beneficiaries) receives any benefit or under which any Seller has any obligation to contribute to or provide any benefit to Seller Employee (or their beneficiaries), Sellers have made available to the Purchaser a copy of such plan (or a description thereof if such plan is not written).  Each Seller Plan has been maintained in all material respects with the applicable provisions of the Code and ERISA, except where such failure would not have a Material Adverse Effect.  Each Seller Plan that is intended to comply with Section 401(a) of the Code has received a favorable determination letter or opinion letter issued by the IRS.

(e)        The representations and warranties set forth in this <u>Section 4.13</u> are Sellers' sole and exclusive representations and warranties regarding employee benefit matters.

4.14    <u>NO OTHER REPRESENTATIONS</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 4 (AS MODIFIED BY THE SCHEDULES), NO SELLER MAKES ANY REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE PURCHASED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR THE BUSINESS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS

FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER SELLERS NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF ANY SELLER.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, the Purchaser hereby represents and warrants to Sellers as follows:

5.1 <u>Organization and Authority of the Purchaser</u>. (a) Purchaser is a limited liability company validly existing and in good standing under the laws of the State of Delaware. The Purchaser has full power and authority to execute, deliver and perform its obligations under this Agreement and all of the Ancillary Documents to which it is a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by the Purchaser have been duly authorized and approved by all required action on the part of the Purchaser and do not require any further authorization or consent of the Purchaser or its shareholders or members. This Agreement has been duly authorized, executed and delivered by the Purchaser and is the legal, valid and binding agreement of the Purchaser enforceable against the Purchaser in accordance with its terms, and each Ancillary Document to which the Purchaser is a party has been duly authorized by the Purchaser and upon execution and delivery by the Purchaser will be a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

(b) Neither the execution and delivery of this Agreement or any of such Ancillary Documents nor the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will:

(i) conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, or an event of default under (A) the Purchaser's organizational documents, (B) any Order to which the Purchaser is a party or by which it is bound or (C) any Legal Requirement affecting the Purchaser; or

(ii) require the approval, consent, authorization or act of, or the making by the Purchaser of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court.

5.2 <u>Litigation</u>. There are no pending or, to the knowledge of the Purchaser, threatened Actions by any Person or Governmental Authority against or relating to the Purchaser (or any

-32-

Affiliate of the Purchaser) or by the Purchaser or their respective assets or properties are or may be bound that, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, for the Purchaser to assume and perform the Assumed Liabilities or for the Purchaser to consummate on a timely basis the transactions contemplated hereby or thereby.

5.3     No Brokers. Except as set forth on Schedule 5.3, neither the Purchaser nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement for which a Seller is or will become liable, and the Purchaser shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions; provided, however, the any fee or commission to any broker retained by the Sellers is an Excluded Liability and remains the obligation of the Sellers.

5.4     Adequate Assurances Regarding Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases; Good Faith. As of the Closing, the Purchaser will be capable of satisfying the conditions contained in section 365(b)(1)(C) of the Bankruptcy Code with respect to the Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases.  To the Purchaser's knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, the Purchaser and/or its Affiliates not to qualify as a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

5.5     Financing. The Purchaser will have at the Closing Date, all funds necessary to consummate the transactions contemplated by this Agreement, including to promptly pay or discharge, when due, the Cash Amount and all of the Assumed Liabilities and Cure Costs.

5.6     Ownership of Sellers. The Purchaser does not hold, directly or indirectly, any beneficial or other ownership interest in any Seller or their respective securities.

5.7     No Inducement or Reliance; Independent Assessment. The Purchaser acknowledges that none of the Sellers or any of their respective Affiliates nor any other Person is making, and the Purchaser is not relying on, any representations or warranties whatsoever, statutory, expressed or implied, written or oral, at law or in equity, beyond those expressly made by Sellers in SECTION 4 hereof (as modified by the Schedules). The Purchaser acknowledges that, except as expressly set forth in SECTION 4 (as modified by the Schedules), none of the Sellers or any of their respective Affiliates nor any other Person has, directly or indirectly, made any representation or warranty, statutory, expressed or implied, written or oral, at law or in equity, as to the accuracy or completeness of any information that any Seller furnished or made available to the Purchaser and its Representatives in respect of the Business, and Sellers' operations, assets, stock, Liabilities, condition (financial or otherwise) or prospects. The Purchaser acknowledges that none of the Sellers or any of their respective Affiliates nor any other Person, directly or indirectly, has made, and the Purchaser has not relied on, any representation or warranty, whether written or oral, regarding the pro-forma financial information, financial projections or other forward-looking statements of Seller, and the Purchaser will make no claim with respect thereto. The Purchaser acknowledges that, except as otherwise provided in this Agreement or the Ancillary Documents, the Purchased Assets are being transferred on an "AS IS, WHERE IS" basis.  None of Sellers or

any other Person (including any officer, director, member or partner of Sellers or any of their Affiliates) shall have or be subject to any liability to the Purchaser, or any other Person, resulting from the Purchaser's use of any information, documents or material made available to the Purchaser in any "data rooms," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Ancillary Documents, except as otherwise provided in this Agreement or the Ancillary Documents.

## SECTION 6
## ACTION PRIOR TO THE CLOSING DATE

6.1     Access to Information.

(a)     Sellers agree that, between the Agreement Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms, Sellers shall permit Purchaser's Representatives reasonable access during regular business hours and upon reasonable notice, to the offices, properties, agreements and other documentation and financial records of Sellers solely and exclusively relating to the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets to the extent of Purchaser's reasonable requests. Sellers shall use commercially reasonable efforts to cause their respective Representatives to reasonably cooperate with Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall use its commercially reasonably efforts to cause its Representatives to reasonably cooperate with the Sellers and their Representatives, and shall use their commercially reasonable efforts to minimize any disruption to the Business.  All confidential documents and information concerning the Business furnished to a Purchaser or its Representatives in connection with the transactions contemplated by this Agreement and the other Ancillary Documents are subject to the terms and conditions of the Confidentiality Agreement.  With respect to the Assumed Leased Real Property, Purchaser may, at its sole cost and expense, obtain a current title commitment from a title company, a property survey, and a Phase I environmental report, for the Assumed Leased Real Property such right shall be subject to any restrictions under the applicable lease.   During the due diligence period, Sellers will allow (and use their reasonable best efforts to cause the applicable landlord to allow) Purchaser or its respective designees to access the Assumed Leased Real Property for the purpose of conducting a site visit in conjunction with a Phase I environmental report, provided however, no Phase II environmental inspection or other invasive inspection, boring, drilling, geotechnical inspection, or sampling of groundwater, soil or materials, including without limitation construction materials, either as part of the Phase I inspection or any other inspection, shall be performed and no samples or other materials shall be submitted to any testing laboratory or similar facility. Such right of investigation shall include the right to review all Property files in Seller's possession or reasonable control to the extent such files are non-proprietary and non-confidential. In addition to the foregoing, Sellers will permit Purchaser to conduct Vehicle inspections, and confirm all current employees' salaries, provide copies of all client service contracts and provide copies of all billable rates tariff currently in use.  Sellers shall also promptly provide Purchasers with a schedule of the names, title, contact information (including, to the extent such information is readily available to Sellers, email address and cell phone number), months of service, salary, benefits, and Employee PTO applicable to each of Sellers' Employees.

(b)        Notwithstanding the foregoing but subject in all respects to the Bidding Procedures Order, this Section 6.1 shall not require any Seller to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Sellers, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which any Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that any Seller would be entitled to assert to be waived, (ii) any information that is competitively sensitive, or (iii) if the Sellers, on the one hand, and the Purchaser or any of its Affiliates, on the other hand, are adverse parties in any Action, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Sellers (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be undermined with respect to such information and in the case of clause (ii), the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so could reasonably (in the good faith belief of Sellers (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of the Purchaser could be provided access to such information.

6.2        Conduct of Business Prior to the Closing Date. From and after the date hereof until the earlier of the Closing Date and the termination of this Agreement in accordance with the terms of SECTION 9 hereof, Sellers shall (a) maintain the Purchased Assets and operate and carry on the Business in the Ordinary Course of Business, and (b) not move to a different location any Purchased Equipment from the Assumed Leased Real Property, except as otherwise expressly required by this Agreement or the Bankruptcy Case or with the consent of the Purchaser, which consent shall not be unreasonably withheld, conditioned, or delayed. Consistent with the foregoing and to the extent permitted or required in the Bankruptcy Case, Sellers shall use commercially reasonable efforts to (a) continue operating the Business as a going concern, and (b) maintain the Purchased Assets and the assets and properties of, or used by, Sellers relating to the Business consistent with the assumptions set forth in the Approved Budget(as defined in the DIP Credit Agreement) prepared by Sellers pursuant to the DIP Credit Agreement and approved by the Bankruptcy Court. In a manner that is reasonable and consistent with a debtor in possession, Sellers shall use commercially reasonable efforts to maintain the Purchased Vehicles in good operating condition, reasonable wear and tear excepted. Notwithstanding anything to the contrary in this Section 6.2, the pendency of the Bankruptcy Case and the effects thereof shall in no way be deemed a breach of this Section 6.2.  Absent Purchaser's prior written consent, Sellers shall not increase or modify the wages, salaries or benefits of any of Seller Employees nor shall they enter into any new or modified employment agreements with Seller Employees, notwithstanding the foregoing, Purchaser's consent shall not be required for Sellers' hiring and firing of employes in the normal course of business.

6.3        Notification of Breach; Disclosure. Each Party shall promptly notify the other of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement). During the period prior to the Closing Date, each Party will promptly advise the other in writing of any

written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement. It is acknowledged and understood that no notice given pursuant to this Section 6.3 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

6.4    Insurance. Until the Closing, Sellers shall not, without the Purchaser's prior written consent, deliver written notice of cancellation to the issuer thereof with respect to any of Sellers' existing insurance policies.

6.5    Bankruptcy Court Approval; Procedures.

(a)    Sellers and the Purchaser acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval. Sellers and the Purchaser acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court and conducting an auction in respect of the Purchased Assets, and (ii) the Purchaser must provide adequate assurance of future performance under the Assumed Contracts, the Assumed Equipment Leases and the Assumed Real Property Leases.

(b)    The Purchaser understands and agrees that Sellers are debtors in possession in bankruptcy and will conduct a sale process and auction and that Sellers shall use this Agreement as the base bid for the Purchased Assets (*i.e.*, as a "stalking horse bid"). The Purchaser shall be entitled but not obligated to participate in any auction beyond its base bid pursuant to this Agreement and the Bidding Procedures Order and shall be deemed "Qualified Bidders" under the Bidding Procedures. If an auction is conducted pursuant to the Bidding Procedures Order and Purchaser is not the Successful Bidder, Purchaser shall, in accordance with and subject to the Bidding Procedures Order, be required to serve as the Next-Highest Bidder if Purchaser is the next highest or otherwise best bidder for the Purchased Assets at auction.

(c)    In the event an appeal is taken or a stay pending appeal is requested, with respect to the Sale Order, Sellers shall promptly notify the Purchaser of such appeal or stay request and shall promptly provide to the Purchaser a copy of the related notice of appeal or order of stay. Sellers shall also provide the Purchaser with written notice of any motion or application filed in connection with any appeal from such orders.

(d)    Sellers shall give notice of the transactions contemplated by this Agreement to the Persons specified in Section 6.5(a) in such manner as the Bankruptcy Court shall require, and to such additional Persons as the Purchaser reasonably requests in writing in advance of the Sale Order being entered.

(e)    On the Closing Date, all Waived Avoidance Actions will be deemed to be waived by the Sellers and the Purchaser covenant and agree that they shall take no action to pursue and enforce any Waived Avoidance Action.

6.6    Bankruptcy Filings.

(a)        The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, the Sale Order, including, sharing in advance of filing any drafts thereof. The Sellers shall promptly provide the Purchaser and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that the Sellers have in their possession (or receives) pertaining to the Sale Order, or any other order related to any of the transactions contemplated by this Agreement. The Sellers shall not seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Cases has been appealed, in each case, without the prior written consent of the Purchaser (not to be unreasonably withheld, conditioned or delayed).

(b)        Sellers shall timely file such motions or pleadings as may be appropriate or necessary to: (i) assume and assign the Assumed Contracts and (ii) subject to the consent of the Purchaser, determine the amount of the Cure Costs; provided that nothing herein shall preclude Sellers from filing such motions to reject any Contracts or Leases that are not listed on Schedule 2.5 or that have been designated for rejection by the Purchaser.

(c)        Sellers shall take all actions as may be reasonably necessary to cause the Sale Order to be issued and entered by the Bankruptcy Court and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court, which Sale Order shall provide for the transfer of the Purchased Assets and the Assumed Liabilities to Purchaser free from all successor or transferee Liability to the fullest extent permitted by section 363 of the Bankruptcy Code. The Sellers shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order and the Sale Order, or such other Order), subject to rights otherwise arising from this Agreement, Sellers shall take all actions as may be reasonably necessary to prosecute and defend such appeal, petition or motion and obtain an expedited resolution thereof. In the event of any appeal, and in the absence of any stay pending such appeal, Purchaser shall have the right but not the obligation to close the transaction.

(d)        Sellers shall use commercially reasonable efforts to (i) hold the Auction, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures, on or before the date that is 60 days following the Petition Date, and (ii) have the Sale Order entered on or before the date that is 65 days following the Petition Date, but in no event shall the date on

which the Sale Order is entered be later than August 15, 2024 without the express written consent of the Purchaser.

6.7   <u>Vacation of Assumed Leased Real Property</u>.

(a)     Purchaser shall have no pre-Closing Liability or responsibility with respect to any environmental or other defect with the Assumed Leased Real Property discovered by Purchaser prior to Closing; provided, however, that Purchaser shall not be relieved of Liability or responsibility to the extent that Purchasers exacerbate any environmental condition or other defect.

(b)     On the day prior to the Closing Date, Sellers Employees who are not Hired Employees shall have vacated the Assumed Leased Real Property and Sellers shall have removed, at their expense, all Excluded Assets (other than the Purchased Assets which shall remain as is, where is).  To the extent that sixty (60) days after the Closing Date, any Excluded Assets remain on the Assumed Leased Real Property, such Excluded Assets shall be deemed abandoned by Sellers and may be disposed of by Purchaser, at its expense, in any manner it determines is appropriate.

6.8   <u>Vehicle Titles</u>. Sellers shall use commercially reasonable efforts to deliver, or caused to be delivered, at the Closing, all certificates of title and title transfer documents to all titled Purchased Vehicles. In the event that Sellers are unable to deliver all such certificates and documents at Closing, Sellers shall use commercially reasonable efforts to deliver, or caused to be delivered, within thirty (30) days following the Closing, the remaining certificates of title and title transfer documents to all titled Purchased Vehicles.

**SECTION 7**
**ADDITIONAL AGREEMENTS**

7.1   <u>Taxes</u>.

(a)     All real property taxes, personal property taxes and other ad valorem taxes levied with respect to the Purchased Assets (other than Transfer Taxes) for a Straddle Period shall be apportioned based on the number of days of the Straddle Period ending on the day prior to the Closing Date and the number of days of the Straddle Period beginning on the Closing Date. The applicable Seller shall be liable for the amount of such taxes that is attributable to the portion of the Straddle Period ending on the day prior to the Closing Date, and the Purchaser shall be liable for the amount of such taxes that is attributable to the remaining portion of the Straddle Period. Such Taxes shall be estimated and paid, through an adjustment in the Purchase Price at Closing. To the extent that the estimate at the Taxes at Closing is not accurate, each Seller and the Purchaser shall cooperate to promptly pay or reimburse the other for any such taxes based on their respective liability for such taxes as determined pursuant to this <u>Section 7.1(a)</u>.  Any refunds of such taxes with respect to a Straddle Period shall be apportioned between the applicable Seller and the Purchaser in a similar manner.

(b)     It is the intention of the Parties that the transactions contemplated by this Agreement be exempt from any sales Tax, use Tax, real property transfer or gains Tax, real property records recordation fees, documentary stamp Tax or similar Tax incurred in connection

with this Agreement or attributable to the sale or transfer of the Purchased Assets ("Transfer Taxes") pursuant to section 1146(a) of the Bankruptcy Code and any similar exemption provided by a state or local Legal Requirement. To the extent any Transfer Tax is not exempt in accordance with section 1146(a) of the Bankruptcy Code or any available exemption under an applicable state or local Legal Requirement, such Transfer Taxes shall be borne 50% by the Purchaser on one hand, and 50% by the Sellers on the other hand. The Party responsible under applicable Legal Requirements for filing Tax Returns and other documentation with respect to any Transfer Taxes shall properly file such Tax Returns and other documentation on a timely basis (and the other Party shall reasonably cooperate with respect thereto as necessary) and timely pay all such Transfer Taxes to the appropriate Governmental Authority. The other Party shall promptly reimburse the filing Party for fifty percent (50%) of the reasonable filing costs with respect to such Transfer Taxes upon receipt of proof of payment from the filing Party. Each Party agrees to use its, and to cause its Affiliates to use, commercially reasonable efforts to mitigate, reduce, or eliminate any Transfer Taxes.

(c)     The Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax, in each case, for any Pre-Closing Tax Period or Straddle Period. The Purchaser and Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for any Pre-Closing Tax Period or Straddle Period until the expiration of the applicable statute of limitations of the taxable period for which such Tax Returns and other documents related. Sellers and the Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business for any Pre-Closing Tax Period or Straddle Period.

7.2     Employees and Employee Benefit Plans.

(a)     From and after the Closing, the Purchaser will recognize any applicable union as the exclusive bargaining representative of any bargaining unit comprising Hired Employees covered by a Collective Bargaining Agreement, as set forth on Schedule 7.2(a). Promptly after the conclusion (or cancellation) of the Auction and Purchaser has been declared the successful bidder, Purchaser agrees, in coordination with Seller, to communicate to the applicable union representatives that upon the Closing, Purchaser will (i) recognize the applicable union and (ii) will agree to accept the terms of the current Collective Bargaining Agreement, subject only to necessary changes needed to provide substantially equivalent benefits and policies to Purchaser's benefit plans and policies.

(b)     Not later than the later of (i) ten (10) Business Days prior to the Closing or (ii) three (3) Business Days after the conclusion (or cancellation) of the Auction and Purchaser has been declared the successful bidder, the Purchaser will make Qualifying Offers to not less than 99% of Seller Employees (on an aggregate basis and not on a per-location basis, and for the avoidance of doubt, Seller Employees does not include employees of the Sellers employed in Erie, Pennsylvania), and upon at least 5 days prior written notice by the Sellers not less than a percent not to exceed 10% and set forth in such notice of the active employees of Sellers employed in Erie,

Pennsylvania, who (A) are currently active and in good standing and work for the Business at an Assumed Real Estate Leased Property being acquired by the Purchaser and (B) otherwise meet the Purchaser's standard hiring criteria, including, without limitation, customary hiring, screening background checks and onboarding processes and requirements (an "Eligible Employee"). In the event the Purchaser is declared the successful bidder, Sellers shall permit the Purchaser to have access to Sellers' personnel files in order to assist the Purchaser in determining, in its sole discretion, those employees to whom an offer of employment will be made. For this purpose, a "Qualifying Offer" means an offer of employment, with such employment to commence at the Closing, to an Eligible Employee (x) who is part of a bargaining unit covered by a Collective Bargaining Agreement; as to which the Purchaser has agreed pursuant to Section 7.2(a) above, on terms that provide substantially equivalent wages, benefits and employment policies with such Collective Bargaining Agreement, including the Purchaser's agreement to recognize for such covered employee the same seniority and years of service, subject to the final agreement between the Purchaser and the union and the terms provided for therein, and (y) for all other Seller Eligible Employees on an "at-will" basis on terms and conditions comparable to the terms and conditions applicable to the then current comparable employees of the Purchaser; and (z) be for the same position or a position with equivalent status as that which the applicable Seller Eligible Employee holds with Sellers immediately prior to the Closing. Anything herein to the contrary notwithstanding, the Purchaser shall make Qualifying Offers to a sufficient number of Seller Employees at each Seller location to avoid triggering any Liability or notification obligations on any Seller or the Purchaser under the WARN Act or any similar state or local law.

(c)        All Qualifying Offers made by the Purchaser pursuant to Section 7.2(b) will be made in accordance with all applicable Legal Requirements and will remain open for a period expiring no earlier than the Closing Date. Such offers may provide, to the extent permitted by applicable Legal Requirements, that the continuing provision of service by Seller Employee following the Closing Date will be deemed acceptance of the offer. Following acceptance of such offers, the Purchaser will provide written notice thereof to Sellers.

(d)        The following will be applicable with respect to the Hired Employees:

(i)        With respect to welfare benefit plans that provide medical, dental or vision care coverage, Hired Employees shall receive, for purposes of eligibility to participate in such welfare benefit plans, credit for all service with Sellers and Purchaser shall waive any pre-existing condition exclusions and waiting periods to allow Hired Employees to commence participation in such Purchaser's welfare benefit plans upon Closing.

In addition, with respect to the calendar year in which the Closing Date occurs, all health care expenses incurred by any such employees or any eligible dependent thereof, including any alternate recipient pursuant to qualified medical child support orders, in the portion of the calendar year preceding the Closing Date that were qualified to be taken into account for purposes of satisfying any deductible or out-of-pocket limit under Seller health care plans will be taken into account for purposes of satisfying any deductible or out-of-pocket limit under the health care plan of the Purchaser for such calendar year .

(ii)        With respect to service and seniority, the Purchaser will, for each Hired Employee recognize the service and seniority recognized by Sellers for all purposes,

including the determination of eligibility, the extent of service or seniority related benefits such as vacation and sick pay benefits, notice of termination, termination, and severance pay and levels of benefits, except to the extent such credit would result in the duplication of benefits for the same period of service.

(iii)    With respect to the defined contribution plans sponsored by Sellers (the "Savings Plan"), Sellers will vest Hired Employees in their Savings Plan account balances as of the Closing Date.  The Purchaser will take all actions reasonably necessary to cause the Purchaser defined contribution  plan in which Hired Employees are eligible to participate (1) to recognize the service that the Hired Employees had in the Savings Plan for purposes of determining such Hired Employees' eligibility to participate, vesting, attainment of retirement dates, contribution levels, and, if applicable, eligibility for optional forms of benefit payments for their period of service with Sellers prior to the Closing Date; provided that such credit does not result in duplication of benefits, and (2) to accept direct rollovers of Hired Employees' account balances in the Savings Plan, including transfers of loan balances and related promissory notes, provided that such loans would not be treated as taxable distributions at any time prior to such transfer, and further provided that it does not require an amendment of Purchaser's existing plan.

(A)    With respect to Sellers' flexible spending plan, between the date of this Agreement and the date of the Auction, Sellers and Purchaser agree to negotiate in good faith a mutually acceptable resolution of the flexible spending plan for the Hired Employees. The Purchaser will honor all vacation days (or payments in lieu thereof) accrued by the Hired Employees and unused as of the Closing, to the extent it constitutes Employee PTO and has not been paid out to the Hired Employees by Sellers.

(B)    For any Hired Employee whose employment is governed by a Collective Bargaining Agreement, their benefits shall be substantially equivalent to the benefits applicable to such Hired Employee called for under the collective bargaining agreement proposed by Purchaser pursuant to Section 7.2(a).

(iv)    Sellers will be responsible, with respect to the Business, for performing and discharging all requirements, if any, under the WARN Act and under applicable Legal Requirements for the notification of its employees of any "employment loss" within the meaning of the WARN Act or any "mass layoff" under applicable Legal Requirements that occurs prior to the Closing.  The Purchaser will be responsible, with respect to Hired Employees, for performing and discharging all requirements, if any, under the WARN Act and under applicable Legal Requirements for the notification of its employees of any "employment loss" within the meaning of the WARN Act or any "mass layoff" that occurs on or following the Closing.  Any workforce reductions of Hired Employees carried out within the ninety (90) day period following the Closing Date by the Purchaser shall be done in accordance with all applicable Legal Requirements governing the employment relationship and termination thereof, including WARN. Purchaser agrees that during the ninety (90) day period following the Closing Date, it will not effectuate an "employment loss" (as that term is defined in the WARN Act and under applicable Legal Requirements) of Hired Employees such that in the aggregate, retroactively triggers obligations under the WARN Act or other applicable Legal Requirements to Sellers.

(v)     Sellers shall remain solely responsible for any compensation or other amounts payable to any of Sellers' current or former employees, officers, directors, managers, independent contractors or consultants including, without limitation, hourly pay, commission, bonus, salary, fringe, pension or profit sharing benefits or severance pay for any period relating to the services with Sellers prior to the Closing, including pursuant to any key employee retention plan or key employee incentive plan, which sums with respect to each Hired Employee shall be reserved for or fully funded into Sellers' payroll account prior to or at Closing, except for payments relating to Employee PTO assumed by the Purchaser.  Purchaser will be responsible for the payment of salary or wages earned by the Hired Employees after the Closing, and for all payments under Purchaser's compensation and benefit plans or programs arising from or relating to their employment by Purchaser from and after the Closing.

(vi)     Sellers shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, accident or disability benefits brought by or in respect of Hired Employees or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Sellers also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, managers, independent contractors or consultants of the Business which relate to events occurring on on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to all Hired Employees as and when due.

(vii)     Eligible Employees who have received a Qualifying Offer from the Purchaser and would otherwise qualify to be Hired Employees but who on the Closing Date are not actively at work due to a leave of absence covered by the Family and Medical Leave Act or other applicable Legal Requirements or are not actively at work due to military leave or other authorized leave of absence, including short term disability, will be treated as Hired Employees on the date that they are able to return to work (provided that such return to work occurs within the authorized period of their leaves following the Closing Date or otherwise within the period prescribed by applicable Legal Requirements for such leaves) and perform the essential functions of their jobs, subject to the Purchaser providing any accommodation required by applicable Legal Requirement, and the Sellers shall be responsible for all compensation, benefits and any other costs or responsibilities associated with respect to such individuals relating to the time between the Closing Date and when they become Hired Employees of the Purchaser (and the Purchaser shall be responsible thereafter).

(e)     The provisions of this Section 7.2 are not, and will not be construed as being, for the benefit of any Person other than the Parties hereto and are not enforceable by any Persons other than such Parties.

7.3     Collection of Receivables.

(a)     For a period of not less than ninety (90) days following the Closing Date, the Purchaser shall transfer money to Sellers in the collection of any accounts receivable included in the Excluded Assets.

(b)     To the extent permitted by the applicable bank, after the Closing Date, Sellers shall use commercially reasonable efforts to transfer to Purchaser ownership and control

of such bank accounts used by Sellers solely for the collection of accounts receivables and payments from customers of the Business occurring, being conducted on or out of or arising from the Assumed Leased Real Property or the Purchased Assets.

7.4    <u>Asset Transfer</u>.  Nothing contained herein is intended to create or demonstrate a relationship of principal and agent, partners, joint venturers, or any other relationship, fiduciary or otherwise between the Purchaser, and the Sellers agree and acknowledge that the Purchaser is not entering into this Agreement in any such capacity of the Purchaser. Notwithstanding anything in this Agreement to the contrary, at its option the Purchaser may direct that specifically identified items of its Purchased Assets be conveyed not to the Purchaser but to an Affiliate or designee (an "Asset Assignee").

7.5    <u>Mutual Release</u>.

(a)    Effective as of the Closing, the Purchaser, on behalf of itself and its successors, assigns, Representatives, administrators and agents, and any other person or entity claiming by, though, or under any of the foregoing, does hereby unconditionally and irrevocably release, waive and forever discharge each Seller and each of the Sellers' past and present directors, officers, employees, advisors, accountants, investment bankers, attorneys, and agents from any and all claims, demands, damages, judgments, causes of action and liabilities or any nature whatsoever, whether or not known, suspected or claimed, arising directly or indirectly from any act, omission, event or transaction occurring (or any circumstances existing) with respect to the Business on or prior to the Closing; provided, however, that nothing contained herein shall release any rights or Claims which constitute Purchased Assets or rights or Claims under or acts, omission, event or transaction occurring with respect to this Agreement, the Ancillary Documents and the transactions contemplated by this Agreement.

(b)    Effective as of the Closing, each Seller, on behalf of itself and its successors, assigns, Representatives, administrators and agents, and any other person or entity claiming by, though, or under any of the foregoing, does hereby unconditionally and irrevocably release, waive and forever discharge Purchaser and each of the Purchaser's past and present directors, officers, employees, advisors, accountants, investment bankers, attorneys, and agents from any and all claims, demands, damages, judgments, causes of action and liabilities or any nature whatsoever, whether or not known, suspected or claimed, arising directly or indirectly from any act, omission, event or transaction occurring (or any circumstances existing) with respect to the Business on or prior to the Closing, provided, however, that nothing contained herein shall release any rights under or acts, omission, event or transaction occurring with respect to this Agreement, the Ancillary Documents and the transactions contemplated by this Agreement.

7.6    <u>Adequate Assurances Regarding Assumed Contracts, Assumed Equipment Leases and Assumed Real Property Leases</u>. With respect to each Assumed Contract, Assumed Equipment Lease and each Assumed Real Property Lease, the Purchaser will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code for the future performance by the Purchaser of each such Assumed Contract, Assumed Equipment Lease and Assumed Real Property Lease included in its Purchased Assets. The Purchaser and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy

Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts, Assumed Equipment Leases and the Assumed Real Property Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making the Purchaser's and Sellers' employees and representatives available to testify before the Bankruptcy Court.

7.7     Reasonable Access to Records and Certain Personnel.  In order to facilitate Sellers' efforts to (i) administer and close the Bankruptcy Case, and (ii) prepare tax returns (together, the "Post-Close Filings"), for a period of one (1) year following the Closing, the Purchaser shall permit Sellers and Sellers' counsel and accountants (collectively, "Permitted Access Parties") during regular business hours, with reasonable notice, reasonable access to the financial and other books and records that comprised part of the Purchased Assets that are required to complete the Post-Close Filings, which access shall include (A) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such required documents and records and (B) the Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they require, but only to the extent such Permitted Access Parties furnish the Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the costs and expenses of such copies and any such other costs the Purchaser incurs in connection with providing the Permitted Access Parties access to such records; provided, however, that the foregoing rights of access shall not be exercisable in such a manner as to interfere with the normal operations of the Purchaser's business. Notwithstanding anything contained in this Section 7.7 to the contrary, in no event shall Sellers have access to any information that, based on advice of the Purchaser's counsel, could (1) reasonably be expected to create liability under applicable Legal Requirement, or waive any legal privilege, (2) result in the discharge of any Trade Secrets of the Purchaser, its Affiliates or any third parties or (3) violate any obligation of the Purchaser with respect to confidentiality.

7.8     Relocation and Storage of Vehicles. Promptly after the Closing, and in any case within thirty (30) days, the Purchaser shall, at its sole cost and expense, collect and relocate any and all Purchased Vehicles that are not located on Assumed Leased Real Property. For a period of not less than sixty (60) days following the Closing Date, the Purchaser shall, at its sole cost and expense, hold and store any and all Vehicles not listed on Schedule 2.1(q) that are located on Assumed Leased Real Property.

## SECTION 8
## CONDITIONS TO CLOSING

8.1     Conditions to Obligations of Each Party. The respective obligations of each Party to effect the sale and purchase of the Purchased Assets shall be subject to the fulfillment (or, if permitted by applicable Legal Requirement, waiver) on or prior to the Closing Date, of the following conditions:

(a)     the Bidding Procedures Order and the Sale Order shall have been entered and become Final Orders; and

(b)     no Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the

consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated.

    8.2    <u>Conditions to Obligations of the Purchaser</u>.

    (a)    The obligation of the Purchaser to purchase the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment or waiver on or prior to the Closing Date of the following additional conditions:

    (i)    the representations and warranties of Sellers contained herein shall be true and correct as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without giving effect to any Material Adverse Effect or materiality qualifications therein, except where all failures of such representations and warranties to be true and correct, in the aggregate, do not have a Material Adverse Effect, and the Purchaser shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof;

    (ii)    the covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and the Purchaser shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof; and

    (iii)    Sellers shall be prepared to deliver, or cause to be delivered, to the Purchaser all of the items set forth in <u>Section 3.7.</u>

    (b)    Any condition specified in <u>Section 8.2(a)</u> may be waived by the Purchaser; provided that no such waiver shall be effective against the Purchaser unless it is set forth in a writing executed by the Purchaser.

    8.3    <u>Conditions to Obligations of Sellers</u>.

    (a)    The obligation of Sellers to sell the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment <u>or waiver</u> on or prior to the Closing Date of the following additional conditions:

    (i)    the representations and warranties of the Purchaser contained herein shall be true and correct in all material respects as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date) and Sellers shall have received a certificate of the Purchaser to such effect signed by a duly authorized officer thereof;

    (ii)    the covenants and obligations that the Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Sellers shall have received a certificate of the Purchaser to such effect signed by a duly authorized officer thereof; and

(iii)     each of the deliveries required to be made to Sellers pursuant to Section 3.6 shall have been so delivered.

(b)     Any condition specified in Section 8.3(a) may be waived by Sellers; provided that no such waiver shall be effective against Sellers unless it is set forth in writing executed by Sellers.

## SECTION 9
## TERMINATION

9.1     Termination. This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, by written notice promptly given to the other Parties hereto, at any time prior to the Closing Date:

(a)     by mutual written consent of the Purchaser and Sellers;

(b)     by either the Purchaser or Sellers if any Order that prohibits the consummation of the transaction shall have become final and not appealable;

(c)     by either the Purchaser or Sellers upon ten (10) calendar days' written notice of such termination to the other Parties, if the Closing shall not have occurred on or prior to the first Business Day which is 120 days after the Petition Date (the "Termination Date");

(d)     by written notice from Sellers to the Purchaser, if the Purchaser breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Section 8.3(a)(i) or Section 8.3(a)(ii), and (ii) cannot be or has not been cured within five (5) Business Days following delivery of notice to the Purchaser of such breach or failure to perform; provided, however, that Sellers shall not be permitted to terminate this Agreement pursuant to this Section 9.1(d) if Sellers are then in breach of the terms of this Agreement such that the conditions set forth in Section 8.2(a)(i) or 8.2(a)(ii) would not be satisfied;

(e)     by written notice from the Purchaser to Sellers, if any Seller breaches or fails to perform in any respect any of Sellers' representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Section 8.2(a)(i) or Section 8.2(a)(ii), and (ii) cannot be or has not been cured within five (5) Business Days following delivery of notice to Sellers of such breach or failure to perform; provided, however, that the Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 9.1(e) if the Purchaser is then in breach of the terms of this Agreement such that the conditions set forth in Section 8.3(a)(i) or 8.3(a)(ii) would not be satisfied;

(f)     by the Purchaser, if (i) the Sellers withdraw the Sale Motion, (ii) the Sellers move to voluntarily dismiss the Bankruptcy Cases or the Bankruptcy Court otherwise orders, (iii) the Sellers move for conversion of the Bankruptcy Cases to chapter 7 of the Bankruptcy Code or the Bankruptcy Court otherwise orders, (iv) the Sellers or any party other than the Purchaser move for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases or the Bankruptcy Court otherwise orders, (v) the Purchaser is not selected as the successful bidder or Next-Highest Bidder at the

conclusion of the Auction or (vi) there is in effect a Final Order of a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the sale contemplated by this Agreement; or

> (g)     by either the Purchaser or Sellers if the Bankruptcy Court approves an Alternative Transaction.

For purposes of this Section 9.1, "Alternative Transaction" means the following transactions with or by any Person or group (other than the Purchaser): a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise of the Purchased Assets or any portion thereof.

9.2     Effect of Termination. In the event of termination of this Agreement by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party except as otherwise provided in Sections 9.4 and 9.5 and except that each Party shall be liable for Fraud or any willful breach of this Agreement by such Party. Notwithstanding the foregoing, the provisions of Section 6.1(a), Section 9.2, Section 9.5, SECTION 10 and SECTION 11 shall expressly survive the expiration or termination of this Agreement (and, to the extent applicable to the interpretation or enforcement of such provisions, SECTION 1).

9.3     Purchaser's Right to Exclude Certain Contracts and Leases.  In addition to whatever Termination rights Purchaser has under the provisions of Section 9.1, Purchaser shall have the right, at its sole option, to remove (a) any Real Property Lease from the schedule of Assumed Real Property Leases, and make it an Excluded Lease, and (b) any Contract from the schedule of Assumed Contracts (other than the Bridgestone Contract with respect to the tires on the Purchased Vehicles), and make it an Excluded Contract.  In the event that (a)  above occurs, the Equipment, Vehicles and other Purchased Assets located on such Leased Real Property (i) shall remain Purchased Assets and (ii) Purchaser shall have thirty (30) days after the Closing, without being charged any rent or storage charges, to remove, at its expense, any Purchased Assets located on such Leased Real Property, after which such Purchased Assets shall be deemed abandoned by Purchaser and may be disposed of by Sellers, at their expense, in any manner they determine is appropriate.

9.4     Good Faith Deposit. As set forth in Section 3.3, in the event that this Agreement is terminated under Section 9.1(d), Sellers shall retain the Good Faith Deposit Funds and the Purchaser shall have no further rights thereto. In the event that this Agreement is terminated under Section 9.1(a), (b), (c), (e), (f), or (g), and provided that in the case of Section 9.1(e), (f), or (g) the Purchaser is not in material breach of any provision of this Agreement that is the proximate cause of such termination and provided further that in the case of Sections 9.1(e), (f), or (g) the Purchaser is ready, willing and able to close the transactions contemplated hereby, the Escrow Holder shall disburse to the Purchaser the Good Faith Deposit Funds pursuant to the Bidding Procedures.  If the Agreement is terminated and the Good Faith Deposit Funds would otherwise have been returned to the Purchaser under the immediately preceding sentence but for the second proviso therein, and provided that Sellers are not in material breach of any provision of this Agreement prior to such termination, then, such Good Faith Deposit Funds shall instead be paid over to Sellers without further action or deed and the Purchaser shall have no further rights thereto.

9.5     Purchaser Protections.    In consideration of the Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, and to compensate the Purchaser as a stalking-horse bidder in connection with the Auction, (i) should this Agreement be terminated pursuant to Section 9.1(g) then in such event the Sellers shall pay to the Purchaser within one (1) Business Day of the consummation of such Alternative Transaction an amount equal to $259,566 (the "Break-Up Fee") and (ii) should this Agreement be terminated pursuant to Sections 9.1(e), 9.1(f) or 9.1(g) then in such event the Sellers shall pay to the Purchaser within five (5) Business Days reimbursement of all of Purchaser's documented, out of pocket costs and expenses, including without limitation the fees and expenses of its attorneys, consultants and accountants, in an amount not to exceed $86,522 (the "Expense Reimbursement"). Any Break-Up Fee and Expense Reimbursement amount (collectively, the "Bid Protections") that are payable to the Purchaser pursuant to this Section shall, to the extent applicable, be paid from the proceeds of the Alternative Transaction at the closing thereof and such proceeds equal to the amount of such Bid Protections shall be expressly carved-out from the collateral of the DIP Lenders. For the avoidance of doubt, the foregoing applies whether the Alternate Transaction is consummated pursuant to section 363 of the Bankruptcy Code or pursuant to a plan.

## SECTION 10
## SURVIVAL

The representations and warranties of the Purchaser and Sellers made in this Agreement and the covenants of the Purchaser and Sellers contained in this Agreement that, by their terms, are to be performed prior to the Closing shall not survive the Closing Date and shall be extinguished by the Closing and the consummation of the transaction contemplated by this Agreement. Absent Fraud, if the Closing occurs, the Purchaser shall not have any remedy against Sellers, and Sellers shall not have any remedy against the Purchaser or its designee(s) or Affiliates for (a) any breach of a representation or warranty contained in this Agreement (other than to terminate the Agreement in accordance with the terms hereof) and (b) any breach of a covenant contained in this Agreement with respect to the period prior to the Closing Date.

## SECTION 11
## GENERAL PROVISIONS

11.1     Confidential Nature of Information. Sellers, on the one hand, and the Purchaser, on the other, agrees that it will treat in confidence all documents, materials and other information that it shall have obtained regarding the Purchaser and its Affiliates and Sellers and their respective Affiliates, respectively, during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents. Such documents, materials and information shall not be disclosed or communicated to any third Person (other than, in the case of the Purchaser, to its counsel, accountants, financial advisors and potential lenders, and in the case of Sellers, to their counsel, accountants and financial advisors). No Party shall use any confidential information referred to in the first sentence of this paragraph in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Purchased Assets and the enforcement of its rights hereunder and under the Ancillary Documents; provided, however, that after the Closing, the Purchaser may use or

disclose any confidential information included in the Purchased Assets and may use or disclose other confidential information that is otherwise reasonably related to the Business or the Purchased Assets. The obligation of each Party to treat such documents, materials and other information in confidence shall not apply to any information that (a) is or becomes available to such Party from a source other than the disclosing Party, provided such other source was not, and such Party would have no reason to believe such source was, subject to a confidentiality obligation in respect of such information, (b) is or becomes available to the public other than as a result of disclosure by such Party or its agents, (c) is required to be disclosed under applicable law or judicial process, including the Bankruptcy Case, but only to the extent it must be disclosed, (d) such Party reasonably deems necessary to disclose to obtain any of the consents or approvals contemplated hereby or (e) Sellers deem necessary to disclose to comply with the Bidding Procedures Order.

11.2    No Public Announcement. Neither Sellers nor the Purchaser shall, without the approval of the other make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by law, including as may be required by the Bankruptcy Case, the Bidding Procedures Order or other Order of the Bankruptcy Court, the Bankruptcy Code, securities laws, or the rules of any stock exchange, in which case the other Party or Parties shall be advised prior to such disclosure and the Parties shall use their reasonable best efforts to cause a mutually agreeable release or announcement to be issued.

11.3    Notices. All notices or other communications required or permitted hereunder shall be in writing and shall be given or delivered by personal delivery, by electronic mail or by a nationally recognized private overnight courier service addressed as follows:

<div style="margin-left: 3em;">

John Montgomery
john.montgomery@uscrewchange.com

</div>

|                                                    |                                         |
| -------------------------------------------------- | --------------------------------------- |
| with a copy to (which shall not constitute notice): | LINDEMAN, ESQ. 646 Valley Avenue, Suite C1 Solana Beach, CA 92075 ATTN:   Curt Lindeman E-mail:   curt@lindemanesq.com |
|                                                    | STINSON LLP 1850 North Central Avenue Suite 2100 Phoenix, AZ 85004 Attn: Thomas J. Salerno E-mail: thomas.salerno@stinson.com |
| If to Sellers, to:                                 | c/o Coach USA, Inc. 160 S. Route 17 North Paramus, NJ 07652 ATTN:   Derrick Waters |

Ross Kinnear

E-mail:  derrick.waters@coachusa.com,
         ross.kinnear@coachusa.com

with a copy to                Alston & Bird LLP
(which alone shall not constitute    90 Park Avenue
notice):                      New York, NY 10016-1387
                              ATTN:  Matthew Kelsey
                                     Eric Wise
                                     William Hao

                              E-mail:  matthew.kelsey@alston.com
                                       eric.wise@alston.com
                                       william.hao@alston.com

                              Young Conaway Stargatt & Taylor, LLP
                              Rodney Square
                              1000 North King Street
                              Wilmington, Delaware 19801
                              ATTN:  Sean Beach
                                     Joe Mulvihill
                              E-mail:  sbeach@ycst.com
                                       jmulvihill@ycst.com

or to such other address as such party may indicate by a notice delivered to the other party hereto.

All notices and other communications required or permitted under this Agreement that are addressed as provided in this Section 11.3 if delivered personally shall be effective upon delivery, if by overnight carrier shall be effective one (1) Business Day following deposit with such overnight carrier, if delivered by mail, shall be effective three (3) days following deposit in the United States certified mail, postage prepaid, and if by e-mail prior to 6:00 p.m. ET, on the date of delivery to the email address set forth above, and if by e-mail at or after 6:00 p.m. ET, on the next Business Day, in each case provided the computer record indicates a full and successful transmission and no failure message is generated.

11.4    Successors and Assigns.

(a)      Except as expressly provided for in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable by such Parties without the written consent of the other Parties hereto.

(b)      This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns. The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such permitted assignee

(whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise). Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the Parties and successors and assigns permitted by this <u>Section 11.4</u> any right, remedy or claim under or by reason of this Agreement.

11.5     <u>Entire Agreement; Amendments; Schedules</u>. This Agreement, the Confidentiality Agreement, the Ancillary Documents and the Schedules referred to herein contain the entire understanding of the Parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the Parties hereto with respect to such subject matter. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties.

11.6     <u>Waivers</u>. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized representative of such Party. Except as otherwise provided herein, the failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.7     <u>Expenses</u>. Unless otherwise set forth herein, each Party will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

11.8     <u>Partial Invalidity</u>. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

11.9     <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement and shall become binding when one or more counterparts have been signed by and delivered to each of the Parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by electronic delivery (i.e., by electronic mail of a PDF signature page) shall be effective as delivery of a manually executed counterpart of this Agreement.

11.10     <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts executed in and to be performed in that State.

(a)        All Actions arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The Parties hereby consent to service of process by overnight mail (in accordance with <u>Section 11.3</u>) or any other manner permitted by law.

(b)        THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, THE PURCHASER, OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

11.11   <u>No Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind; provided, however, that the Administrative Agent and the DIP Agent are and will remain a third-party beneficiary of, to, and under this Agreement to the extent of any Encumbrances or other rights or interests of the Administrative Agent and the Lenders or the DIP Agent and the DIP Lenders arising in or under, or otherwise relating to, the terms of this Agreement. Notwithstanding anything in this Agreement to the contrary, the undersigned each acknowledges, confirms, and agrees that all of Sellers' rights and interests in, under, and to this Agreement, including all of Sellers' rights and interests in, under, and to the Good Faith Deposit Funds, are subject to any Encumbrances and other rights or interests therein from time to time granted or otherwise provided to the Administrative Agent and the DIP Agent, including under or in connection with any cash collateral order, debtor-in-possession financing order, or related documentation from time to time approved by the Bankruptcy Court, and including any Encumbrances granted or provided to the Administrative Agent or the DIP Agent from time to time under any of Sections 361 or 364 of the Bankruptcy Code .

**[SIGNATURE PAGES FOLLOW]**

*Alston & Bird Draft Dated 7/5/2024*

**IN WITNESS WHEREOF,** the Parties hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

PURCHASER:

**Great Plains Crew Change Company, LLC**

By: _____

Name: John Montgomery

Title:   Chief Executive Officer

*[Signatures Continue on Following Pages]*

**SELLERS:**

**POWDER RIVER TRANSPORTATION SERVICES, INC.**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

**BUTLER MOTOR TRANSIT, INC.**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

**GAD-ABOUT TOURS, INC.**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

**TRANSPORTATION MANAGEMENT SERVICES, INC.**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

**ELKO, INC.**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

*[Signatures Continue on Following Pages]*

**SELLERS (CONT.):**

**COACH LEASING, INC.**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

**CAM LEASING, LLC**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

**COACH USA, INC.**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

**COACH USA ADMINISTRATION, INC.**

By:_____

Name: Ross Kinnear
Title: Chief Financial Officer

## SCHEDULE A

### SELLERS

**Sellers**

1.      **Powder River Transportation Services, Inc.;**

2.      **Butler Motor Transit, Inc.;**

3.      **Gad-About Tours, Inc.;**

4.      **Transportation Management Services, Inc.;**

5.      **Elko, Inc.;**

6.      **Coach Leasing, Inc.;**

7.      **CAM Leasing, LLC;**

8.      **Coach USA, Inc.; and**

9.      **Coash USA Administration, Inc.**

# <u>EXHIBIT A</u>

## FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT

*Execution Version*

# EXHIBIT B

## FORM OF BIDDING PROCEDURES ORDER

*Execution Version*

## EXHIBIT C

**FORM OF BILL OF SALE**

STRICTLY CONFIDENTIAL

## EXHIBIT D

## FORM OF SALE ORDER

## SCHEDULE 1

| Debtor | Contract Counterparty | Description of Contract | Cure Amount |
|---|---|---|---|
| Powder River Transportation Services, Inc. | North Platte Agency LLC | Lease - 500 Willow Dr, Douglas, WY 82633 | $311.67[*] |
| Powder River Transportation Services, Inc. | Livingston Landlady | Lease - 210 Loves Lane Livingston MT 59047 | $733.33[*] |
| Powder River Transportation Services, Inc. | Livingston Landlady | Lease - 705 N N St., Livingston MT 59047 | $522.50[*] |
| Powder River Transportation Services, Inc. | HRT Rentals | Lease - 175 Main Boulder Road Fishing Hole 'B' | $421.67[*] |
| Powder River Transportation Services, Inc. | Kristy M Lewis | Lease - PO Box 904, Newcastle WY 82701 | $82.50[*] |
| Powder River Transportation Services, Inc. | Lone Tree Village 108 | Lease - 401 South Russel Ave #108 Gillette WY 82633 | $344.67[*] |
| Powder River Transportation Services, Inc. | Lone Tree Village 24 | Lease - 401 South Russel Ave # 24 Gillette WY 82633 | Included in Amount Above[*] |
| Powder River Transportation Services, Inc. | 4w Properties | Lease - 120 Meadowlark Street, Glenrock WY 82637 | $3,903.33 |
| Powder River Transportation Services, Inc. | Schon LLC | Lease - 7568 Hwy 59, Wright WY 82718 | $6,000 |
| Powder River Transportation Services, Inc. | St Mary's Catholic Church | Lease - 41 View Vista Dr, Livingston MT 59047 | $0 |
| Powder River Transportation Services, Inc. | HDDA- Billings, LLC | Lease - 5500 Midland Rd, Billings MT 59102 | $0 |
| Powder River Transportation Services, Inc. | Columbus 1 Re2 LLC | Lease - 602 8th Ave. North, Columbus MT 59109 | $0 |
| Powder River Transportation Services, Inc. | Montana Works | Lease - Laurel MT | $0 |
| Powder River Transportation Services, Inc. | Gasstop Two | Lease - Union Chapel Road | $3,493.33 |
| Powder River Transportation Services, Inc. | Cook Properties | Lease - 6830 Commercial Ave, Billings MT 59102 | $0 |
| Powder River Transportation Services, Inc. | Park County Fair | Lease - 46 View Vista Dr, Livingston MT 59047 | $0 |
| Powder River Transportation Services, Inc. | Beartooth Industries | Lease - 7042 Highway 212, Red Lodge MT 59068 | $0 |
| Powder River Transportation Services, Inc. | Susan Carter | Lease - 542 Broadway, Red Lodge, MT 59068 | $0 |
| Powder River Transportation Services, Inc. | Coach Properties | Lease - 1700 East Hwy. 14-16, Gillette, WY - Building | $32,845.12[**] |
| Powder River Transportation Services, Inc. | Coach Properties | Lease - 1700 East Hwy. 14-16, Gillette, WY -Parking lot "A" | $4,398[**] |
| Powder River Transportation Services, Inc. | Coach Properties | Lease - 1700 East Hwy. 14-16, Gillette, WY -Parking lot "B" | $1,600[**] |
| Powder River Transportation Services, Inc. | Coach Properties | Lease - 400 Stetson Drive (Arch Coal Parking lot) | $2,050[**] |
| Powder River Transportation Services, Inc. | Coach Properties | Lease - 1611 E 6th Street (Arch & Cloud Peak parking lot) | $1,575[**] |

[*] Cure Costs associated with these designated leases shall not be counted towards the Cure Costs Cap of $46,200.00 and shall be borne by the Purchaser.
[**] Cure Costs subject to resolution of pending informal objection.

| Debtor | Contract Counterparty | Description of Contract | Cure Amount |
|---|---|---|---|
| Powder River Transportation Services, Inc. | Coach Properties | Lease - 685 Smylie Road, Douglas, WY(Building) | $10,328.96** |
| Powder River Transportation Services, Inc. | Coach Properties | Lease - 685 Smylie Road, Douglas, WY(Parking Lot) | $1,393.17** |
| Powder River Transportation Services, Inc. | Montana Public Safety | Lease - #14 Midway Dr, Red Lodge MT 59608 | $0 |
| Powder River Transportation Services, Inc. | Peabody Powder River Services, LLC | Charter Bus Transportation Services Agreement, dated as of August 20, 2019, as amended by that certain First Amendment, dated as of July 29, 2022 | $0 |
| Powder River Transportation Services, Inc. | Peabody Powder River Services, LLC | Charter Bus Transportation Services Agreement, dated as of September 30, 2015, as amended by that certain First Amendment, dated as of January 20, 2017, and that certain Second Amendment, dated as of March 1, 2021 | $0 |
| Powder River Transportation Services, Inc. | Stillwater Mining Company d/b/a Sibanya-Stillwater | Contract #4036 (OS), executed as of March 14, 2023 | $0 |
| Powder River Transportation Services, Inc. | Navajo Transitional Energy Company, LLC | Agreement for the Supply of Products and/or Services (Contract No. P2019300I201), Statement of Work 01, effective as of February 1, 2020, and Statement of Work 02, effective as of April 1, 2022, as amended by Amendment Number 01, dated as of February 24, 2022 (Antelope Mine Contract) | $0 |
| Transportation Management Services, Inc. DBA Lenzner Coach Line. | Whiting-Turner PJ Dick JV | Whiting-Turner PJ Dick JV subcontract, dated as of July 25th, 2023 | $0 |
| Powder River Transportation Services, Inc. | Wyoming Machinery Company | Transportation Agreement, dated as of June 7, 2019 | $0 |
| Coach USA, Inc. | Bridgestone Americas Tire Operations, LLC | Agreement, dated as of August 19, 2019, Solely with respect to tires currently on the Purchased Vehicles listed on APA Schedule 2.1(q) | $0 |

- 46 -

| Debtor | Contract Counterparty | Description of Contract | Cure Amount |
|---|---|---|---|
| Butler Motor Transit, Inc | AFL-CIO and Local 298 (formerly 1931) of the Eastern States Joint Board | Memorandum of Agreement for the period 5/1/2022 – 4/30/2025 in relation to mechanics (unsigned)[4]*** | $0 |

- 47 -

*** Terms are being accepted subject to necessary changes needed to provide substantially equivalent benefits and policies to Purchaser's benefit plans and policies.

LEGAL02/44699916v5